**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTONIO SOLIS, JOSE SOLIS, and JUAN RANGEL, individually and on behalf of all others similarly situated, | ) ) ) | Case No. 20 C 2348 |
| | ) | Hon. Martha M. Pacold, |
| *Plaintiffs*, | ) ) | District Judge |
| v. | ) ) | Hon. Sunil R. Harjani, Magistrate Judge |
| HILCO REDEVELOPMENT LLC, HRE CRAWFORD LLC, HRP EXCHANGE 55 LLC, MCM MANAGEMENT CORP., MORGAN/HARBOUR LLC, HENEGHAN WRECKING & EXCAVATING CO., CONTROLLED DEMOLITIONS, INC., V3 COMPANIES, LTD., COMMERCIAL LIABILITIES PARTNERS LLC, and MARINE TECHNOLOGY SOLUTIONS LLC, | ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF |
| *Defendants*. | ) ) ) | **JURY TRIAL DEMANDED** |

**<u>FIRST AMENDED COMPLAINT</u>**

Antonio Solis, Jose Solis, and Juan Rangel, Plaintiffs, by their undersigned attorneys, on behalf of themselves and all others similarly situated, bring this class action complaint for monetary, declaratory, and injunctive relief against Defendants Hilco Redevelopment LLC, HRE Crawford LLC, HRP Exchange 55 LLC, MCM Management Corp., Morgan/Harbour LLC, Heneghan Wrecking & Excavating Co., Controlled Demolitions, Inc., V3 Companies, Ltd., Commercial Liabilities Partners LLC, and Marine Technology Solutions LLC, stating as follows:

**INTRODUCTION**

1.      In the midst of the COVID-19 pandemic causing severe respiratory illness and death worldwide, the Defendants in this lawsuit caused a smokestack to be demolished at the

Crawford Coal Power Plant in the Little Village neighborhood of Chicago, emitting a plume of toxic debris and particulate matter across the neighborhood.

2.     The Defendants' toxic plume consumed the Little Village neighborhood without warning, settling in the lungs, on the bodies, and across the property of the Little Village community, who are the Plaintiffs and Class Members in this lawsuit.

3.     The Defendants' demolition was done with blatant disregard for the safety of the community. And the Defendants conducted their demolition in violation of the rules, regulations, and customs governing the safe demolition and disposal of industrial sites.

4.     Immediately, the Defendants' toxic plume caused the residents of Little Village difficulty breathing, and it has had and will have a pronounced effect on their health in the future. In addition, the Defendants' toxic plume coated dozens of properties and personal property throughout the neighborhood, reducing their value, and requiring extensive remediation.

5.     Little Village is a largely Latino neighborhood that has long been one of the most vibrant and industrious neighborhoods in Chicago. But despite its cultural and economic contributions to the city, the residents of Little Village have long been victims of environmental injustice. The Defendants' recent demolition at the Crawford Coal Power Plant is the latest in this long line of environmental harms inflicted on the residents of Little Village, and it is an incident that would not have occurred in the white neighborhoods on the north side of Chicago.

6.     Plaintiffs bring this action for monetary, declaratory, and injunctive relief to redress the harms that they have suffered and that they will continue to suffer in the future.

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between the Parties and Class Members in this action, the

aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and there are 100 or more members of the Classes. The named Plaintiffs and many other Class Members are individuals who are citizens of Illinois, and at least two of the Defendants are citizens of other states. Namely, Controlled Demolitions, Inc. is a Maryland corporation with its principal place of business in Maryland, and MCM Management Corp. is a Michigan corporation with its principal place of business in Michigan.

8.    In addition, this Court has jurisdiction of the federal claims pursuant to 28 U.S.C. §1331, and supplemental jurisdiction of the state-law claims pursuant to 28 U.S.C. § 1367.

9.    Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred in the Northern District of Illinois.

## PARTIES

### A.    The Named Plaintiffs

10.    Plaintiff Antonio Solis is a resident of, and property owner in, the Little Village neighborhood. Mr. Solis is a citizen of Illinois. He was in his house when the dust cloud descended, coating the entire neighborhood and seeping into his home. The dust was so widespread that he felt it in his mouth. He later experienced headaches when he went outside, as well as a sore throat. And as an older man, he is fearful that the dust will endanger his health. He is afraid to clean the dust in his home because he does not know what chemicals it might contain.

11.    Plaintiff Jose Solis is a resident of the Little Village neighborhood and a citizen of Illinois. Mr. Solis witnessed the immediate aftermath of the demolition from his home as an enormous, dense cloud of dust spread rapidly toward his house. The cloud, in which Solis saw particles resembling ash, remained so dense that for more than ten minutes he could hardly see outside and left a thick residue in and around his home. From his time working as a security

guard at Crawford Coal, Solis believes that the plant building contained potentially harmful substances, and for days after the incident he kept his child from going outside for fear that he would become sick. Solis and his father, who has health issues, were afraid even to clean up the dust residue because they feared exposure to dangerous toxins.

12.     Plaintiff Juan Rangel is a resident of, and property owner in, the Little Village neighborhood and a citizen of Illinois. He has been actively involved in the Little Village community for more than thirty years. After visiting his brother who had fallen ill with coronavirus, Mr. Rangel returned to his home in Little Village and saw that the remnants of the dust cloud coated his entire block. Mr. Rangel was not aware that the demolition was planned for that day despite his extensive connections with other community members, and he first saw the notice of the demolition only after it occurred. He and the other community members he has spoken to are fearful of the health consequences that will follow from the demolition, particularly because many people in the community, including older people, spend considerable time outside on Saturdays, the day that the demolition occurred. He is afraid to attempt to clean up the dust or even spend time working outside because he does not know whether doing so will put his health in further danger.

**B.     The Defendants**

13.     Defendant HILCO REDEVELOPMENT LLC is an Illinois company that acquires and redevelops real estate properties. It owns the now-shuttered Crawford Coal Power Plant and the land on which it was situated in 2017.

14.     Defendant HRE CRAWFORD LLC is an Illinois company. On information and belief, HRE CRAWFORD LLC is a subsidiary, affiliate, or partner of Hilco Redevelopment directly concerned with the redevelopment of the Crawford Coal Power Plant. In filings with the

4

State of Illinois and the Chicago Department of Public Health, HRE CRAWFORD LLC is listed as the owner of the site.

15.    Defendant HRP EXCHANGE 55 LLC is an Illinois company. On information and belief, HRP EXCHANGE 55 LLC is a subsidiary, affiliate, or partner of Hilco Redevelopment directly concerned with the redevelopment of the Crawford Coal Power Plant. In March 2020 permit for work at the Crawford Coal Plant, HRP EXCHANGE 55 LLC is listed as the owner of the site.

16.    Defendant MCM MANAGEMENT CORP. is a Michigan corporation with its principal place of business in Michigan. MCM MANAGEMENT CORP. provides demolition services. On information and belief, one or more of the Defendants hired MCM MANAGEMENT CORP. to oversee the demolition and disposal at the Crawford Coal Power Plant.

17.    Defendant MORGAN/HARBOUR LLC is an Illinois company that provides general contracting services. MORGAN/HARBOUR LLC is the general contractor for the redevelopment of the Crawford Coal Power Plant.

18.    Defendant HENEGHAN WRECKING & EXCAVATING CO. is an Illinois corporation that provides demolition services. On information and belief, HENEGHAN WRECKING & EXCAVATING CO. contracted with one or more other Defendants to perform the demolition and disposal at the Crawford Coal Power Plant.

19.    Defendant CONTROLLED DEMOLITIONS, INC. is a Maryland corporation with its principal place of business in Maryland. CONTROLLED DEMOLITIONS, INC. provides demolition services and, on information and belief, CONTROLLED DEMOLITIONS,

INC. contracted with one or more other Defendants to perform the demolition and disposal at the Crawford Coal Power Plant.

20.     Defendant V3 COMPANIES, LTD. is an Illinois company that provides engineering, contracting, environmental planning, and surveying services. On information and belief, V3 COMPANIES was heavily involved in planning and carrying out the redevelopment of the Crawford Coal Power Plant, including the demolition of the existing structures.

21.     Defendant COMMERCIAL LIABILITY PARTNERS, LLC is a Florida company that provides environmental risk and liability management services for property redevelopment services. COMMERCIAL LIABILITY PARTNERS, LLC is partnered with one or more other Defendants in the redevelopment of the Crawford Coal Power Plant.

22.     Defendant MARINE TECHNOLOGY SOLUTIONS, LLC, based in Selinsgrove, PA., is a construction management and environmental safety consulting firm and one of the contractors hired to work onsite at the Crawford Coal Power Plant.

## FACTS

### A.     The Little Village Community

23.     Little Village is a neighborhood on Chicago's southwest side. It has been a majority-Latino neighborhood for more than 40 years and is home to the largest Mexican and Mexican-American communities in the Midwest.

24.     The 26th Street corridor in Little Village generates the second-most revenue and sales tax of any shopping district in the entire city, after the Magnificent Mile in downtown Chicago. Customers spend $900 million a year at the 500 businesses that make up this commercial district.

25.    Unfortunately, Little Village has also suffered from a long history of serious environmental degradation caused by a variety of heavily polluting industrial sites.

26.    As of 2013, Little Village also had the least green space per capita of any neighborhood in Chicago, with its tens of thousands of residents sharing a single park. This changed in 2014 with the opening of La Villita Park, which occupies the site of a former industrial brownfield polluted by Celotex Corp. that had been designated a Superfund Site by the Environmental Protection Agency.

27.    The remediation of the heavily contaminated Celotex Superfund Site and its conversion into La Villita Park is only one of many hard-fought victories won by the long-standing community activist group Little Village Environmental Justice Organization (LVEJO), which has taken on many other sources of dangerous pollution and chemical exposure in the neighborhood, including the Winter Metals smelter, Waste Management Inc.'s Waste Transfer Station, and the site at the center of this suit, the Crawford Coal Plant.

28.    As described below, the closure of the Crawford Coal Plant was supposed to represent the end of a major and deadly source of pollution in the neighborhood. Instead, the Defendants' actions have caused the very chemicals from the Crawford Coal Plant that LVEJO and the Little Village community worried about for years to blanket residents, homes, businesses, and open spaces.

**B.     The Crawford Coal Plant Has Been A Years-Long Health Hazard**

29.    The Crawford Coal Plant was a coal-fired electric-generating plant that began to operate at its location on the 3500 block of South Pulaski Road in 1924.

30.    By 2011, the Crawford Coal Plant was one of only two large coal plants in operation anywhere in the United States within the boundaries of a major city. The reason that

such plants were not operated within densely populated areas in the United States is because they generate harmful particulate matter and a long list of dangerous chemicals.

31. Among other things, the Crawford Coal Plant, like other coal-fired power plants, generated, discharged, or emitted mercury, sulfur dioxide, nitrogen oxides, and lead. Moreover, coal-fired power plants are a tremendous source of radiation. The burning of coal produces fly ash, and a typical coal plant produces fly ash containing five to ten tons of uranium and thorium per year. Community members and local officials have expressed concern about asbestos at the Crawford Coal Plant site.

32. At least as recently as 2019, on-site soil inspections have revealed the continuing presence of a wide range of contaminants at levels that present a potential hazard to human health if inhaled or ingested. Such contaminants include but are not limited to mercury, lead, arsenic, polychlorinated biphenyls (PCBs), and total petroleum hydrocarbons (TPHs), a class of chemicals known to cause respiratory problems, cancer, and permanent damage to the nervous system.

33. Pollutants from the Crawford Coal Plant imposed extreme health consequences on the Little Village community during the years that the facility operated. In 2012, LVEJO finally succeeded in closing the Crawford Coal Plant, and the group has been fighting for remediation of the site since that time.

34. In 2017, Defendant Hilco purchased the Crawford Coal Plant, and it set about building a warehouse on the site. The demolition and disposal of the smokestack at the Crawford Coal Plant was performed as part of Defendant Hilco's building project.

35. LVEJO as well as other community groups repeatedly expressed concerns about the Crawford Coal Plant redevelopment project, including concerns about how toxic waste and

chemicals would be contained during the remediation, demolition, and redevelopment process. LVEJO also expressed concerns about air monitoring during the demolition. Defendants repeatedly reassured the community that they had plans in place to ensure that dust would be properly suppressed during the demolition and that the neighborhood's air quality would not be affected.

**C.      The Defendants Cut Corners Demolishing the Crawford Coal Plant**

36.      The Defendants worked collectively to demolish and dispose of the smokestack at the Crawford Coal Plant on April 11, 2020.

37.      The demolition and disposal were an unmitigated disaster.

38.      It was a disaster because of the Defendants' wrongful conduct.

39.      Among other things, the Defendants did not follow the rules, regulations, or customs governing the demolition and disposal of industrial sites.

40.      The Defendants did not take measures to prevent the ejection of debris and particulate matter from the Crawford Coal Plant during their demolition and disposal.

41.      The Defendants did not put in place measures to stop the spread of debris and particulate matter resulting from its demolition and disposal across the community.

42.      The Defendants did not take measures to protect the Little Village community from the spread of debris and particulate matter resulting from its demolition and disposal.

43.      The Defendants made false promises about how the demolition and disposal would proceed and it did not adhere to those promises.

44.      The Defendants gave no notice of their demolition and disposal to the Little Village community.

45.     Defendants failed to give proper warnings to the Little Village community about risks of the demolition and disposal to their health.

46.     Defendants failed to give proper warnings to the Little Village community about steps they should be prepared to take to mitigate harm to themselves in the event of a toxic release in the demolition and disposal.

47.     Instead, the Defendants intentionally misled residents, cut corners that prevented the demolition from occurring safely, and then proceeded with their plainly unsafe demolition and disposal during Easter weekend in the middle of a pandemic.

**D.      The Defendants' Toxic Plume**

48.     On the morning of April 11, the Defendants toppled the smokestack at the Crawford Coal Plant.

49.     Immediately after the smokestack fell, a toxic plume enveloped the Little Village community.

50.     In the words of the Mayor of the City of Chicago, "A massive plume of dust drifted across [the] area, dropping dirt and particulate matter across homes, cars, businesses, trees and every other inch of this community."

51.     The following sampling of photographs of the scene show the on-the-ground reality of the dense plume covering the Plaintiffs' and Class Members' neighborhood:







52.     A video recording of the demolition and the resulting toxic plume is available

here: https://www.nbcchicago.com/top-videos-home/drone-video-shows-demolition-that-

blanketed-little-village-in-dust/2254805/.

53.     The following is a still image from that video, showing the plume's spread over

the neighborhood:



54. Large-scale demolitions like the one performed by the Defendants cause particulate matter to spread widely through the surrounding environment even in normal circumstances. The Defendants' implosion of the Crawford Coal Plant smokestack released a cloud containing particulate matter that raised the air quality index from 50 (good) to 155 (unhealthy) within hours. As the images above show, the particulate matter spread a wide radius from the demolition site.

55. Given the historical pollution of the Crawford Coal Plant site with hazardous compounds including mercury, sulfur dioxide, nitrogen oxide, lead, asbestos, uranium, thorium, and TPHs, given that 2019 inspections revealed potentially hazardous levels of contaminants including mercury, lead, arsenic, polychlorinated biphenyls (PCBs), and total petroleum hydrocarbons (TPHs), and given that the force of the demolition discharged soil particles, some or all of these materials were present in the cloud of particulate matter that enveloped the Little Village community starting on April 11.

56. Plaintiffs have not been advised as of the time of filing what amounts or concentrations of these compounds were present in the plume of debris and particulate matter that they inhaled and that now coats their community.

57. Nonetheless, even at this early stage, there can be no doubt that Defendants significantly mishandled the demolition.

58. Following the demolition, the City of Chicago issued 16 citations and fined Defendants $68,000.

59. Following the demolition, Defendant Hilco submitted an Incidence of Noncompliance to the Illinois Environmental Protection Agency.

60.     Following the demolition, the Illinois Environmental Protection Agency referred an enforcement against Defendants to the Illinois Attorney General for violations of the Illinois Environmental Protection Act and Illinois Pollution Control Board Regulations.

61.     Hilco Redevelopment Partners has now admitted that the demolition was not properly planned, with its CEO stating that "the measures that were to be implemented were not sufficient to contain the dust that migrated off-site" and further stating that the result was "unacceptable."

62.     Hilco Redevelopment Partners fired MCM Management Corp. as a result of the botched demolition.

63.     Moreover, although Hilco has publicly represented that it will clean up the debris for certain residents of Little Village, it has failed to do so as of the filing of this complaint, and its proposed plan is woefully inadequate in any event, covering only a small fraction of the affected area.

**E.     Plaintiffs' and Class Members' Injuries and Damages**

64.     The Defendants' misconduct created an unjustifiable risk to public health and caused incalculable harm to the Plaintiffs and Class Members.

65.     The Little Village neighborhood was particularly vulnerable to the health consequences of the Defendants' actions. A 2002 study linked the pre-existing pollution in the community to an abnormal and large increase in premature deaths, increased emergency room visits, and asthma attacks. In addition, Little Village faces the established health disparities resulting from the fact that it is a majority-minority neighborhood. These disparities have made the Little Village community one of the hardest-hit in the entire city during the COVID-19 pandemic.

66.     In the immediate aftermath of the demolition, many community members had serious difficulty breathing. In addition, exposure to particulate matter can cause medical issues ranging from irritation to the eyes, nose and throat to lung irritation, lung tissue inflammation, increased susceptibility to viral and bacterial pathogens, and in some cases death. This is true for otherwise healthy people, and all the effects can be more severe for individuals with pre-existing heart or respiratory problems.

67.     When particulate matter arises from the demolition or collapse of concrete, it also contains crystalline silica, a compound that can cause serious, sometimes fatal lung diseases if inhaled in sufficient quantities. Such effects have been associated with first responders present on the site of the World Trade Center collapse in New York City on Sep. 11, 2001.

68.     While the release of any quantity of particulate matter at this scale is a serious public health concern, this particular site is known to have been contaminated with the toxic compounds discussed above. Whether from the buildings themselves, discharged soil particles, or any other aspect of the site disturbed by the demolition, the release of such harmful contaminants into the air poses an additional and acute health risk to the community.

69.     In this case, the health risks were increased because the Defendants conducted their negligent demolition during the COVID-19 pandemic.

70.     While some residents of Little Village already began experiencing the effects of the Defendants' toxic plume, many more will discover the full extent of their injuries only in the months and years to come as the long-term medical implications of the Defendants' misconduct become clear.

71.     Even the individuals who may appear to avoid serious illness in the short term will need to have their condition carefully monitored now and in the future.

72.     In addition to the serious health risks that the Defendants' misconduct created, the dust cloud has caused distress, nuisance, and property damage. Community members already grappling with the fear of an unprecedented pandemic have been burdened with the uncertainty that their health may now be in even greater danger than before.

73.     Property owners and individuals with an interest in property in Little Village must also contend with the physical damage caused by the dust cloud. Particulate matter causes pervasive damage to materials. Fine particle dust has coated the entire community and will require massive clean-up efforts to remove. In some cases, rainfall following the demolition may have caused the hazardous dust to seep into the soil of individual yards and community spaces. The dust has even penetrated inside the homes of community members, requiring significant cleaning just to make those residences safe and habitable.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23, seeking damages and equitable relief on behalf of the following Classes for which Plaintiffs seek certification:

a.      All persons, property owners, lessees and businesses whose property received particulate matter from the toxic plume from the demolition and disposal of the smokestack at the Crawford Coal Plant (the "Property Class"); and

b.      All persons present in the area containing particulate matter from the toxic plume created by the demolition and disposal of the smokestack at the Crawford Coal Plant from April 11, 2020 until the particulate matter has been completely remediated (the "Resident Class").

75.     Excluded from the Classes are the Defendants and any judge or court personnel assigned to this case and members of their immediate families.

76.     Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division after having had an opportunity to conduct discovery.

77.     **Numerosity**. Consistent with Rule 23(a)(1), the Classes are so numerous that joinder of all members is impracticable. While Plaintiffs do not know the exact number of members of the Classes, tens of thousands of people live in Little Village alone and thousands of pieces of real and personal property were affected. Class Members may be identified through objective means, including objective data available to the Parties regarding the persons and property present in the affected areas following the demolition and disposal. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice.

78.     **Commonality and predominance**. Common questions of law and fact exist as to all Class Members. These common questions of law or fact predominate over any questions affecting only individual members of the Classes. Common questions include, but are not limited to the following:

a.      Whether the Defendants engaged in wrongful conduct as alleged herein;

b.      Whether the Defendants conducted their demolition and disposal at the Crawford Coal Plant in violation of rules, regulations, and customs;

c.      Whether the Defendants caused the release of toxic particulate matter into the Little Village Community during their demolition and disposal at the Crawford Coal Plant;

d.      Whether the Defendants violated permits issued by the City of Chicago;

e.      Whether the Defendants failed to use the appropriate standard of care in conducting their demolition;

f.  Whether the Defendants omitted required, reasonable, or minimal safety measures when conducting their demolition and disposal;

g.  Whether the Defendants engaged in ultrahazardous activities;

h.  Whether the Defendants were negligent;

i.  Whether the Defendants inflicted emotional distress on the Plaintiffs and Class Members;

j.  Whether the Defendants created a nuisance in conducting their demolition and disposal;

k.  Whether the Defendants engaged in discrimination based on the Plaintiffs' and Class Members' race;

l.  Whether Plaintiffs and Class Members suffered injury and damages to their persons as a result of Defendants' conduct;

m.  Whether Plaintiffs and Class Members suffered injury to their property interests as a result of Defendants' conduct;

n.  Whether Plaintiff and Class Members are entitled to damages, equitable relief and other relief.

79.  **Typicality**. Plaintiffs' claims are typical of the claims of the Classes they seek to represent because Plaintiffs and all members of the proposed Classes have suffered similar injuries as a result of the same conduct alleged herein. Plaintiffs have no interests to advance adverse to the interests of the other members of the Classes.

80.  **Adequacy**. Plaintiffs will fairly and adequately protect the interests of Classes and have retained as their counsel attorneys experienced in class actions and complex litigation.

81.     **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. Moreover, individual litigation of the legal and factual issues of the case would increase the delay and expense to all parties and the court system. A class action, however, presents far fewer management difficulties and provides the benefit of single adjudication, economy of scale and comprehensive supervision by a single court.

82.     In the alternative, the proposed classes may be certified because:

a.      The prosecution of separate actions by each individual Class Member would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Defendants;

b.      The prosecution of individual actions could result in adjudications that, as a practical matter, would be dispositive of the interests of non-party Class Members or which would substantially impair their ability to protect their interests; and

c.      Defendants acted or refused to act on grounds generally applicable to the proposed classes, thereby making final and injunctive relief appropriate with respect to Class Members.

83.     Pursuant to Rule 23(c)(4), particular issues are appropriate for certification—namely those described in paragraph 78 above—because resolution of such issues would advance the disposition of the matter and the parties' interests therein.

## CLAIMS

### COUNT I
### Strict Liability for Ultrahazardous Activity

84.     Plaintiffs incorporate by reference their allegations in the paragraphs set out above as though they were fully set forth herein.

85.     One or more of the Defendants directly engaged in the demolition and disposal at the Crawford Coal Plant site by way of planning and implementing the demolition and disposal that occurred on April 11, 2020.

86.     Defendants' actions surrounding the demolition and disposal at the Crawford Coal Plant site presented a high degree of risk of harm to the residents of and near Little Village, including the named Plaintiffs and Class Members, and their property. As described throughout this Complaint, the residents in and near Little Village, including the named Plaintiffs, had little warning, if any, that the demolition and disposal was going to occur. The residents in and near Little Village, including the named Plaintiffs and Class Members, had absolutely no warning that the demolition and disposal would occur in the manner that Defendants conducted it, and which included toxic debris and particulate matter being released into their community.

87.      The manner in which the demolition and disposal occurred, as detailed throughout this Complaint, outweighed any potential value of removing the smokestack, particularly at a time when the link between poor respiratory health and COVID-19 is a matter of heightened concern.

88.     Defendants are strictly liable for the injuries that occurred to the residents of Little Village, including the named Plaintiffs in this matter.

89.     Defendants are strictly liable for the property damage that occurred to the residents of Little Village, including the property damage claimed by the named Plaintiffs in this matter.

**COUNT II**
**Negligence**

90.     Plaintiffs incorporate by reference their allegations in the paragraphs set out above as though they were fully set forth herein.

91.     Each of the Defendants knew or should have known of the toxicity of the substances they were releasing into the neighborhood, the harmfulness of those substances and particulate matter generally to human life and health, and the high likelihood that the neighborhood-wide spread of such substances would result in serious damage to and diminution in the value and enjoyment of the affected property.

92.     Each of the Defendants knew or should have known of the close proximity of the Plaintiffs' properties and residences to the Crawford Coal Plant site.

93.     Each of the Defendants knew or should have known that the demolition and disposal would generate large amounts of dust laden with harmful substances, that such dust would be geographically disseminated by wind, and that such dust would likely be carried to the Plaintiffs' properties and residences and expose the Plaintiffs if not adequately controlled. Defendant Hilco assured Little Village residents in a "Dear Neighbor" letter that those adequate controls would be in place, making clear that Defendants understood them to be necessary. "Protecting the health and safety of the Little Village community and local workers is very important and our top priority," Hilco wrote. "That's why we have watering trucks, water cannons, misting systems, fence liners, and other efforts on site to help control dust generated by demolition or construction activities on site."

94. Additionally, and/or alternatively, the Defendants were negligent in choosing the method of demolition and disposal given the risks that method posed.

95. Each of the Defendants had a duty to prevent the release of such dust and particulate matter from the Crawford Coal Plant site. Defendants owed Plaintiffs and Class Members a duty of care, given that they are residents of and individuals with property interests in the very neighborhood for whose benefit Defendants' remediation work is taking place.

96. Each of the Defendants had a duty to promptly respond to known release of such dust in a manner which would prevent further exposure to the harmful substances contained therein, and otherwise protect Plaintiffs and their properties from the harmful effects of exposure and contamination.

97. Each of the Defendants breached these duties by disregarding the requisite standard of care in conducting the demolition and disposal, thus causing uncontrolled discharges of dangerous dust into the environment and disposal of unknown quantities of harmful, toxic substances on the Plaintiffs' properties.

98. Each of the Defendants also breached its duty to timely warn Plaintiffs of the threatened and actual contamination of Plaintiffs' properties and the risk of personal harm due to the Defendants' discharge of such dust.

99. As a result of Defendants' negligent acts, Plaintiffs suffered physical and emotional injuries, and other grievous and continuing damages as set forth above.

## COUNT III
## Negligent Infliction of Emotional Distress

100. Plaintiffs incorporate by reference their allegations in the paragraphs set out above as though they were fully set forth herein.

101.    Defendants owed Plaintiffs and Class Members a duty of care, given that they are residents of and individuals with property interests in the very neighborhood for whose benefit Defendants' remediation work is taking place.

102.    Defendants' conduct in carrying out the demolition and disposal fell far below the applicable standard of care required for such sensitive and dangerous actions. Defendants' conduct caused the uncontrolled discharge of dust laden with harmful substances, thus causing Plaintiffs to be exposed to that particulate matter in their own home, endangering their health and further causing such matter to be disposed on the Plaintiffs' properties.

103.    As a direct result of such exposure and disposal, Plaintiffs have suffered severe emotional distress, causing them to alter their normal practices and behavior, and causing them to constantly worry that their health has been impaired, and that their lives may be cut short.

104.     Immediately after the incident, the Defendants acknowledged that their misconduct, in the midst of a pandemic, caused anxiety and stress across the neighborhood.

**COUNT IV**
**Nuisance**

105.    Plaintiffs incorporate by reference their allegations in the paragraphs set out above as though they were fully set forth herein.

106.    Defendants' demolition and disposal of the Crawford Coal Plant site caused the uncontrolled discharge of dust laden with harmful substances, which invaded the Plaintiffs' properties. Plaintiffs did not consent to the entry of such materials onto their properties.

107.    Defendants knew or should have known that they caused the disposal and invasion of harmful dust on the Plaintiffs' properties but have failed to remove such material from the Plaintiffs' properties.

108.     Defendants' uncontrolled discharge of the harmful dust and the disposal and invasion thereof onto the Plaintiffs' properties is unreasonable and unlawful. Such discharge, disposal and invasion have substantially interfered with the lawful rights of Plaintiffs to use and enjoy their properties and constitute a private nuisance.

109.     Such discharge, disposal and invasion have injured Plaintiffs and Plaintiffs seek damages for these injuries. Plaintiffs also seek injunctive relief, as described below.

## COUNT V
## Trespass

110.     Plaintiffs incorporate by reference their allegations in the paragraphs set out above as though they were fully set forth herein.

111.     Defendants' demolition and disposal caused the uncontrolled discharge of dust laden with harmful substances, which invaded the property in which the Plaintiffs' and Class Members have an interest. Plaintiffs did not consent to the entry of such dust onto their properties.

112.     Defendants are aware that they caused the disposal and invasion of such harmful dust on the Plaintiffs' properties but have failed to remove the dust from the properties.

113.     Defendants' uncontrolled discharge of such dust and the disposal and invasion thereof onto the Plaintiffs' Properties is unreasonable and unlawful. Such discharge, disposal and invasion have substantially interfered with the lawful rights of Plaintiffs to use and enjoy their properties and constitute an unlawful trespass.

## COUNT VI
## Assault & Battery

114.     Plaintiffs incorporate by reference their allegations in the paragraphs set out above as though they were fully set forth herein.

115.    The manner in which the demolition and disposal of the Crawford Coal Plant site was conducted on April 11, 2020, released dust and other particulate matter into the Little Village community. Residents of Little Village, including the named Plaintiffs and Class Members, were forced to breathe the dust and particulate matter. This action, taken willfully by the Defendants in a manner described more fully throughout this Complaint, constituted contact by the Defendants to which Plaintiffs did not consent.

116.    In addition, this action, taken willfully by the Defendants in a manner described more fully throughout this Complaint, caused Plaintiffs to be in reasonable apprehension of an imminent, offensive contact with their persons to which they did not consent.

117.    As a result of this harmful contact, Plaintiffs suffered damages, as described above.

## COUNT VII
## Medical Monitoring

118.    Plaintiffs incorporate by reference their allegations in the paragraphs set out above as though they were fully set forth herein.

119.    Defendants' demolition and disposal caused contaminants to be released into the air through a toxic plume of dust. The contaminants released are known to cause respiratory problems, cancer, and permanent damage to the nervous system, among other conditions.

120.    Defendants' demolition and disposal released these contaminants into the air at the height of the COVID-19 pandemic in the City of Chicago. The COVID-19 virus attacks the respiratory function of individuals and causes severe respiratory distress, leading to a heightened risk of death, particularly in those with underlying health conditions.

121.    Due to inadequate notice of the demolition and disposal, as well as the sheer extent of the dust cloud, there was no way for the Plaintiffs to avoid inhaling or ingesting the contaminants.

122.    As a result of the Defendants' misconduct, significant harm was done to the health and well-being of the Plaintiffs notwithstanding any latent manifestation of that harm.

123.    Defendants knew or should have known that the sudden plume of dust and continued exposure to the contaminants caused Plaintiffs harm and increased Plaintiffs' risks of further pain and suffering from serious medical conditions.

124.    The need for medical monitoring and testing is the result of the exposure to chemicals produced and released by Defendants. The medical monitoring regime should include but should not be limited to testing of the air and soil to determine the contaminants for better treatment options, including a timely disclosure of all testing results to community organizations.

125.    The medical monitoring will mitigate the harmful effects caused by Defendants' misconduct.

## COUNT VIII
### Title VI

126.    Plaintiffs incorporate by reference their allegations in the paragraphs set out above as though they were fully set forth herein.

127.    On information and belief, one or more Defendants receive federal financial assistance.

128.    These Defendants have maintained an intentionally discriminatory system by deliberately exposing Plaintiffs and Class Members to the needlessly high risk of dangerous particulate matter in and around their homes during a global pandemic, knowing that it could and

would result in widespread serious damage, whereas Defendants did not plan or carry out any similarly dangerous demolitions in predominantly white neighborhoods.

129.    These Defendants knew Little Village residents were particularly vulnerable to the health consequences of their misconduct. For decades, Little Village residents have lived in dangerous proximity to toxic sites and factories that contaminate the area. Furthermore, brownfield sites, abandoned properties, toxic waterways, and dilapidated infrastructure contribute to health disparities and limit opportunities for healthy activities that are safe and accessible.

130.    Given the clear difference in the treatment between the Little Village neighborhood and other similarly situated white neighborhoods, the deliberate and intentional decisions and actions of these Defendants in deliberately exposing Plaintiffs and Class Members to dangerous particulate matter was the product of racial discrimination in violation of Title VI. If Plaintiffs' community had been predominately white, Plaintiffs and Class Members would have been treated in the same manner as their predominantly white neighbors in Chicago and this incident would not have occurred.

131.    Studies, such as a 2002 Harvard School of Public Health study, have found that Little Village residents, who are majority Latino, did not enjoy the same degree of protection from environmental and health hazards as that provided to other communities.

132.    Title VI provides that no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

133.    The foregoing misconduct constitutes intentional discrimination on the basis of race, color, or national origin, with respect to participation in a program receiving federal financial assistance, which is prohibited by Title VI.

134.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of Plaintiffs' and the Class Members' rights.

135.    As a result of Defendants' misconduct described above, Plaintiffs' rights have been and continue to be violated. Plaintiffs have suffered and continue to suffer damages, including physical, emotional, and economic injuries including distress, nuisance, property damage, and other grievous and continuing damages as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Antonio Solis, Jose Solis, and Juan Rangel, on behalf of themselves and on behalf of all Class Members, respectfully seek the following relief:

136.    Certification of the Classes as requested herein;

137.    Appointment of Plaintiffs as Class representatives and their undersigned counsel as Class counsel;

138.    An award of damages to Plaintiffs and members of the proposed Classes;

139.    An award of pre-judgment and post-judgment interest to Plaintiffs and members of the proposed Classes as permitted by law;

140.    An award of reasonable attorneys' fees and costs of suit, including expert witness fees, to the Plaintiffs and proposed Classes; and

141.    Equitable, injunctive, and declaratory relief to the Plaintiffs and proposed Classes requiring the Defendants to:

a. Provide all Little Village residents with particulate masks;

b. Provide all Little Village residents with high efficiency particulate air filters for their homes;

c. Conduct immediate testing and sampling of the air and residual dust to detect the presence of toxins and other chemicals potentially hazardous to human health;

d. Immediately and publicly disclose all information regarding the toxins and other compounds (i.e., the stack constituents) that comprised the plume;

e. Institute perimeter particulate matter monitoring at the fence line of the demolition site;

f. Install additional air quality monitors in all affected areas;

g. Stop work on demolitions and any construction activities until a revised containment plan has been presented to the Little Village community and approved by the community and the City;

h. Appoint monitors to supervise and enforce the containment plan prior to resuming demolition and construction activities;

i. Provide a full cleanup of all affected residences, businesses, and common areas;

j. Sweep the streets in all affected areas with sweepers that are $PM_{10}$ and $PM_{2.5}$ certified;

k. Wash the exterior of buildings in all affected areas;

l. Wash the streets and sidewalks in all affected areas;

m. Coordinate with the Chicago Bureau of Forestry to increase leaf coverage in the Little Village community before resuming demolition and construction activities;

n.      Provide alternative housing for Little Village residents for the duration of the cleanup process; and

o.      Provide funds for an independent third-party assessor to evaluate and provide estimates to Little Village property owners regarding property damage and diminution in property value.

142.    Any and all additional relief that the Court deems just and proper.

**JURY TRIAL DEMAND**

143.    Plaintiffs demand a jury trial on all claims so triable.


DATED: April 24, 2020                              RESPECTFULLY SUBMITTED,

                                        BY:   /s/ Steve Art
                                              *One of Plaintiff's Attorneys*

Jon Loevy
Michael Kanovitz
Steve Art
Scott Rauscher
Cindy Tsai
Julie Goodwin
Danielle Hamilton
Renee Spence
John Hazinski
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
steve@loevy.com