LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## COURT REPORTERS

NO. 20 CV 2348

ANTONIO SOLIS, JOSE SOLIS, AND JUAN RANGEL, INDIVIDUALLY

AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED

V.

HILCO REDEVELOPMENT LLC, ET AL.

-------------------------------------------------------------------

CASE NO. 2020 L 004286

ESTATE OF FERNANDO CANTU HINOJOSA, JR.

KATHRYN RAMIREZ-MERCADO AND KIMBERLY RAMIREZ-MERCADO

V.

HRE CRAWFORD, LLC, ET AL.

DEPONENT:  RAYMOND ZUKOWSKI

DATE: FEBRUARY 6, 2023



✉ schedule@kentuckianareporters.com
☎ 877.808.5856  |  502.589.2273

www.kentuckianareporters.com

1   IN THE UNITED STATES DISTRICT COURT FOR THE
   NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
2      HON. MARTHA M. PACOLD,
       DISTRICT JUDGE
3      HON. SUNIL R. HARJANI,
      MAGISTRATE JUDGE
4      NO. 20 CV 2348

5

ANTONIO SOLIS, JOSE SOLIS, AND JUAN RANGEL, INDIVIDUALLY
6     AND ON BEHALF OF ALL
     OTHER SIMILARLY SITUATED,
7      Plaintiffs

8
       V.
9

10 HILCO REDEVELOPMENT LLC, HRE CRAWFORD LLC, HRP EXCHANGE
     55 LLC, MCM
11  MANAGEMENT CORP., CONTROLLED DEMOLITION, INC., AND
     MARINE TECHNOLOGY
12     SOLUTIONS LLC,
     Defendants

13

14      AND

15

   JENKINS ENVIRONMENTAL SERVICES,
16    Third-Party Defendant

17

18

19

20

21

22

23

24 DEPONENT: RAYMOND ZUKOWSKI
  DATE:   FEBRUARY 6, 2023
25 REPORTER: LINDSAY LARSON-TODD



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
 1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
               COUNTY DEPARTMENT, LAW DIVISION
 2            HON. CATHERINE A. SCHNEIDER
               CASE NO. 2020 L 004286
 3
 4              CONSOLIDATED WITH:
          NO. 2021 L 004461 ALEJANDRO AND CARMEN ABUANZA
 5            NO. 2021 L 004467 CELIA GOMEZ
              NO. 2021 L 000461 ELIZABETH CRUZ
 6            NO. 2022 L 000462 MARIA MONTES
              NO. 2022 L 000463 RAUL MONTES JR.
 7            NO. 2022 L 003289 MIGUEL GUAJARDO
               NO. 2022 L 001659
 8        ESTATE OF FERNANDO CANTU HINOJOSA, JR.
 9    KATHRYN RAMIREZ-MERCADO AND KIMBERLY RAMIREZ-MERCADO,
                      Plaintiffs,
10
11                    V.
12
          HRE CRAWFORD, LLC, HILCO REDEVELOPMENT, LLC, MCM
13    MANAGEMENT CORP., HRP EXCHANGE 55, LLC and CONTROLLED
                   DEMOLITION, INC.,
14                  Defendants
15
16
17
18
19
20
21
22
23
24   DEPONENT:  RAYMOND ZUKOWSKI
     DATE:      FEBRUARY 6, 2023
25   REPORTER:  LINDSAY LARSON-TODD
```

Page 3

```
 1                APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFFS, ANTONIO SOLIS, JOSE SOLIS,
 4   AND JUAN RANGEL:
 5   Danielle Hamilton, Esquire
 6   Loevy & Loevy
 7   311 North Aberdeen Street
 8   Third Floor
 9   Chicago, Illinois 60607
10   Telephone No.: (312) 243-5900
11   E-mail: hamilton@loevy.com
12   (Appeared via Videoconference)
13
14   ON BEHALF OF THE PLAINTIFFS, KATHRYN RAMIREZ-MERCADO AND
15   KIMBERLY RAMIREZ-
16   MERCADO:
17   Sean Driscoll, Esquire
18   Driscoll Law Group
19   22 West Washington Street
20   Suite 1500
21   Chicago, Illinois 60602
22   Telephone No.: (312) 818-4823
23   E-mail: spd@driscolllawgroupllc.com
24   (Appeared via Videoconference)
25
```

Page 4

```
 1              APPEARANCES (CONTINUED)
 2
 3   ON BEHALF OF THE PLAINTIFF, ESTATE OF FERNANDO CANTU
 4   HINOJOSA, JR.:
 5   Carrie Cotter, Esquire
 6   Stephanie Weissman, Esquire
 7   Greg Strellis, Esquire
 8   Strellis Firm Law Offices
 9   444 North Wells Street
10   Suite 404
11   Chicago, Illinois 60654
12   Telephone No.: (312) 201-0000
13   E-mail: sweissman@strellislaw.com
14         ccotter@strellislaw.com
15         gstrellis@strellislaw.com
16   (Appeared via Videoconference)
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              APPEARANCES (CONTINUED)
 2
 3   ON BEHALF OF THE DEFENDANT, MCM MANAGEMENT CORP.:
 4   Edward A. DeVries, Esquire
 5   Wilson Elser Moskowitz Edelman Dicker LLP
 6   55 West Monroe Street
 7   Suite 3800
 8   Chicago, Illinois 60603
 9   Telephone No.: (312) 704-0550
10   E-mail: edward.devries@wilsonelser.com
11   (Appeared via Videoconference)
12
13   ON BEHALF OF THE DEFENDANTS, HILCO REDEVELOPMENT LLC,
14   HRE CRAWFORD LLC, AND
15   HRP EXCHANGE 55, LLC:
16   Michael S. Smith, Esquire
17   Kirkland & Ellis LLP
18   300 North LaSalle Street
19   Chicago, Illinois 60654
20   Telephone No.: (312) 862-2000
21   E-mail: michael.smith@kirkland.com
22   (Appeared via Videoconference)
23
24
25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
                                        Page 6
1                  APPEARANCES (CONTINUED)

2

3   ON BEHALF OF THE DEFENDANT, CONTROLLED DEMOLITION, INC.:

4   Andrew Rice, Esquire

5   Cray Huber Horstman Heil & Vanausdal, LLC

6   303 West Madison Street

7   Suite 2200

8   Chicago, Illinois 60606

9   Telephone No.: (312) 332-8450

10  E-mail: apr@crayhuber.com

11  (Appeared via Videoconference)

12

13  ON BEHALF OF THE DEFENDANT, MARINE TECHNOLOGY SOLUTIONS

14  LLC.:

15  Thomas J. Lyman, III, Esquire

16  Smithamundsen LLC

17  150 North Michigan Avenue

18  Suite 3300

19  Chicago, Illinois 60601

20  Telephone No.: (312) 894-3241

21  E-mail: tlyman@amundsendavislaw.com

22  (Appeared via Videoconference)

23

24

25
```

```
                                        Page 7
1                  APPEARANCES (CONTINUED)

2

3   ON BEHALF OF THE DEFENDANT, JENKINS ENVIRONMENTAL:

4   John Beribak, Esquire

5   Ed Olsen, Esquire

6   Charysh & Schroeder, Ltd.

7   33 North Dearborn Street

8   Suite 1300

9   Chicago, Illinois

10  Telephone No.: (312) 372-8838

11  E-mail: jberibak@cslaw-chicago.com

12  eolson@cslaw-chicago.com

13  (Appeared via Videoconference)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                        Page 8
1                          INDEX

2                                                  Page

3   PROCEEDINGS                                    13

4   DIRECT EXAMINATION BY MS. HAMILTON             16

5   EXAMINATION BY MR. DRISCOLL                    165

6

7                        EXHIBITS

8   Exhibit                                        Page

9   1 - Bates MCM-SOLIS_0004309 - Controlled

10      Demolition Incorporated Proposal -

11      October 22, 2019                           38

12  2 - Bates MCM-SOLIS_0005435 - Controlled

13      Demolition Incorporated Proposal -

14      December 19,2019                           41

15  3 - Bates CTRL001937 - Controlled Demolition

16      Incorporated Preliminary Plan

17      and Procedure                              46

18  4 - Bates CTRL014180 - Controlled Demolition

19      Incorporated Preliminary Plan

20      and Procedure - Chimney                    52

21  5 - Bates CTRL014196 - MCM Management

22      Corporation - Subcontract for

23      Performance of Work - February 24, 2020    57

24  6 - Bates CTRL002118 - Crawford Generating

25      Plant - September 29, 2019                 69
```

```
                                        Page 9
1                  EXHIBITS (CONTINUED)

2   Exhibit                                        Page

3   7 - Bates CTRL000081 - Email from Jennifer L.

4       Renteria on Behalf of Raymond Zukowski

5       - Subject RE: Chicago-Crawford           89

6   8 - Bates CTRL000381 - Email from Raymond

7       Zukowski to Carol Groft                   92

8   9 - Bates CTRL000307 - Email from Eric Dovas

9       to Raymond Zukowski - Subject Exclusion

10      Zone for Crawford - April 2, 2020         95

11  10 - Bates CTRL002057 - Crawford Generating

12       Plant - Fugitive Dust Control Plan       107

13  11 - Bates CTRL000027 - Email from Eric Dovas

14       to Raymond Zukowski - Subject

15       RE: Crawford Subcontract for the

16       Chimney                                  111

17  12 - Bates CTRL000040 - Email from Raymond

18       Zukowski to Nicholas Pullara -

19       Subject RE: Crawford Station Chimney     115

20  13 - Bates CTRL012782 - Email Chain -

21       Subject RE: Crawford Chimney

22       Permitting                               116

23

24

25
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

EXHIBITS (CONTINUED)

Exhibit                                          Page

14 - Bates CTRL000161 - Email from Mark
     Loizeaux to Raymond Zukowski -
     Subject Crawford Chimney - Chicago, IL
     - CDI File #19-189                            117

15 - Bates CTRL000156 - Email from Mark
     Loizeaux to Raymond Zukowski -
     Subject Crawford Chimney - Chicago, IL
     - CDI File #19-189 - April 1, 2020            121

16 - Bates CTRL012827 - Email Chain -
     Subject RE: Crawford Station -
     Chicago, IL                                   127

17 - Bates CTRL000176 - Email from Mark
     Loizeaux regarding the TLG Report            135

18 - Bates HILCO_CRAWFORD_00002236 - Hilco
     Redevelopment Partners Immediate
     Actions Following the Implosion of the
     Stack at the Crawford Power Plant -
     April 13, 2020                                138

19 - Bates HILCO_CRAWFORD_00017928 -
     Statement from Hilco Redevelopment
     Partners CEO - Roberto Perez -
     April 14, 2020                                143

Page 11

EXHIBITS (CONTINUED)

Exhibit                                          Page

20 - Bates PL 000001 - Electronic Mail to
     Mayor Lightfoot from Roberto Perez
     - April 16, 2020                              146

21 - Bates HILCO_CRAWFORD_00022789 -
     Email Chain - Subject Proposed
     Statement Regarding Crawford Incident
     - April 14, 2020                              148

22 - Bates HILCO_CRAWFORD_00012502 -
     RE: Termination Notice -
     April 28, 2020                                151

Page 12

STIPULATION

The VIDEO deposition of RAYMOND ZUKOWSKI was taken at
KENTUCKIANA COURT REPORTERS, 110 NORTH WACKER DRIVE,
CHICAGO, ILLINOIS 60606 via videoconference in which all
participants attended remotely on MONDAY the 6th day of
FEBRUARY 2023 at 11:08 a.m. (ET); said deposition was
taken pursuant to the FEDERAL Rules of Civil Procedure.
THE OATH IN THIS MATTER WAS SWORN REMOTELY PURSUANT TO
FRCP 30.

It is agreed that LINDSAY LARSON-TODD, being a Notary
Public and Court Reporter for the State of ILLINOIS, may
swear the witness and that the reading and signing of
the completed transcript by the witness is not waived.

Page 13

PROCEEDINGS

COURT REPORTER:  All right.  We are on the
record.  My name is Lindsay Larson-Todd.  I'm the
online video technician and court reporter today
representing Kentuckiana Court Reporters, located at
110 North Wacker Drive, Chicago, Illinois, 60606.
Today is the 6th day of February 2023.  The current
time is 11:08 Eastern Standard Time.  We are
convened by videoconference to take the deposition
of Raymond Zukowski in the matter of Antonio Solis,
Jose Solis, and Juan Rangel, individually and on
behalf of all other similarly situated, versus Hilco
Development [sic] LLC, HRE Crawford LLC, HRP
Exchange 55, LLC, MCM Management Corporation,
Controlled Demolition, Incorporated, and Marine
Technology Solutions LLC, pending in the United
States District Court for the Northern District of
Illinois Eastern Division, number 20-CV-2348.  Will
everyone but the witness please state your
appearance, how you are attending, and the location
you are attending from, starting with Plaintiff's
counsel?

MS. HAMILTON:  This is Danielle Hamilton on
behalf of the plaintiffs.  I'm attending via Zoom
from Chicago, Illinois.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 6 of 49 PageID #:1820
The Deposition of RAYMOND ZUKOWSKI, taken on February 08, 2023

14..17

Page 14

1    MR. DRISCOLL: My name is Sean Driscoll. I'm
2  representing the Ramirez Mercado Plaintiff Group,
3  represented by Clifford Law Offices and Driscoll Law
4  Group, and I am attending via Zoom from Glen Ellyn,
5  Illinois.
6    MS. WEISSMAN: Stephanie Weissman on behalf of
7  the estate of Fernando Cantu Hinojosa Jr., attending
8  from Chicago, Illinois.
9    MS. COTTER: This is Carrie Cotter, also
10  attending on behalf of the estate of Fernando Cantu
11  Hinojosa, Jr. Also via Zoom in Chicago, Illinois.
12    MR. RICE: Andrew Rice on behalf of Controlled
13  Demolition Inc. And I'm appearing in my office in
14  Chicago, Illinois.
15    MR. DEVRIES: Edward DeVries for defendant MCM
16  Management. I'm attending from Wilson Elser's
17  office at 233 East 84th Drive in Merrillville,
18  Indiana.
19    MR. SMITH: Michael Smith for the Hilco
20  defendants attending on behalf of -- in Kirkland &
21  Ellis attending via Zoom and from Chicago, Illinois.
22    MR. LYMAN: Good morning. Tom Lyman on behalf
23  of Marine Technologies attending from my second
24  office, luckily in Florida. Sorry about that,
25  everyone.

Page 15

1    MR. BERIBAK: John Beribak. I represent the
2  third party defendant, Jenkins Environmental
3  Incorporated, and the cases filed in Cook County and
4  I'm in Chicago, Illinois.
5    COURT REPORTER: All right. And then
6  Mr. Zukowski, will you please state your full name
7  for the record.
8    THE WITNESS: Raymond Daniel Zukowski.
9    COURT REPORTER: And go ahead and hold your ID
10  up to the camera for me. Okay. Perfect. Do all
11  parties agree that the witness is in fact Mr.
12  Raymond Zukowski?
13    MR. DRISCOLL: Yeah.
14    MR. RICE: Yes.
15    MS. WEISSMAN: Yes.
16    MR. BERIBAK: Yes.
17    MR. SMITH: Yes.
18    MR. DEVRIES: Yes.
19    COURT REPORTER: All right. Mr. Zukowski, go
20  ahead and raise your right hand for me. Do you
21  solemnly swear or affirm that the testimony you're
22  about to give will be the truth, the whole truth,
23  and nothing but the truth?
24    THE WITNESS: I do.
25    COURT REPORTER: All right. You may begin.

Page 16

1    DIRECT EXAMINATION
2  BY MS. HAMILTON:
3    Q  Good morning, Mr. Zukowski.
4    A  Good morning.
5    Q  As I mentioned, my name is Danielle Hamilton.
6  I'll be the first person asking you questions today. I
7  want to go over just some rules of the deposition. I'm
8  not sure if you've been deposed before or if you -- how
9  long it's been since you've been deposed, if you have
10  been. So I'm going to ask you questions today and you
11  will give answers under oath just as if you were in a
12  courtroom. Do you understand that?
13    A  Yes.
14    Q  Okay. If you don't understand the question,
15  please ask. I'm happy to rephrase your questions. If
16  you answer the question, I will assume you understood
17  it. Do you understand that?
18    A  Yes, I do.
19    Q  Okay. Please give verbal answers, so the
20  court reporter can take down, you know, yes and no and
21  not uh-huh or uh-huh or shaking of the head or anything
22  like that. Do you understand that?
23    A  Yes.
24    Q  If you need a break at any time, please let me
25  know. I'm happy to take a break. I just ask you that

Page 17

1  you answer the question pending before you take that
2  break. Do you understand that?
3    A  Yes.
4    Q  Is there any reason you can't provide complete
5  and accurate answers to my questions today?
6    A  No.
7    Q  Okay. Do you have any conditions that might
8  affect your memory?
9    A  No.
10    Q  And are you taking any medication that might
11  affect your memory?
12    A  No.
13    Q  Okay. Did you prepare for your deposition
14  today?
15    A  Yes.
16    Q  How did you prepare for your deposition?
17    MR. RICE: Well, I'm going to object on that.
18  I think you're going to ask him certain questions
19  about what he reviewed and time, but I don't know if
20  you can go into details about how he prepared but go
21  ahead.
22    MS. HAMILTON: What -- is there objection
23  there?
24    MR. RICE: Privilege. Yes.
25  BY MS. HAMILTON:



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1     Q    Well, I'm not asking you about privilege
2  conversations you've had with your counsel.  I'm asking
3  you how you prepared to -- for the deposition today.
4  So, you know, please don't reveal any privilege
5  communications, but please answer the question.
6     A    I simply reviewed the documents in the file.
7  It's been a while. Just the -- the job was not -- you
8  know, not yesterday, as we all know.  So just wanted to
9  catch up.
10        MR. RICE:  I think we may have lost Danielle
11  accidentally.
12        THE WITNESS:  Yeah.  Well, she froze on my
13  screen.
14        MR. RICE:  Yeah.
15        COURT REPORTER:  Let me take us off the record
16  real quick.  All right.  We're going off the record
17  at 11:14 a.m. Eastern Standard Time.
18        (OFF THE RECORD)
19        COURT REPORTER:  We are back on the record.
20  The time is 11:14 a.m. Eastern Standard Time.  You
21  may continue.
22  BY MS. HAMILTON:
23     Q    Sorry, I don't know if you heard my last
24  question.  It was: when you say you reviewed documents
25  in the file, what file are you referring to?

Page 19

1     A    My file of the job.
2     Q    And when did you last review your file of the
3  job?
4     A    This morning.
5     Q    And did you review it at any other time other
6  than this morning?
7     A    Yes.
8     Q    When did you do that?
9     A    Numerous times since this all started.
10    Q    And so is this your own personal file of the
11  Crawford job that you reviewed that -- prior to this
12  deposition today?
13    A    They're all -- they're all -- they're all
14  company documents.  I just print some out when needed.
15    Q    Do you know approximately how many pages the
16  CDI file of the Crawford job is?
17    A    No idea.
18    Q    Is it hundreds of pages?
19    A    Again, I've never counted.
20    Q    Okay.  Have you reviewed any deposition
21  testimony in preparation for your deposition today?
22    A    No.
23    Q    Have you spoken with your attorney in
24  preparation for your deposition today?
25    A    Yes.

Page 20

1     Q    When did you speak with your attorney to
2  prepare for the deposition?
3     A    This morning.
4     Q    Did you speak with your attorney to prepare
5  for the deposition any time other than this morning?
6     A    We've spoken on numerous occasions.  I would
7  say it was specific to the deposition.  It was just -- I
8  guess they're all specific to the deposition because
9  that's why we're here.
10    Q    Okay.  How long did is meeting this morning?
11    A    An hour and 45 minutes maybe.
12    Q    And then the other numerous occasions that
13  you've spoken in preparation for your deposition, can
14  you put an estimate on how many occasions you spoke with
15  your attorney?
16    A    I'd be guessing, but four or five.
17    Q    And how long did those meetings last?
18    A    Numerous or varying times.  Sometimes there
19  were, you know, ten- minute phone calls and sometimes we
20  talk for an hour.
21    Q    And did you review any documents, any of the
22  meetings you had with your attorneys?
23    A    Yes.
24    Q    Okay.  What documents did you review in those
25  meetings?

Page 21

1     A    The documents that had already been submitted.
2  E-mails, drawings, plans.
3     Q    When you say submitted, do you mean produced
4  in the case?
5     A    I believe so.
6     Q    The documents that you reviewed that have been
7  produced in this case, is that the same or different
8  than your -- than the CDI file of the job?
9     A    Our documents would be the same.
10    Q    So when you say you reviewed the CDI file of
11  the job, you reviewed the CDI production produced in the
12  federal case, correct?
13    A    No.  I -- I -- again, there's -- I have not
14  seen the entire document that was submitted to anybody.
15  I -- you know, I was involved with the job, so I got up
16  to speed with, you know, things that I -- I was involved
17  in -- in this submission.
18    Q    Okay.  Have you spoken with any other person
19  about the substance of your deposition other than your
20  attorneys?
21    A    Just to my boss.
22    Q    Who's your boss?
23    A    Mark Loizeaux.
24    Q    And when did you speak to Mr. Loizeaux about
25  your deposition?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    A    I think the last time -- well, we bumped into
2 each other this morning in the hallway, but he just
3 asked me if I was ready for the meeting today and I said
4 yes.
5    Q    Did you speak with him any other time about
6 your deposition other than this morning?
7    A    I'm sure we have.  I mean, he's being deposed
8 shortly after I am, I believe, so how many times?  I'd
9 be guessing.
10   Q    Did you and Mark talk about the substance of
11 your deposition?
12   A    Define substance.
13   Q    About any of the questions or answers that you
14 would be providing today?
15   A    No.  Just -- just talked about the job and
16 what was done.
17   Q    Have you spoken to Tom Doud about the -- about
18 your deposition today?
19   A    No.
20   Q    Did you do anything else to prepare other than
21 what you testified to?
22   A    No.
23   Q    And Mr. Zukowski, are you currently employed?
24   A    Yes.
25   Q    And where are you employed?

Page 23

1    A    Controlled Demolition Incorporated.
2    Q    And how long have you been employed at
3 Controlled Demolition Incorporated?
4    A    I started here in 1996, 27 years ago.
5    Q    That's very quick math.  Prior to CDI, what
6 was your employment?
7    A    I worked for a demotion company out of
8 Syracuse, New York.
9    Q    How long did you work for that company out of
10 Syracuse?
11   A    About seven years.
12   Q    And before that, what was your employment?
13   A    I was in school.
14   Q    Were you in college?
15   A    Yes.
16   Q    Where did you go to college?
17   A    Syracuse University.
18   Q    And did you graduate from Syracuse?
19   A    Yes.  I -- I graduated from their satellite
20 school in Utica, New York, but it's a -- it was a
21 Syracuse diploma.
22   Q    Sure.  What was your degree in?
23   A    Construction Management.
24   Q    And have you done any postgraduate education?
25   A    No.

Page 24

1    Q    Okay.  When was CDI founded?
2    A    You'd have to ask Mark the exact date.  I'd
3 have to look it up.
4    Q    Do you know the year?
5    A    I believe it was incorporated in '60
6 something.
7    Q    And what is your -- what was your position at
8 CDI when you started in 1996?
9    A    I was an estimator and project manager.
10   Q    What are the responsibilities of an estimator
11 and project manager?
12   A    To go bid the jobs when they come in and run
13 them after you get them.
14   Q    I'm sorry, I didn't hear your answer.  And run
15 them what?
16   A    Run them after -- if you get the job, then
17 you're responsible for running it.  The overall
18 management of the job.
19   Q    Okay.  And how long were you an estimator and
20 project manager for
21 CDI?
22   A    I still am.  It's what I do every day.
23   Q    Have you had held any other positions at CDI
24 other than estimator or project manager?
25   A    Yes.  I was promoted to field operations

Page 25

1 manager and now I am the vice president.
2    Q    How long were you fields operations manager?
3    A    Probably ten years.
4    Q    And what are the responsibilities of a field
5 operations manager?
6    A    Just make sure all the jobs are running on
7 schedule and on budget and coordinate --
8    Q    And what do you --
9    A    -- coordinate all crews.  You know, we're not
10 a very big company, so it's -- you know, it sounds
11 bigger than it is.
12   Q    Do you know how many employees are at CDI
13 today?
14   A    If we're currently including office and field,
15 we have 13 -- 14 people.
16   Q    And back in April of 2020, did you have 14
17 people?
18   A    No, I think we -- we had a few more.  We had a
19 couple of the field guys leave us since COVID.
20   Q    When were you promoted to vice president?
21   A    Five years ago or -- no, 2016.  So six, seven
22 years.
23   Q    And what are your responsibilities as vice
24 president of CDI?
25   A    Same as they always were.  Get the -- find the



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 9 of 49 PageID #:1823
The Deposition of RAYMOND ZUKOWSKI, taken on February 03, 2023

26..29

Page 26

1   jobs, bid the jobs, run the jobs, review the contracts,
2   make sure everything is on time and under budget.
3       Q    Have you worked with MCM in your capacity as
4   an employee of CDI before April of 2020?
5       A    Yes.
6       Q    How many times have you worked with them?
7       A    I'd have to check the dates.  Again, you know,
8   27 years of doing dozens and dozens of jobs over the
9   years, they kind of run together after a while.  The --
10  the -- the last one we did was the Beckjord Power
11  Station. Before then, I believe that was before
12  Crawford.  Yes.  Yes, it was.  Then, we worked at -- did
13  a bunch of work for them down in Bethlehem Steel here in
14  Baltimore and they were in charge of clearing that site.
15  We do some blasting for them down there.
16      Q    Do you know when the Beckjord project was?
17      A    I'd have to look it up, but I -- I believe
18  shortly before this.
19      Q    Shortly before the Crawford project?
20      A    Yes.
21      Q    So shortly before April of 2020?
22      A    I think so.  I can look it up now if you need
23  -- need me to.
24      Q    Go ahead.  Sure.  Why don't you look it up?
25      A    Give me one second.  Yeah.  Sorry.

Page 27

1       Q    Okay.
2       A    No, it was after -- I'm sorry, but the actual
3   shot date was May 8th of '20.
4       Q    Okay.
5       A    But it was -- just because that -- it was shot
6   in May doesn't mean that's the first time I was there.
7   There was a review of the project, meetings, stuff like
8   that.  So it was probably almost concurrent with this
9   then.
10      Q    I forgot to ask you, do you have any physical
11  hard copy documents with you today for the deposition?
12      A    I've got sticky notes just to write down some
13  times.  Again, I don't remember what you sent.  I got
14  the documents that you sent via LinkedIn or whatever.
15  Sorry.
16      MR. RICE:  I believe those are the exhibits
17      that you sent.
18      THE WITNESS:  Yes.  Yes.  Thank you.
19      Q    What do your sticky notes say?
20      A    One has your name on it and the other one has
21  just the timeline, you know, of the job, shot date when
22  I first visited.
23      Q    Can you read the sticky note that has the
24  timeline on it?
25      A    Yep.  It says fall 2019 and it says December

Page 28

1   2019 first visit and then it says shot 11 -- 4-11-20,
2   8:00 a.m.  $81,920 and 378 feet tall.
3       Q    And is the money figure the cost of the
4   Crawford job?
5       A    Yes, that was our contract.
6       Q    Okay.  Has Mark always been the president of
7   CDI since you've been working there?
8       A    Yes.
9       Q    Okay.  So what services does CDI provide?
10      A    We are a explosives demolition subcontractor.
11      Q    Does CDI provide demolition services that
12  don't use explosives?
13      A    Not anymore, no.
14      Q    Did CDI ever provide that?
15      A    Yes.
16      Q    When did they stop providing demolition
17  services that didn't involve the use of explosives?
18      A    Our last project that we did that we were not
19  using explosives was six or seven years ago and we just
20  -- and -- and we were just the main -- we were the main
21  contractor, but I only had one person on the job.  We
22  subcontracted the whole work out, so --
23      Q    Do you know why CDI stopped providing
24  demolition services that didn't use explosives?
25      A    There's too much competition out there.  I

Page 29

1   mean, we're -- we're - - we're really good at what we do
2   and so that's -- that's the path we've decided to stick
3   to and there's -- there's so much competition out there.
4   It's -- it's incredibly hard to be competitive.
5       Q    Okay.  What is involved in providing explosive
6   demolition services?
7       A    That's kind of vague from -- from -- from from
8   day one through the shot?  I mean, how much -- what do
9   you --
10      Q    Yes.
11      A    Day one if the phone call comes in or an e-
12  mail comes in and says, "Would you like to bid this job?
13  Can -- please have a number on it."  And I'll look at the
14  plans if they have them.  If not, I'll go visit the
15  site.  I'll bid the job.  If we're successful, I'll go
16  to the job again.  I'll review the subcontracts.  All
17  subcontracts come through me with my final approval from
18  Mark.  And once the paper's in place, I'm in --
19  it's my job that I'm physically going to do.  I'll order
20  the explosives.  I'll do all of the liaison with the
21  client and their client if need be and make sure the job
22  is prepared for spec and then once it's time, I'll --
23  I'll go down and be in charge of the -- loading of the
24  explosives.
25      Q    When you say make sure the job is ready for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1   spec, what does that mean?
2        A    No.  Per spec.  That -- that -- that -- what's
3   been prepared -- that -- that it's been prepared.  The
4   structure's been prepared to -- per our -- per our
5   design.  You just don't -- buildings just don't fall
6   down or chimneys just don't fall down.  You have to make
7   them fall down.  There's a lot of work that has to go
8   into it prior to explosives arriving.  So our -- our
9   superintendents are in charge of that to make sure that
10  our client gets the building ready or the structure
11  ready.  And once we all agree and it's ready, then we'll
12  put it on the ground.
13       Q    And do you or someone at CDI design how to get
14  the building ready for demolition?
15       A    Yes.
16       Q    As for your demolition projects that you bid
17  and the bid is accepted, do you provide Community
18  Outreach services?
19       A    When asked, yes.
20       Q    And when asked by the contractor, the person
21  you're contracting with?
22       A    Correct.
23       Q    And have you provided Community Outreach
24  services before as part of your demolition projects?
25       A    Yes.

Page 31

1        Q    And what do those Community Outreach services
2   entail?
3        A    Well, it depends on the project.  If you're
4   doing a -- a building in downtown Chicago, those
5   outreaches are going to be a lot different than if
6   you're doing a -- you know, a -- a power plant in the
7   middle of nowhere.  So they're not -- there's no set
8   community outreach.  It's all job specific.
9        Q    Have you provided Community Outreach for any
10  jobs in the City of Chicago?
11       A    Personally, no.
12       Q    To your knowledge, has CDI provided any
13  Community Outreach for any jobs in Chicago?
14       A    Probably without -- without looking into the
15  file, but I'm sure the -- the housing projects that we
16  did had the Community Outreach aspect to it.
17       Q    And when were those housing projects?
18       A    Late '90s.
19       Q    And can you tell me what -- understanding that
20  depends on the job, if you were doing a job in a major
21  city, what Community Outreach do you typically do?
22       A    Again, it's -- it depends on where the
23  structure is and what's around it more importantly.  You
24  know, if it's in a downtown environment, do you have to
25  evacuate businesses?  Do you have to, you know, talk to

Page 32

1   the building owners about their air conditioning systems
2   and you know, stuff like that.  You know, if you're
3   closing down city streets for three or four blocks
4   around the structure, people ought to know, so you just
5   talk them through the process.
6        Q    When do you normally talk to adjacent
7   businesses or buildings -- people in buildings?
8        A    Again, it's all -- it's all project specific.
9   If -- if -- if you start too early, then -- then it's
10  not as effective.  But if you start too late, it's not
11  effective at all either.  There's a -- it -- it's a
12  learned experience over decades of doing this that you,
13  "Okay.  This is -- you know, my clients has -- the
14  neighbors are A, B, and C, but A's needs are way more
15  -- his needs are much larger than B's needs and C's
16  needs."  So it -- it's -- you got to have -- have time
17  for them, time to prepare and, you know, you need to
18  have time to respond to the questions, so there's no --
19  there's no formula.  It's all -- you know, it's a
20  learned experience after years of doing it.
21       Q    Do you have a checklist of any kind when you
22  do Community Outreach for demolition projects?  So Just
23  things to make sure that you do as a part of your
24  community outreach?
25       A    No, there's no checklist.  No.

Page 33

1        MR. RICE:  Just a note, Ray, wait until she's
2   done asking the question.
3        THE WITNESS:  Okay.  Sorry.
4        MR. RICE:  If you talk before --
5   BY MS. HAMILTON:
6        Q    Sorry.  I didn't mention that earlier, but
7   just to make sure the court reporter can take down both
8   of us.  He'll just let me finish my question, even if
9   you know where I'm going and if there are any
10  objections, you know, counsel will make that and then
11  you can answer.
12       A    Understood.
13       Q    When CDI has been contracted to provide
14  demolition services, does the company normally handle
15  getting blasting permits?
16       A    Yes.
17       Q    And who typically handles that at CDI?
18       A    Carol Groft, G-R-O-F-T.
19       Q    And what is Carol Groft's position at CDI?
20       A    She is Mark's executive assistant/holds us all
21  together.
22       Q    And are you aware of the process that
23  Ms. Groft goes through to get blasting permits?
24       A    Yes.
25       Q    What is that process?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 34

1    A    You start at the -- you start at the high
2  level, the federal, which we have ATF, then you go to
3  the state, depending on which state you're in, they'll
4  have or they may or may not, excuse me, have a blasting
5  permit or a license that's required.  And then after
6  that, you go to the local county. Some counties do, some
7  counties don't.  And then you go to the actual city or
8  town that you're in.  So you have to -- there's the --
9  believe it or not, the -- there's -- there's no set
10  blasting license.  They're all different all over the
11  country and all over the world.  You think it would be
12  more streamlined and, you know, coherent, but it's not.
13  Chicago, for example, has a city blasting license.  The
14  state has a -- and Illinois has a state license, and
15  obviously the federal has federal, but that's Chicago.
16  Well, you go to the next town over, they might not have
17  a city requirement.  So she has to do all the research
18  from, you know, top down, make sure all, you know, T's
19  are crossed and I's are dotted.  You know, no one gets
20  overlooked.
21    Q    When CDI did projects in Chicago prior to
22  April of 2020, did CDI obtain the blasting permit?
23    A    I was -- yes, but I wasn't specifically in
24  charge of any of those previous projects, but that's
25  what we do.

Page 35

1    Q    And when CDI is contracted to provide
2  demolition services, does CDI provide any dust
3  mitigation plans or measures?
4    A    No.
5    Q    I'm sorry?
6    A    Sorry.  Sorry.  Sorry.  No.
7    Q    Has CDI ever been contracted to provide dust
8  mitigation measures or services as a part of its
9  demolition services?
10    A    No, not specifically.  Have we been involved
11  in projects where we involved with the clean-up of the
12  dust, yes, but that's -- that's a business that we no --
13  no longer perform.
14    Q    When did CDI stop performing that business?
15    A    Again, same time on as before when we got out
16  of the main demotion contractor business.
17    Q    And why did CDI stop performing that business
18  of dust clean-up?
19    A    We're -- we're much smaller.  We seem to get
20  smaller every year. Focus on what you do and there's
21  plenty of qualified people out there to prepare
22  buildings and clean them up after they're shot, so --
23    Q    Do you play any role in working with other
24  companies to prepare buildings for demolition and clean
25  up afterwards?

Page 36

1    MR. RICE:  I'm going to object for vagueness,
2  but if you understand the question, Ray, go ahead.
3    A    The answer is no.  We only prepare buildings
4  for us and no one else.
5    Q    So let's turn now to this Crawford job.  When
6  did CDI first submit a proposal for the Crawford
7  project?
8    A    Their original proposals went out in 2015.
9    Q    And who did that proposal go to?
10    A    I'd have to look up, but there was probably
11  half a dozen bidders that contacted us back then.
12    Q    And did you write the proposal that went out
13  in 2015?
14    A    I believe so.
15    Q    And what was the result of the -- that
16  proposal?
17    A    That proposal was for boiler 7, boiler 8, and
18  the chimney associated with Unit 8.  But that was a -- a
19  different -- nothing -- to answer your question, nothing
20  became of that proposal.  The property was sold
21  afterwards and here we are today.
22    Q    Is there a difference between submitting a
23  proposal and bidding on a project?
24    A    No.
25    Q    So you bid on the pro -- on Crawford in 2015

Page 37

1  and that bid was not accepted, correct?
2    A    The job was -- wasn't accepted because that
3  version of the project never happened.  When it was put
4  out to bid in 2015, it was still owned by the previous
5  owner, the power plant itself.  I can't -- I don't
6  remember what the -- the group's name was, but they --
7  instead of tearing down the plant themselves, they sold
8  the property to Hilco.  Hilco decided to give it over
9  from there.  And that's when it came back around, MCM
10  asked us for numbers to find the boilers and the
11  chimney, but eventually, we just felled the chimney.
12    Q    Okay.  So when did you first get in contact
13  with MCM about the Crawford project?
14    A    I think they contacted us late '19, probably.
15  Early 2020.
16    Q    And who contacted you from MCM?
17    A    Eric -- Eric Dovas.
18    Q    And when he contacted you, what did he say?
19    A    I'd have to reread the e-mail.  Been a while.
20  Just asking for a number, I'm sure.
21    Q    And when you say asking for a number, you mean
22  asking for a budget for demolition services?
23    A    Yes.  A price for us to do the blast.
24    Q    And when you and Mr. Dovas spoke about a price
25  for the blast, did you know what he was asking to be



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 38

1  blasted?

2       MR. SMITH: Objection to form.

3       A  Yeah, it was -- sorry. It was the same --

4  same scope as before. Unit 7 and Unit 8 and the Unit 8

5  chimney.

6       Q  And did you submit a proposal to MCM for the

7  blasting of Unit 7, Unit 8, and Unit 8 chimney?

8       A  Yes.

9       Q  When did you submit that proposal?

10      A  I'd have -- I'd have to look it up.

11      Q  Let's look at an Exhibit I'll mark as Exhibit

12  1. Lindsay, would you mind pulling up what has one --

13  the number 158 in front of it?

14          (EXHIBIT 1 MARKED FOR IDENTIFICATION)

15      COURT REPORTER: Yeah. Give me just one

16  second. You said 158?

17      MS. HAMILTON: Yes.

18      COURT REPORTER: Okay.

19      MR. RICE: Ray, do you have that for -- can you

20  pull up 158, as well? Unless -- are you sharing

21  that, Danielle? I'm not sure how we're doing this.

22      COURT REPORTER: I'm going to share my screen.

23      MS. HAMILTON: Lindsay's going to share it so

24  he doesn't need to pull it up and so --

25      MR. RICE: Thanks. I appreciate that. Thank

Page 39

1  you.

2       MS. HAMILTON: No problem.

3       COURT REPORTER: Can you see that?

4       THE WITNESS: Yes.

5       MS. HAMILTON: Yes. So yeah. Let me get the

6  Bates stamp. So this is Exhibit 1, Bates stamped

7  MCM Solis 004309 through -- can you go to the last

8  page?

9       COURT REPORTER: Yeah.

10      MS. HAMILTON: At the very bottom so I can just

11  mark the Bates stamp. Through MCM Solis 000 --

12  0004316.

13  BY MS. HAMILTON:

14      Q  So Mr. Zukowski, is this the first proposal

15  that you submitted to

16  MCM?

17      A  I'd have to look it up.

18      Q  What do you mean?

19      A  I'd have to pull a file. Again, in 2015, we

20  sent half a dozen proposals to half a dozen contractors.

21  And, you know, I -- I send out, you know, sometimes one

22  time, sometimes six proposals a week so -- but without

23  actually pulling the file, there's no way to see if I

24  sent something before this.

25      Q  Okay.

Page 40

1       A  There's just -- there's just too many.

2  Hundreds and hundreds a year, so --

3       Q  Understood. Did you write this proposal, this

4  October 20 -- 22, 2019 proposal to MCM?

5       A  You'll have to go to the signature. Most

6  likely.

7       MS. HAMILTON: Can you scroll down to the next

8  page?

9       A  It'd be page 2 or 3 probably. Yep. No, Tom

10  did. I'm sorry. Okay. That's why. Look.

11      Q  And who is Tom?

12      A  Tom's our field operations manager.

13      Q  And were you aware that Tom sent out this

14  October 22, 2019 proposal?

15      A  Sure I was.

16      Q  Did you play any role in coming up with this

17  proposal with Tom?

18      A  Yeah, I believe I did the estimate. We all

19  wear many hats in this office. I'm vice president, but

20  I'm also an estimator. Tom's operations manager, he's

21  also an estimator. You know, we're all project

22  managers. We all order explosives. We all handle the

23  explosives. There's no specific job duty. So I might

24  have been out of the office that day and Eric needed

25  proposals, so Tom sent them out. But nothing goes out

Page 41

1  without anybody else knowing about it.

2       Q  Okay. This proposal was, according to this

3  document, accepted by Eric Dovas on November 15, 2019,

4  correct?

5       A  Yes.

6       Q  And do you know what happened after this

7  proposal was accepted?

8       A  Subcontract would've came shortly thereafter.

9  I know I first visited -- so right after he accepted it

10  was our first visit to the site. That's from that little

11  sticky note I had. Again, we're offered drawings of

12  everything, but, you know, once it's -- if we've never

13  visited the site, we have to go visit the site to verify

14  that the dimensions on the drawings are actually

15  correct. So my first visit after it was signed was to

16  verify that. Then I would come back with the data and

17  then we would design the shot back here.

18      Q  And you went to the site for the first time in

19  December of 2019, you said?

20      A  Yeah, I think it was December 11th.

21      MS. HAMILTON: Okay. And can you pull up 393,

22  please, Lindsay.

23      Q  I'm showing you Exhibit 2, which is Bates

24  stamped MCM Solis 5435 through 5444. And this is a

25  December 19, 2019 CDI proposal to Eric Dovas, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 42

1    (EXHIBIT 2 MARKED FOR IDENTIFICATION)
2    A    I knew I'd get my number on the boilers.  It
3 was just when.  If you read it "based on our recent
4 conversations, review the information you furnished and
5 my recent site visit."
6    Q    So --
7    A    Yes.
8    Q    Okay.
9         MS. HAMILTON:  And then if you'll go to the
10    second page, please, Lindsay?
11        COURT REPORTER:  Yep.
12        MS. HAMILTON:  Actually, the third page, sorry.
13 BY MS. HAMILTON:
14    Q    And so this contract -- this proposal was
15 signed by you, correct?
16    A    Yes.
17    Q    And is there a reason why you sent a second --
18 or another proposal after the October 22, 2019 proposal
19 to Eric Dovas at MCM?
20    A    Yes, because they asked us for a proposal.
21    Q    So after the October 22, 2019 proposal was
22 accepted, they asked for another proposal?
23    A    Yes.
24    Q    And did this proposal differ in any way from
25 the October 22, 2019 proposal?

Page 43

1    A    Yes.  The first proposal was just for the
2 chimney itself, and this was for the boilers.
3    Q    So the December 19, 2019 proposal proposed to
4 blast more -- the more buildings, then, than the October
5 22, 2019 proposal?
6    A    Yeah, the --
7         MR. DEVRIES:  Object to form.
8    A    -- the December proposal, they -- they -- they
9 were getting ready to eventually wreck the boilers, and
10 they wanted to see if it would be cheaper to do it using
11 our services.  And they decided to self-perform the
12 boiler demolition.
13    Q    What does it mean that MCM -- you said they
14 decided to self- perform the boiler demolition?  What
15 does that mean?
16    A    Yes, they -- and they did it without using
17 explosives.  The boilers were wrecked using their heavy
18 equipment.
19    Q    Okay.  Did you play any role in demolishing
20 the boilers?
21    A    No.
22    Q    In this December 20 -- December 2019 proposal,
23 did you propose to perform any dust mitigation measures?
24    A    No.
25    Q    Did you propose that MCM perform any dust

Page 44

1 mitigation measures?
2         MR. DEVRIES:  Object to the relevance that it's
3    about work that CDI didn't even do.
4    Q    You can answer.
5    A    Dust, by contract, is excluded -- dust
6 clean-up by contract is excluded from CDI's scope of
7 work.
8    Q    Okay.  After this -- was this
9 December 22, 2019 -- I'm sorry, December 2019 proposal
10 accepted by MCM?
11    A    No.
12    Q    Did you say no?
13    A    No.  Was not accepted.
14    Q    Do you have any understanding as to why it
15 wasn't accepted?
16         MR. RICE:  Object to --
17         MR. DEVRIES:  Object to foundation.
18         COURT REPORTER:  I'm sorry, who just made those
19    objections?
20         MR. DEVRIES:  That's Edward DeVries for MCM
21    objecting to foundation.
22         MR. RICE:  Andrew Rice, CDI, for speculation.
23         MR. SMITH:  Michael Smith for Hilco joins both
24    objections.
25 BY MS. HAMILTON:

Page 45

1    Q    You can answer.
2    A    What was the question again, please?
3    Q    Do you have any understanding as to why this
4 December 2019 proposal was not accepted by MCM?
5    A    No.
6    Q    Did you have any conversations about why the
7 proposal wasn't accepted with MCM?
8    A    No.
9    Q    Okay.
10        MS. HAMILTON:  So you can take the exhibit
11    down.  Thank you, Lindsay.
12    Q    So after this December 2019 proposal was not
13 accepted, when did you next hear from MCM related to the
14 Crawford project?
15    A    I'd have to look it up.  All correspondence is
16 saved to the file, so there's an e-mail somewhere that
17 came in.
18    Q    And what did that e-mail that came in say?
19    A    I -- hundreds of jobs.  Years ago.  I can't
20 remember every e- mail.
21    Q    Well, eventually, you were contracted to
22 provide demolition services for MCM, correct?
23    A    Correct.
24    Q    Do you know approximately when you were
25 contracted to do that?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

```
 1      A    Again, I'd have to -- contracts come in, I
 2  review them, I make modifications, I send them back, the
 3  client reviews them, they either accept or they come
 4  counter offer -- counter corrections.  Again, I'd have
 5  to look when the first subcontract came in versus the
 6  final executed date, so --
 7      MS. HAMILTON:  Okay.  Lindsay, can you pull up
 8  159, please?
 9      COURT REPORTER:  Yep.  Give me just a second.
10      Q    This is Exhibit 3.  This is a Controlled
11  Demolition Incorporated preliminary plan and procedure
12  dated, or prepared, December 19, 2019, Bates stamped
13  CTRL 1937 through 1943.  Did you create this preliminary
14  plan and procedure?
15      (EXHIBIT 3 MARKED FOR IDENTIFICATION)
16      A    I believe so.
17      Q    And was this submitted along with your bid in
18  December of 2019?
19      A    I'd have to check the timeline, but typically,
20  it's submitted after.
21      Q    So you -- typically, you submit a bid and then
22  you submit a plan after the bid?
23      A    Yeah, after they accept the project, because
24  sometimes plans get submitted with proposals to -- to
25  expedite things if it's, you know, if that's what the
```

Page 47

```
 1  client requests.  I -- I -- I don't know specifically if
 2  this went with or -- before or after.
 3      MS. HAMILTON:  Okay.  And can you go to page 2,
 4  please, Lindsay?
 5      Q    So page 2 under introduction, the second
 6  paragraph reads, "CDI's explosive demolition methods
 7  will allow for a more efficient, time saving, and safer
 8  demolition operation as compared to conventional
 9  demolition methods."  What are conventional mechanical
10  demolition methods?
11      A    As I said earlier that the use of heavy
12  equipment and -- and men with torches.  Excuse me.
13      Q    And what makes CDI's explosives demolition
14  method more efficient than conventional or mechanical
15  demolition methods?
16      A    Well, that -- that's structure specific.  If -
17  - if you're looking at a 370-foot-tall chimney, you
18  could send guys up there on scaffolding and take it down
19  bit by bit and brick by -- by brick over months on end.
20  Or you could use our services and have it felled in --
21  in six seconds after the explosives are detonated, so --
22  it's certainly safer.
23      Q    What makes explosive demolition safer?
24      A    Well, again, there -- there's -- you have two
25  options.  Three, kind of.  At 378 feet, the only way to
```

Page 48

```
 1  get it down to where it could be reached with a high
 2  reach excavator or crane is to put men climbing the
 3  chimney and putting scaffolding around it, collar
 4  scaffolding, using handheld rivet busters and breaking
 5  it up in tiny little pieces and pushing all that debris
 6  down the base of the chimney.  You know, previous
 7  experience on jobs where that's been done, they --
 8  they're lucky if they get five feet a day, you know, so
 9  divide 378 by five, that tells me how many days you have
10  men in the air, you know, doing extremely hard physical
11  labor, where you can accomplish the same end result with
12  chimney on the ground in a matter of days by explosives.
13      Q    And at this point in the December -- by
14  December of 2019, did CDI offer conventional or
15  mechanical demolition services?
16      A    No.
17      Q    Sorry.  All right.  When --
18      MS. HAMILTON:  You can take this exhibit down.
19      Q    When a building is demolished using explosive,
20  what happens when the building hits the ground?
21      MR. RICE:  I'm going to object for vagueness,
22      but I guess if you can answer the question, Ray, go
23      ahead.  But that seems a little broad.
24      MR. SMITH:  Hilco join.
25      MR. DEVRIES:  Join.
```

Page 49

```
 1  BY MS. HAMILTON:
 2      Q    You can answer.
 3      A    For this project, our -- our scope was to fell
 4  the chimney, the chimney was on the ground, we inspected
 5  it, made sure there was no property damage or no
 6  undetonated explosives.  We issued the all clear.  Then,
 7  by contract, our job was done.
 8      MS. HAMILTON:  Okay.  Can we take a ten-minute
 9      break?  I'm getting a phone call I need to answer.
10      COURT REPORTER:  Yeah.  Let me get us off the
11      record.  The current time is 12:02 p.m. Eastern
12      Standard Time, and we are off the record.
13      (OFF THE RECORD)
14      COURT REPORTER:  All right.  We are back on the
15      record for the deposition of Raymond Zukowski.  The
16      current time is 12:12 p.m. Eastern Standard time on
17      February 6, 2023.  You may continue.
18  BY MS. HAMILTON:
19      Q    So when a building is demolished using
20  explosives, is dust generated?
21      A    Yes.
22      Q    And where does the dust go after an -- a
23  demolition using explosives?
24      MR. SMITH:  Object to form.
25      MR. RICE:  Join.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

1    MR. DEVRIES:  Join.
2    MR. RICE:  You can still answer, Ray.
3    A    Well, dust is -- first off, dust is generated
4  via any type of demolition.  It's a unavoidable
5  byproduct of demolition, whether it's done
6  conventionally, manually, or via explosives.  So it's
7  just the -- the timeline of dust generation via
8  explosives is shortened due to it's a one- time event.
9  And where it goes, if -- if -- if I could predict that,
10  I wouldn't be sitting in this chair.  I'd -- I'd be a
11  very wealthy weatherman somewhere because no one can
12  predict the weather, which way -- where's the dust going
13  to go, which way's the wind going to blow that day.  You
14  know, you got an idea in a long range forecast, but, you
15  know, usually, you pick a shot date, you're two weeks or
16  two months or six months out and -- and, you know, the
17  dust goes where the wind will take it.
18  BY MS. HAMILTON:
19    Q    Are there any other factors that affect where
20  the dust goes other than wind?
21    A    Wind is the -- the, you know, humidity will
22  have a slight impact on it, but not much.  But wind is
23  the -- the -- the -- the major factor where the dust
24  ends up.  We'll have -- we'll have dust in the immediate
25  vicinity regardless, depending on the type of structure.

Page 51

1  But the -- the dust that travels, airborne dust is --
2  is, you know, taken by the wind.
3    Q    And do you pick shot dates based on wind or
4  weather factors?
5    A    No.  And 99 percent of the times, our client
6  picks the shot date.
7    Q    Have you ever obtained a shot date based on
8  weather or wind conditions?
9    A    I have not, no.
10    Q    Do you normally check weather or wind
11  conditions near the shot date?
12    A    Yes.  Obviously, you want to know what the
13  weather is.  There's two things that prevent us from
14  using explosives.  The -- they say the -- the morning
15  of, does the wind speed and direction or rain or snow or
16  anything have any impact on what we do?  The answer is
17  no.  What does, if there's thunder and lightning, by law
18  and code, we're not allowed to blast during an active
19  electrical storm, for obvious reasons.  Yes, we check
20  the weather.
21    Q    But if it's a particularly windy day, by law
22  you're still able to use explosives, correct?
23    MR. DEVRIES:  Object to form.  Vague as far as
24    the windiness.  You can answer.
25    MR. SMITH:  Join.

Page 52

1    MR. RICE:  Join.
2  BY MS. HAMILTON:
3    Q    You can answer.
4    A    Wind speed and direction does not come into
5  play on most projects.
6    Q    Did wind speed and direction come into play on
7  the Crawford project?
8    A    No, it did not.
9    Q    Did you check the wind speed or the wind
10  direction for the Crawford project?
11    A    Probably.  Again, I mean, we're all glued to
12  our phones these days and you know, WeatherBug is
13  something I look at regularly.  Yeah.  But you need to
14  dress for the day, so got to check the weather.
15    MS. HAMILTON:  Okay.  Let's look at 25 please,
16    Lindsay.
17    COURT REPORTER:  All right.
18    Q    Okay.  This is Exhibit 4, CDI Preliminary Plan
19  and Procedure prepared February 19th -- or revised
20  February 19, 2020.  Bates stamp CTRL 14180 through
21  14185.  Did you prepare this Preliminary Plan and
22  Procedure that was revised February 19, 2020?
23    (EXHIBIT 4 MARKED FOR IDENTIFICATION)
24    A    Yes.  Believe I did.
25    Q    And did it differ from the December 2019

Page 53

1  Preliminary Plan and Procedure?
2    A    I'd have to compare them side by side, but
3  that one in December was for the boilers.  And this is
4  specific for the chimney, if I'm not mistaken.  If you
5  go to page 2, it may have a tentative shot date on there
6  right in the first paragraph.  Now -- and under
7  Introduction, if we had a shot date, it would've been
8  the last sentence in the first paragraph.
9    Q    So does that mean you didn't have a shot date
10  by the time of this Preliminary Plan and Procedure in
11  February '19?
12    A    Correct.
13    Q    2020 or -- yeah, 2020?
14    A    That's -- that's correct.  There should be
15  another later revision with the shot date on it.
16    Q    And why did you revise the December 2019
17  Preliminary Plan?
18    A    Well, sorry.  You didn't finish that.  The
19  December, if I -- again, this -- I believe the one in
20  December was specific to the boilers, which we were not
21  contracted to do.  And this is specific to the chimney,
22  which we were contracted to do.
23    Q    Okay.  And then can we go to page 6?  Okay.
24  On my copy, this -- the highlighted was part of what we
25  -- what was produced.  Did you -- did you highlight

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 16 of 49 PageID #:1830
The Deposition of RAYMOND ZUROWSKI, taken January 17, 2023
54..57

Page 54

1  that?
2      A    No idea.
3      Q    Do you know if you highlighted or someone else
4  at CDI highlighted it?
5      A    I couldn't say either -- either way.  That's -
6  - if you pull up all the plan and procedures that CDI
7  sends out, that's last paragraph in every one, or a
8  version thereof.
9      Q    Is it normally highlighted on your plan and
10 procedures?
11     A    No, it's not.
12     Q    Okay.  We talked about this a little bit, but
13 I just want to be - - make sure I understand.  This
14 says, "Dust is an unpreventable byproduct of any type of
15 demolition operation."  Oh, sorry.  "Dust, an
16 unpreventable byproduct of any type of demolition
17 operation, will last in the general vicinity for five to
18 ten minutes following the demolition."  Why is the
19 case that dust is an unpreventable byproduct of any type
20 of demolition operation?
21     A    Whether you take a piece of concrete and hit
22 it with a sledgehammer or -- or hit it with a hydraulic
23 hammer or put a piece of dynamite in it, you're going to
24 generate dust.  There's no way to prevent it.
25     Q    Do certain methods of demolitions cause a

Page 55

1  higher volume of dust than others?
2      A    The same amount of dust is in that piece of
3  concrete, whether you hit it with a hammer or hit it
4  with a hydraulic hammer or a sledgehammer or a piece of
5  dynamite.  Dust is -- dust is created by the fracture of
6  the concrete, so whether it's fractured over the long
7  period of time or short period of time, that same -- as
8  long as the same amount of fractures take place, the
9  same amount of dust is produced.
10     Q    So does the use of explosives cause a higher
11 volume of dust than a conventional or mechanical
12 demolition method?
13     A    No.
14     MR. SMITH:  Objection.  Foundation.
15     COURT REPORTER:  I'm sorry, who made that
16 objection?
17     MR. SMITH:  Michael Smith.  Thank you.
18 BY MS. HAMILTON:
19     Q    So the same amount of dust would've been
20 generated for the Crawford chimney regardless of the
21 type of demolition -- regardless of the method of
22 demolition; is that correct?
23     A    It's correct.  It's -- and as I spoke of
24 previous, it's -- it's the release time of that dust.
25 Same amount -- again, you -- you break concrete, you

Page 56

1  make dust.  It's just a simple fact.  If that concrete
2  is broken up over a period of six months, it's far less
3  noticeable because it's just tiny, tiny, tiny bits for a
4  much longer period versus where our -- our scope of work
5  comes in, it's generated instantly over an amount of --
6  over seconds.  We didn't create any more dust.  The same
7  amount of dust is created.  It's just the -- the
8  duration of time.
9      Q    Understood.  And you said that this paragraph
10 10 in your plan and procedure is included in all of your
11 plan and procedures, correct?
12     A    It's standard language in our plan and
13 procedure, yes.
14     Q    And why is it included in all of your -- a
15 standard language in all of your plan and procedures?
16     A    It just is.  It always has been.
17     Q    Is there a particular reason that you include
18 that?
19     A    It just a -- a follow-up with a -- the plan.
20 It starts off from the beginning of looking at it and
21 talks about drilling, it talks about explosives, it
22 talks about the countdown and conditions following the
23 demolition.  Structure's going to fall down over a
24 certain amount of time and it's going to create dust.
25     Q    And this plan and procedure had no dust

Page 57

1  mitigation plan in it, correct?
2      A    Correct.
3      Q    Have you ever provided a dust mitigation plan
4  in your plan and procedures for a project?
5      A    No, not specific.  Again, our scope is to get
6  it ready and knock it down at the request of our client.
7  One of our conditions is the dust is yours.  You know,
8  we're not -- we're not forcing anybody to use our
9  services, but the -- the byproduct of our services is
10 the creation of the dust and -- and their clean-up of
11 same, so --
12     Q    Do you recall having a specific conversation
13 with MCM about dust related to the Crawford project?
14     A    No, I did not have any conversations.
15     Q    Okay.  Let's look at another exhibit, Exhibit
16 5.  This is Exhibit 5, MCM Management Corporation
17 Subcontract for Performance of Work with Subcontractor
18 Control Demolition Incorporated.  It's Bates stamped
19 CTRL 14196 through 14213.  And so this is the contract
20 between MCM and CDI for the Crawford project, correct?
21         (EXHIBIT 5 MARKED FOR IDENTIFICATION)
22     A    Correct.
23     Q    And on the bottom of the first page, you
24 signed it on behalf of CDI, correct?
25     A    Correct.



Kentuckiana Reporters
30 Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1    Q    On March 4, 2020?
2    A    Yes, that's the date.
3    Q    And Eric Dovas from MCM signed it on
4    March 4, 2020 as well?
5    A    That's the date he wrote, yes.
6    Q    Okay.  There are a number of initials
7    throughout the contract.  RDZ, did you make those
8    initials?  The RDZ initials?
9    A    Yes, those are my initials.
10   Q    There are also a number of strikethroughs
11   through the contract.  Did you make those strikethroughs?
12   A    Yes, I did.
13   Q    Okay.  And there's also handwriting, for
14   instance, in paragraph three.  Is that your handwriting?
15   A    Yes, it is.
16   Q    Okay.  Can you read what the handwriting says
17   after -- in paragraph three?
18   A    "As limited by subcontractor's proposal
19   (attached as Exhibit B)."
20   Q    Okay.  And then under General Conditions on
21   the next page in paragraph one, there's some other
22   handwriting.  Is that your handwriting?
23   A    Yes.
24   Q    And can you read that handwriting --
25   A    "To the extent of insurance provided by the

Page 59

1    subcontractor and limited herein."
2    Q    Okay.  And then onto 2V, is that your
3    handwriting as well?
4    A    Yes.
5    Q    And can you read what that says?
6    A    "Subcontractor will provide quotes for various
7    limits."
8    Q    All right.  And onto the next page, paragraph
9    five.  That's your handwriting that says "Illinois"?
10   A    Yes.
11   Q    Okay.  And so why did you make the
12   strikethroughs through the contract?
13   A    To make it consistent with the terms and
14   conditions of our proposal.  The items -- items
15   scratched out are usually exceptions that we take in our
16   proposal and if they're not struck through on a
17   document, then they -- your proposal becomes moot.
18   Q    Okay.  To your knowledge, did Eric Dovas make
19   any edits to this contract?
20   A    Not that I recall.  If -- if there were, it'd
21   be in a different handwriting.
22   Q    And do you know how many times the contract
23   went back and forth before it was signed on
24   March 4, 2020?
25   A    No.  Again, I'd have to look.  Sometimes the

Page 60

1    client will take -- take a -- you know, the first set of
2    revisions, you know, as is.  And sometimes they say,
3    "Well, I -- I -- I'd like you to take this back and that
4    back," but it -- it'd be in the file.
5    Q    Would it be easy for you to look up how many
6    times the contract went back and forth?
7    A    Probably.
8    Q    Yeah.  Would you mind doing that?
9    A    Hopefully I won't lose you.
10   Q    Hopefully not.
11   A    Some reason it's not letting me minimize this.
12   Q    I had the same problem.
13   A    Yeah, it's like I can't do anything.
14   Everything I click on, nothing happens.  Maybe it's
15   because this exhibit is up.  I'm not sure.
16        MS. HAMILTON:  Let's take this exhibit down for
17   a minute, if you wouldn't mind, Lindsay.  Thank you.
18   A    All right.  That seemed to do the trick.  This
19   was project submittals.  Came in -- their contract came
20   in on February 21.  I sent revisions over on the 24th,
21   and it was executed on the -- so appears there was just
22   one set of revisions.
23   Q    Okay.  Thanks for looking that up.  Can you
24   put the exhibit back up please, Lindsay?  So the other
25   initials appear to say ED.  To your knowledge, is that

Page 61

1    Eric Dovas' initials -- or sorry, did Eric Dovas initial
2    this contract?
3    A    I'm assuming so.  I wasn't -- I wasn't there
4    to witness it, but --
5        MR. DEVRIES:  It's -- object to foundation.
6    This is Ed DeVries.  Sorry.
7    Q    And it looks like there's initials ED next to
8    all of your handwritten additions; is that correct?
9    A    Yeah.  So when I strikethrough something, I
10   initial it to let them know that it was me.  And they --
11   when it comes back with the client's initials on it, it
12   -- it means that they accept the strikethrough.
13   Q    Okay.  So the client here accepted all of your
14   edits to this contract, correct?
15   A    Yes.
16   Q    And so per this contract, who was responsible
17   for dust mitigation efforts generated by the implosion
18   of the Crawford chimney?
19   A    That would be MCM.
20   Q    And does that say -- does that -- do you know
21   where that's stated in the contract?
22   A    It would be under CDI's general conditions.
23   Probably GC9, I believe.  Our proposal's attached to the
24   subcontract.  It'd be probably the third to the last
25   page of this attachment.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 18 of 49 PageID #:1832
The Deposition of RAYMOND ZUKOWSKI, taken on February 04, 2022

62..65

Page 62

1    MS. HAMILTON: Lindsay, can you go to the third
2  to the last page?
3    A    Keep going. One more page. I'm sorry. Oh,
4  we went too fast. One more up. Do you see -- there you
5  go. Our conditions changes. Making sure I got the
6  right one. If you could go to the next page please?
7    MR. RICE: Yeah. For some reason it seems like
8  you're missing a page in this document.
9    THE WITNESS: Yeah. Because this is page -- if
10  you -- I can't -- it's page blank of whatever. If
11  you could scroll up. I just can't read it. It says
12  --
13    MR. DRISCOLL: This is Sean Driscoll for the
14  record. It's Bates stamped, I think, correctly. So
15  we -- this is production, right, that you produced?
16    MS. HAMILTON: Yeah, this is -- this was
17  produced to us, and the Bates stamped --
18    MR. RICE: Well, what -- let me explain here
19  for something. The exhibits that you produced today
20  via the link has this complete copy. For some
21  reason, the document you're pulling up right now,
22  unless you can go back one page, that is the end of
23  GC9 there prior to GC10, but for some reason the
24  previous page did not have GC9 on it. I don't know
25  why, but it's on the document you produced by the

Page 63

1  links, but it's not -- this is not the same -- can
2  you go back one page there to page 16? See, for
3  some reason that page is missing. I don't know
4  what's going on with the shared document here. It's
5  not the same as the one that you sent out earlier
6  today.
7    THE WITNESS: Yeah, you're missing GC7 and 8.
8  This isn't --
9    MR. RICE: Yeah, I don't --
10    THE WITNESS: This is not complete.
11    MR. RICE: Yeah.
12    MR. DRISCOLL: Hold on. Andrew, what I would
13  tell you is I'm looking at the link right now and
14  I'm going down to the terms and GC9 is not included
15  in that. So I don't know what link you're looking
16  at, but the link that I received for documents
17  today, which would be 5-CTRL014196 fully executed
18  subcontract does not have that page in it.
19    MR. RICE: I would disagree. I'm looking at it
20  myself here. I've got --
21    MR. DRISCOLL: I'm looking at it myself, too.
22    MR. DEVRIES: I'm looking at it and I'm -- I
23  see GC9. It's page 15 of 18.
24    THE WITNESS: Yeah.
25    MR. SMITH: And everyone, I think maybe to cut

Page 64

1  through this, I think the pages might be out of
2  order in this document. So if you look at page --
3  the fourteenth page of the PDF, it says page 4 of 8.
4  Scroll down, it says page 6 of 8. You scroll to the
5  next one, it says page 5 of 8. So I think pages 5
6  and 6 are out of order.
7    MR. DEVRIES: Yeah, you need six of eight.
8    THE WITNESS: GC9 right there.
9    MR. RICE: Oh, I see it. Yeah. Okay. It's --
10  obviously it's out order. Got you. Okay.
11    THE WITNESS: Under -- yeah, continue down
12  under second paragraph at GC9.
13  BY MS. HAMILTON:
14    Q    Okay. And for the record, we produced this --
15  or you know, this exhibit is -- was produced by CDI and
16  it's Bates stamped. It appears to be out of order, but
17  it's -- the Bates stamp is in order. Just the document
18  itself is out of order. So GC9 is where --
19    A    Where the contract -- the -- the contractor
20  agrees to be solely responsible for and agrees to defend
21  and indemnify, blah, blah, blah, blah, blah. And it
22  lists a myriad of things and one of those things is
23  dust.
24    Q    And can you tell me where the paragraph --
25    A    One, two, three, four -- at the end of the

Page 65

1  fifth sentence, it said, "Time of CDI's operations, dust
2  or smoke generated by the implosion; consequences of
3  splash of soil, mud or debris resulting from CDI's
4  felling in the structure."
5    Q    Did you discuss this particular provision with
6  Eric Dovas of MCM?
7    A    It's not a revision. It was part of our
8  original subcontract -- part of our original proposal.
9  Excuse me.
10    Q    And there -- you didn't make any edits to this
11  provision in the contract that was signed by you and
12  Eric Dovas on March 4, 2020, correct?
13    A    No, this is a copy of the proposal that he
14  signed off on initially.
15    Q    And then there are there other revisions in
16  the Exhibit B contract?
17    A    On CDI's Exhibit B?
18    Q    Yes, to this?
19    A    Unless there's -- there's a strikethrough,
20  then no. This is a copy of the proposal that went out
21  for the project and was accepted by the client.
22    Q    And can you just scroll up, Lindsay, starting
23  with GC1, Exhibit B. Oh, here it is. Exhibit A.
24  Sorry, go -- sorry. You can stop on Exhibit A, Special
25  Conditions. And those are initialed by you and Eric



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1  Dovas at the bottom, correct?  This page?
2      A    Yeah, this -- the -- the -- the -- the
3  proposal that he signed off on or accepted, he initialed
4  the proposal, was made part of the subcontract.  It's
5  just the -- this -- our subcontract was attached in as -
6  - as an exhibit to the proposal.
7      Q    Okay.  And then --
8      A    The date -- the date he accepted this proposal
9  should be under the signature page.  If you go up one
10  page, it should be there.
11     Q    Right.
12     A    No, keep going.  One more page.  He -- he
13  accepted the proposal
14  11-15-19.
15     Q    Okay.  Can we go to the next page please,
16  Lindsay, in this document?  And this -- there's a
17  revision there in paragraph five, correct?
18     A    Yes.
19     Q    And did you make that revision?
20     A    Yeah, they -- they, as in MCM, requested that
21  we provide $7 million general liability insurance.
22     Q    And did you provide $7 million general
23  liability insurance?
24     A    I believe so.  I know there were some -- some
25  change orders for additional insurance after the fact.

Page 67

1  I'd have to pull up, you know, those specific documents,
2  but if I struck through and wrote seven, it was per
3  their request.  So if I find the insurance certificate,
4  which I'm sure somebody has a copy of, we'll tell you
5  the limits that we have.
6      Q    Okay.  And then can you go to the next page
7  please, Lindsay?  This is Exhibit A, Special Conditions,
8  and this is initialed by both you and Eric Dovas,
9  correct, at the bottom?
10     A    Yes.
11     Q    And then can you go to the next page, Lindsay?
12  And then Exhibit B, General Conditions, I think it says
13  at the top.  Wait, hold on.  Let me -- yes.  General
14  Conditions continued.
15     A    Well, this is where we're out of order here.
16     Q    Right.  Throughout Exhibit B, General
17  Conditions, are there -- did you make any revisions?
18     A    Scroll through, please.  Keep going.  One more
19  please.  No, I don't see any revisions made.
20     Q    But you and Eric Dovas initialed every page of
21  the Exhibit B, General Conditions, correct?
22     A    Yes.  Back in -- he -- again, he signed it --
23  he signed this in November.  He -- he initialed it in
24  November and sent it back.  And I either initialed it
25  and sent it back that day or initialed -- initialed it

Page 68

1  when it went out with the subcontract.  I'm not sure.
2      Q    Okay.  And who was -- for this contract, the
3  whole contract, who was responsible for clean-up of post
4  implosion dust or debris?
5      A    MCM.
6      Q    And where in the contract does that -- does it
7  state that?
8      A    GC9.  We just -- we were just there.
9      Q    Okay.  Is there anywhere else in the contract
10  where the -- there's a discussion of who's responsible
11  for the clean-up of post implosion dust or debris?
12     A    I'd have to read the contract from beginning
13  to end.  There might be.  The dust may be -- dust or
14  debris may be mentioned somewhere else in our General
15  Conditions.  I think it's under "The contractor will" on
16  our proposal that they'll be responsible for dust and
17  debris.  So if you go up to the third page of our
18  proposal, keep going up please.  All right.  Oh, hang
19  on. And it will.  And scroll down.  "Contractor will,"
20  number five, "clean-up post implosion dust/debris to
21  satisfaction, regulatory agencies, and or contractor's
22  client."
23     Q    And did you discuss clean-up post implosion
24  dust or debris with Eric Dovas prior to signing this
25  contract?

Page 69

1      A    No.  CDI and MCM have -- have done numerous
2  projects in the past that they're a well-versed
3  contractor on -- on what to expect.  And again, that's -
4  - it's not our job to tell them what to do.
5      Q    So at any time during the formation of this
6  contract, did you discuss CDI being responsible for dust
7  mitigation efforts for the implosion of the Crawford
8  chimney?
9      A    No, I -- I never had those conversations.
10  Again, it's -- it's not -- it's not our contract -- not
11  in our contract.  I'm sorry.
12     Q    Did you ever discuss CDI providing dust
13  mitigation measures with anyone at Hilco?
14     A    No.
15     Q    Okay.  And let's now look at Exhibit -- you
16  show 121, please, which I believe is Exhibit 6?
17          (EXHIBIT 6 MARKED FOR IDENTIFICATION)
18          COURT REPORTER:  Yes.
19          MS. HAMILTON:  And having the same issue of not
20  being able to get out the Zoom.  Hold on a second.
21          COURT REPORTER:  Do you want me to stop sharing
22  real quick?
23          MS. HAMILTON:  Oh no, that's okay.  I figured
24  it out.
25          MR. DEVRIES:  You said this is 6?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 70

1    MS. HAMILTON: This is Exhibit 6.
2    MR. DEVRIES: Oh, 120 -- no, I'm sorry. Okay.
3    All right.
4    COURT REPORTER: I'm sorry, who was that that
5    just spoke?
6    MR. DEVRIES: That was Edward DeVries. I was
7    confused between the 6 and the 121. I'm
8    straightened out, though.
9    BY MS. HAMILTON:
10    Q    Okay. This is Exhibit 6, Crawford Generating
11    Plant CGP, Final Exhaust Stack Reduction Submission,
12    Crawford Generating Plant with a date of
13    September 29, 2019. Bates stamped CTRL 2118 through
14    2134. And Lindsay, if you wouldn't mind just scrolling
15    through the exhibit slowly. My question for you,
16    Mr. Zukowski, is have you ever seen this exhibit before?
17    A    Yeah, but just recently. I had no knowledge
18    of it prior to the project.
19    Q    Prior to the Crawford project?
20    A    Yeah. Well, I -- I was never -- this document
21    was never shared with me before we shot the chimney.
22    Q    Okay. So when did you see this document?
23    A    Andrew showed it to me.
24    Q    When did --
25    THE WITNESS: Andrew, last week, was it? Two

Page 71

1    weeks ago?
2    MR. RICE: I believe it may have been, yeah,
3    January 16th perhaps.
4    THE WITNESS: Okay.
5    BY MS. HAMILTON:
6    Q    Okay. And so the first time you saw this
7    document was in January of 2023?
8    A    Yes.
9    Q    Okay. So it was not provided to you prior to
10    your development of the CDI plan for the Crawford
11    project?
12    MR. DEVRIES: I'm going to object to the form
13    of the question that it assumes this document was
14    able to be provided, but the witness can answer.
15    A    I was not provided this document.
16    BY MS. HAMILTON:
17    Q    Okay. So looking at page 4 of this document -
18    - well, first of all, this document was prepared by
19    JEI/MTS. Are you familiar with JEI?
20    A    No, I am not.
21    MR. DEVRIES: Objection to form.
22    Q    And are you familiar with MTS?
23    A    No, I am not.
24    Q    Has CDI ever worked with JEI or MTS before?
25    A    Not to my knowledge, no.

Page 72

1    Q    Okay. Sorry. Let's look at page 5 actually.
2    So page 5 under Section 2.4.4, Whole Structure
3    Mechanical. This document reads, "This approach
4    contains a variety of higher risk and potentially
5    significant impacts, but each of these can be reduced or
6    minimized through adequate preparation and planning.
7    Moreover, this approach contains the ability to duration
8    of effects of work and significantly reduce potential
9    for hazardous working conditions -- condition for those
10    involved." Do you agree with this recommendation for
11    the type of demolition method to use for the Crawford
12    project?
13    MR. RICE: Object to the --
14    MR. SMITH: Objection.
15    MR. RICE: Go ahead. I'll go after you.
16    MR. SMITH: Objection. Form. Foundation.
17    COURT REPORTER: I'm sorry, who was it that's
18    making those objections?
19    MR. SMITH: It's Michael Smith for Hilco.
20    MR. RICE: And Andrew Rice for CDI.
21    MR. DEVRIES: And MCM joins.
22    BY MS. HAMILTON:
23    Q    You can answer.
24    A    I'm reading through their -- whomever, again,
25    their whole segmental reduction and whole structure

Page 73

1    mechanical. I -- I've never even heard of these terms
2    before. Obviously, someone not in the demolition
3    industry probably was the author of this document. So -
4    - so I -- I -- I don't even -- I'm confused as to
5    what they're even trying to say. So it's a term I've
6    never heard of. Whole structural -- whole structure
7    mechanical. Is that conventional? What -- what are they
8    meaning? These are using terms that are not used in the
9    demolition world.
10    Q    Okay. And do you know what segmental
11    reduction means?
12    A    No. What are they talking? Are they talking
13    about soft cutting it and picking it down in pieces or
14    are they -- what is that? Is there a definition of it
15    somewhere?
16    Q    Let's see --
17    A    Not -- not a demolition term that's used in
18    our industry.
19    Q    Okay. All right. Let's go up to page 2.
20    Under Section 2.1, Types of Potential Demolition
21    Approaches. And so would you agree with the definition
22    of deconstruction means?
23    MR. SMITH: Object to form.
24    COURT REPORTER: Who was it that made that
25    objection? I'm sorry.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA COURT REPORTERS**

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1       MR. SMITH:  Michael Smith, with Hilco.
2    BY MS. HAMILTON:
3       Q    Maybe you guys could just say your names
4    before you make an objection or after you make an
5    objection, so the court reporter knows and doesn't have
6    to ask every time.  I appreciate that.  You can answer
7    the question.
8       A    Yeah, I mean, deconstruction's not a -- again,
9    it's not a term widely used.  This is -- this is manual
10   demolition.  Again, where the guy's got to climb all the
11   way up to the top and use the little jackhammers and
12   busters and bust it up and work their way down.
13      Q    And then do you agree with the definition of
14   segmental demolition?
15      A    No.  Could it be done?  Are they -- again, are
16   they talking about cutting it in chunks and lifting
17   chunks off instead of little pieces?  Sure, it could be
18   done.  It's not done.  Certainly couldn't -- wouldn't be
19   effective on this project.
20      Q    Why wouldn't it be effective on this project?
21      A    Try to find me a crane that can reach 378 feet
22   that can pick up anything of -- of any size down.
23   You're -- you're limited to the size of equipment that
24   you have available.
25      Q    Has CDI ever --

Page 75

1       A    Could -- could -- could it be done?
2    Absolutely.  But you'd spend a fortune, though.
3       Q    And has CDI ever done any segmental
4    demolitions prior to April of 2020 to your knowledge?
5       A    Not to my knowledge, no.
6       Q    And then do you agree with the definition for
7    whole structure reduction?
8       A    Reducing -- provides for reducing the stack in
9    one piece, reducing, what, its height?  Again, it's --
10   it's not very clear what they're trying to get their --
11   their point across here.
12      Q    And you said whole structure reduction is not
13   a term used in the demolition industry?
14      A    Correct.
15      Q    And so has, to your knowledge, has CDI ever
16   demolished something using a whole structure reduction
17   method?
18      A    I've never said -- those words have never come
19   out of my mouth, I'll tell you that.  No, I'm not going
20   to -- I'm not going to agree to say that we did when
21   it's not a term that we use.
22      Q    Okay.  So let's go to page 10, please.  This
23   says, "The effect of this degradation impacts both the
24   selected approach as well as the methodology and timing
25   of the actual demolition."  And then Section 3.10 says,

Page 76

1    "Environmental.  There are various environmental
2    elements involved with stack demolition.  Each of the
3    three identified have been given consideration during
4    the evaluation approach methodology.  From the selected
5    methodology, the following observations and controls
6    have been compiled."  So first is there -- did CDI
7    consider these environmental elements of noise, dust,
8    and debris in its plan for the felling of the Crawford
9    chimney?
10      MR. SMITH:  Michael Smith for Hilco, objection
11   to form.
12      MR. DEVRIES:  MCM will join.
13      Q    You can answer.
14      A    Noise, yes.  If you look at our exclusion zone
15   map that we generated, part of that exclusion zone is --
16   is based on how loud it's going to be.  Because if -- if
17   -- OSHA has a -- a -- a threshold of how loud you can
18   subject third parties to or workers to without providing
19   hearing protection.  And that's based on a calculation
20   of how many pounds of explosives are going off in any
21   one delay.  And that was taken into consideration in an
22   exclusion zone.  And it was also confirmed by our post
23   shot readings of the, you know, of -- of the event by
24   the size of the graphs that we set up.
25      Q    What about dust and debris?

Page 77

1       A    Dust --
2       Q    Was dust considered by CDI?
3       A    Again, dust is not CDI's responsibility.  And
4    people -- we don't force people to use us.  They call us
5    because it's usually a quicker and more effective way.
6    But part of that quicker and effective way is the -- is
7    the - - is dealing with the dust, so no to dust.  And
8    debris in certain circumstances, sure.  If I had to
9    worry about debris from the -- the -- from the shot
10   impacting structures to remain, then it would be, you
11   know, maybe we could take the structure a different way
12   or you have to put some protection up.  But yeah, noise,
13   certainly.  Dust, no.  Debris, sometimes.
14      Q    For the Crawford plant or Crawford chimney
15   specifically, was there anywhere in your plan that
16   accounted for debris or debris?
17      A    No, because again, what time we shot the
18   chimney, most everything around it was wrecked or -- or
19   soon to be wrecked.  And, you know, we had a clear open
20   fall path, and the -- the structure went exactly where
21   it was supposed to go.  And again, debris stayed right
22   there on the job.
23      Q    Okay.  So 3 -- 3.10.2 reads, "The stack is
24   constructed of concrete with interior layers of
25   insulation and steel.  The dust arising will only



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

1  minimally, -- minimally be the product of concrete
2  structural disintegration, but more likely soil impact.
3  For that reason, JEI/MTS recommend attempting to time
4  the reduction and impact immediately after a large
5  precipitation event (preferably in excess of one inch)."
6  Do you agree with JEI/MTS' recommendation?
7       MR. DEVRIES:  Object.
8       A   No, because -- no, because you pick a date,
9  and is it going to rain an inch the day before?  What if
10 the -- what if there's no rain in the forecast for --
11 for two weeks or a month?  What if this job was in
12 Nevada?  I mean these people couldn't write these
13 things.
14      MR. DEVRIES:  And this is MCM.  I was just
15      going to object again to using this particular
16      document to identify any supposed recommendation.
17      MR. SMITH:  Hilco joins.
18      MR. RICE:  CDI joins.
19      A   I mean, I join, too.  This is -- I've never
20 seen this until recently and I don't know who these
21 people are and what their skills or qualifications are,
22 but they're using -- they're using stuff that us -- us
23 demo guys don't use.
24 BY MS. HAMILTON:
25      Q   So did CDI attempt to time the demolition of

Page 79

1  the Crawford chimney after a large precipitation event?
2       A   No.
3       Q   Did CDI ever consider timing the demolition of
4  the Crawford chimney after a large precipitation event?
5       MR. RICE:  I'm -- Andrew Rice.  I'm going to
6       object based on the assumption that CDI had some
7       involvement in picking the date.  Go ahead, Ray.
8       A   Agreed.  The date was chosen by MCM in concert
9  with Hilco and the City about what day worked best for
10 them for the closure of Pulaski Highway or Pulaski Road.
11 Excuse me.  And they came back to us to say, are you
12 available on this date?  And we said yes.
13      MS. HAMILTON:  Okay.  I'm sorry, Lindsay, could
14      you read back my question?
15      COURT REPORTER:  Yep.  Give me just one moment.
16      Please stand by.
17      (REPORTER PLAYS BACK REQUESTED QUESTION)
18      COURT REPORTER:  Do you need me to play it
19      again?
20 BY MS. HAMILTON:
21      Q   No, that's okay.  So did CDI play any role in
22 the timing of the event of the Crawford chimney
23 demolition?
24      A   None other than our availability -- our
25 availability to do it on the date and time requested.

Page 80

1       Q   Okay.  This document, the MTS document, goes
2  on to read, "This will have saturated the soil to a
3  depth of at least four inches and result in the lowest
4  level of dust other than if accomplished during the
5  winter with the ground frozen or covered with snow.
6  Timing considered -- considering wind direction for the
7  reduction will also be employed.  The most important
8  component of this approach is sufficient wetting.
9  Chicago Department of Public Health has warned in a
10 response to evaluation of this plan that 'No matter how
11 much water is believed to be needed, we would need more
12 than that.'  JEI/MTS has duly consider this element and
13 contained in Section 5.0 are the amplified responses to
14 the CDPH warning."  Do you agree with CDPH'S warning?
15      MR. DEVRIES:  I'm going to, again, object to
16      the use of this 29 September document for
17      questioning.  That's MCM.
18      MR. RICE:  Andrew Rice, CDI.  I will join.
19      MR. SMITH:  Hilco.  Also add the form and
20      foundation objection, joins previous objections.
21 BY MS. HAMILTON:
22      Q   You can answer.
23      A   Do I agree with the CDPH statement?  Again,
24 I've never seen this document until just recently, so I
25 don't know who the author is and -- and what their

Page 81

1  qualifications are or what communications they have with
2  outside agencies.  So I do not agree.  I can't agree.
3  I'm -- I'm -- I'm not in a position to agree.
4       Q   As you sit here today, do you agree with the
5  notion that following an the -- an implosion of the
6  Crawford chimney, that no matter how much water is
7  believed to be needed, we would need more than that?
8       MR. RICE:  Objection.  Asked and answered.
9       MR. SMITH:  Hilco joins.
10      MR. DEVRIES:  MCM joins and will also object to
11      form as far as "more than that."
12 BY MS. HAMILTON:
13      Q   You can answer.
14      A   It's -- it's impossible for me to say how much
15 water is -- is required.  If these people were so smart,
16 they should have told us.  And -- and you know, again, I
17 don't know who these people are and -- and what their
18 qualifications are, but --
19      Q   When you mean -- when you say, "these people,"
20 who are you referring to?
21      A   The author of this document.  Who are they?
22 What do they do for a living?  What are their -- what
23 are their qualifications on explosives demolition?  I've
24 been doing this a long time.  I've never heard of them.
25      Q   Did you have any conversations with the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 23 of 49 PageID #:1837
The Deposition of RAYMOND ZUROWSKI, taken on February 10, 2023

82..85

Page 82

1  Chicago Department of Public Health regarding the
2  Crawford project?
3      A    No.
4      Q    In your past demolition work in Chicago, have
5  you been in contact with the -- or did you have any --
6  had you been in contact with the Chicago Department of
7  Public Health?
8      A    Not me personally, no.
9      Q    Has anybody at CDI been in contact with the
10  Chicago Department of Public Health for prior CDI
11  projects in Chicago?
12      A    I have no way of answering that.
13      Q    So you don't know one way or the other?
14      A    I -- yeah.  Again, who was -- who was speaking
15  to who and when?  I mean, there's no way I have any --
16  any knowledge of any of those conversations.
17      Q    Do you agree that sufficient wetting is the
18  most important component to minimize dust following an
19  implosion?
20          MR. RICE:  Objection for vagueness.  But go
21      ahead, if you understand the question.
22      A    No, it's -- it's -- sorry.  It's -- it's a --
23  it's a -- the question is vague and -- and define
24  sufficient wetting.  If they're -- they wanted to wait
25  for a torrential downpour and now you've actually made

Page 83

1  the -- you -- you -- four inches of -- saturate the soil
2  to a depth of at least four inches, these people
3  obviously don't know what they're talking about because
4  if -- that's mud and now when the chimney lands on the
5  ground, you just created a mud wave, which is a giant
6  displacement of -- of dirt and rocks and plus the debris
7  of the chimney itself.  Now you've given the -- the
8  chimney and the ground a vehicle to send particles
9  flying through the air other than dust.  It's a bad
10  recommendation in my opinion.
11      Q    Do you believe that wetting the ground before
12  an implosion plays any role in -- well, actually strike
13  all that.  In prior demolitions, have you ever
14  considered wetting the ground before a demolition to
15  minimize dust?
16          MR. RICE:  I'm sorry.  Andrew Rice.  I'm
17      objecting just to the fact that they -- CDI has
18      stated they don't do this but go ahead.
19          MR. SMITH:  Michael Smith, Hilco, object to
20      form and join previous objection.
21          MR. DEVRIES:  MCM will join.
22  BY MS. HAMILTON:
23      Q    You can answer.
24      A    It's standard practice to wet the ground,
25  whether you're blasting the structure or taking it down

Page 84

1  conventionally in the haul roads, it's -- you know.
2  Does wetting the ground help?  But it -- it does zero to
3  stop the dust from the fracture of the concrete.
4  There's -- it's physically impossible to wet the inside
5  of a 18-inch thick piece of concrete.  You can -- you
6  can spray all the water you want, but you'll -- you'll
7  never -- the water will never penetrate the concrete
8  fully.  It just can't happen.  So does it help with dust
9  from the ground?  Sure, it does, but it does absolutely
10  zero for the dust from the concrete itself.  You got to
11  remember there's dust from the chimney itself, the
12  concrete and the brick, and the ground, which is the
13  ground.  They're not the same, so --
14      Q    And when you say standard practice to wet the
15  ground before demolition, is that a practice that CDI
16  performs?
17      A    No, again, dust is not our responsibility.  If
18  you go to any major demolition project in Chicago or
19  anywhere else in this country, you'll always see a water
20  truck run around all day wetting down the haul roads,
21  spraying water on what they're wrecking.  It's just
22  standard practice.  So, you know, can you -- can you
23  completely mitigate the dust?  No, but you can try.  And
24  if you can make the attempt why, you know, make the
25  attempt.  If it helps, great.  If it, you know, it

Page 85

1  doesn't, it doesn't.
2      Q    Are you aware whether or not the ground was
3  wet -- wetted before the Crawford chimney demolition?
4          MR. SMITH:  Object to form.  Michael Smith for
5      Hilco.
6      Q    You can answer.
7      A    I knew they had water trucks.  They, as in
8  MCM, had water trucks or -- or truck or trucks.  Not --
9  I don't remember if it was one or two.  And did they wet
10  the area?  Yes, I believe, and I believe they had the
11  DustBosses set up.  You know, only -- only concern with
12  the trucks is at a certain point in time we have to cut
13  them off because we have to make the final connections
14  to the chimney with our -- our lead line.  We can't have
15  trucks running over it for obvious reasons.  So -- but I
16  -- I'm 99 percent sure that they did have water trucks
17  that day and that the fall area was wet.
18      Q    Did you say the default area?
19      A    The fall area, yes.
20      Q    The fall area.  And if the fall area hadn't
21  been wetted -- wet, would you have still been able to do
22  the demolition?
23      A    Yes.
24      Q    So there's no requirement that the fall area
25  is wet before a demolition occurs, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1    A    There's not a CDI requirement.  I'm -- if
2  there's something localized, some local provision for
3  it, then you know, yes, it could be.  But not for us on
4  this project, no.
5    Q    So on this particular project, you were not
6  required to stop the demolition if the ground wasn't
7  wet, correct?
8    A    Correct.
9    Q    And when you said it was standard practice to
10  wet the fall area before a demolition, in this case, who
11  would've been responsible for wetting the ground before
12  a demolition, if not CDI?
13    A    MCM.
14    Q    Okay.  Did you have any discussions with MCM
15  about wetting the fall area before the demolition?
16    A    Again, only as to when their trucks would stop
17  so it wouldn't interfere with us making the final
18  connections to the chimney.
19    Q    Okay.  Go to page 15.  15, Section 5.0, is
20  post demolition dust control.  And this reads, "In order
21  to" -- third paragraph.  "In order to achieve this,
22  JEI/MTS has arranged collaborative agreements with five
23  Chicago Fire Department CFD battalions to support this
24  demolition effort with up to 24 total engines, trucks,
25  and water tankers to assist in limited what may be an

Page 87

1  extremely pervasive dust event.  These will be augmented
2  by additional water trucks levied expressly for the
3  event.  However, the primary rationale for mechanical
4  demolition, which allows more acute timing control is to
5  repair the reduction during fair weather and then to
6  demolish the stack during a heavy rain event, allowing
7  nature to assist with the dust control." Do you agree
8  that demolishing the stack in a heavy rain event would
9  allow nature to assist with dust control?
10    A    No --
11        MR. DEVRIES:  This is -- go ahead, Michael.
12        MR. SMITH:  Michael Smith for Hilco, objection.
13  Form and foundation.
14        MR. DEVRIES:  MCM joins.  Also, again,
15  objecting to just even the use of this document.
16  It's inappropriate.
17        MR. RICE:  Andrew Rice, CDI will join as well.
18  BY MS. HAMILTON:
19    Q    You can answer.
20    A    Rain does zero to -- to knock the dust down.
21  Not -- I'm not going to say zero.  It does almost zero.
22  Again, all the dust generated by the fracture of the
23  concrete, the rain can't penetrate the concrete, nor can
24  it prevent that dust and nor can it palliate it in the
25  amount of time in -- in the short duration of how much

Page 88

1  dust is generated.  So again, I -- I -- I agree with
2  everybody else.  This document, I don't know where it
3  came from. I've been doing this 27 years and my god, 24
4  firetrucks?  What if there was an emergency in the city
5  for god's sakes.  That's -- that's, yeah.  I mean that's
6  a ridiculous amount of -- there -- there was two fire
7  trucks when we did this, and the City was involved with
8  the permitting from day one.  So I -- I don't know
9  where this document came from and who said it was going
10  to -- who -- who -- where were these other 22 firetruck
11  during the day if JEI had all these conversations?
12    Q    Did you have any conversations with the
13  Chicago Fire Department regarding trucks for the
14  Crawford demolition?
15    A    No.
16    Q    Did you have any conversations with MCM about
17  using firetrucks for the Crawford demolition?
18    A    No.
19    Q    Do you agree that the Crawford chimney
20  demolition may be an extremely pervasive dust event?
21        MR. DEVRIES:  This is MCM.  I'll object to
22  form.  Foundation, vague.
23        MR. RICE:  Andrew Rice, CDI will join.
24        MR. SMITH:  Hilco joins.
25  BY MS. HAMILTON:

Page 89

1    Q    You can answer.
2    A    No, it was just same -- this was no different
3  than the hundreds of chimneys that we've done prior to,
4  as respects dust, so --
5    Q    So prior to the demolition of the Crawford
6  Chimney, you didn't believe that it would be an
7  extremely pervasive dust event, correct?
8    A    Correct.
9    Q    If under the CDI -- actually strike that.
10  We'll -- let's show 160, please.  This is Exhibit 7,
11  Bates stamped CTRL 81 through 80 -- let's see, is that
12  86, I think? 88.  This is an e-mail from Jennifer L.
13  Renteria on behalf of Raymond D. Zukowski.  Who's
14  Jennifer L. Rent -- I don't know how to pronounce her
15  last name.  Renteria?
16        (EXHIBIT 7 MARKED FOR IDENTIFICATION)
17    A    She's -- she's one of the assistants here.
18    Q    And she sent this e-mail on your behalf,
19  correct?
20    A    Correct.
21    Q    And in this e-mail, you are sending Eric CDI's
22  revised preliminary plan and procedure and exclusion
23  zone drawing, correct?
24    A    Yes.
25    Q    And then go -- can you go to the last page of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 90

1  this document?  Okay.  Is this the exclusion zone
2  document?
3      A    Hard to tell, it's not in color, but I can see
4  the outline of the lines that match my exclusion zone.
5  Yes.
6      Q    And what is an exclusion zone?
7      A    As it say -- as it states, it's -- it's where
8  people are not allowed inside -- out -- inside the --
9  the -- the line, you know, or on their roofs to watch,
10  to keep them -- mostly to keep them from being exposed
11  to the 140 DBL.  Then it also stretches on the north and
12  south end to catch the road closure at the
13  intersections.
14      Q    And who created this exclusion zone document?
15      A    I started it and then there were some requests
16  to modify it and make it larger, which was fine with me,
17  larger the better.  And then ultimately it was changed
18  to add the locations of the DustBosses and the command
19  posts and all that, but I didn't make those changes.
20      Q    Do you know who did make those changes?
21      A    Yes, Eric Dovas.
22      Q    Did you instruct Eric Dovas to make those
23  changes?
24      A    No, it was based on a -- I -- he and I spoke
25  about it and he added it and he sent it to me.  Said,

Page 91

1  "Per our" -- you know, "Per our conversation, attached,
2  please find."  And -- and I didn't take any objections
3  to it.
4      Q    Did you have an understanding as to why Eric
5  was making those changes?
6      A    I -- I believe it had to do with Hilco's or
7  MCM's submittal to the City.  But again, they -- they --
8  they added where the command post was be -- was going to
9  be and where the firetrucks were going to be and where
10  the DustBosses were going to be, so I didn't feel that
11  was anything that I needed to object to.
12      Q    Did you have any input on where the DustBosses
13  or any of the other changes to the exclusions of
14  document, like where the location of those items would
15  be?
16      A    No, it was not my decision.
17      Q    Did you give any input on the location of
18  Eric's additional additions to the exclusion zone
19  document?
20      A    No, I think he asked if he could put the
21  command post where it was, and since it was outside of
22  my red line, I didn't -- I didn't take any objections to
23  it.  It seemed like a decent place to have it.
24      Q    Does the exclusion -- does this exclusion zone
25  document take into account dust migrating off-site?

Page 92

1      A    No, it does not.
2      Q    Are you aware of whether Hilco made any edits
3  to the exclusion zone document?
4          MR. SMITH:  Michael Smith, Hilco, object to
5  foundation and form.
6      You can answer.
7      A    I have no knowledge of Hilco modifying the
8  document.  No.
9      Q    Okay.  Can you pull up 33, please, Lindsay?
10  So this is an e-mail -- sorry, this is Exhibit 8 and
11  this is an e-mail.  Sorry, it's Bates stamp CTRL 381 to
12  382.  And this is an e-mail from you to Carol Groft,
13  correct?  On April 3, 2020?
14          (EXHIBIT 8 MARKED FOR IDENTIFICATION)
15      A    Yes.
16      Q    And scrolling down, there's an e-mail on this
17  exhibit from Nicholas Pullara to you on April 3rd,
18  subject, Crawford Chimney Exclusion Zone Community,
19  correct?
20      A    Correct.
21      Q    And the e-mail says, "Ray, as discussed, we
22  prefer to make the attached elements to the original
23  chimney exclusion zone to include in the community
24  notice.  If we can make the edits by 2:00 p.m. CST, it
25  would be greatly appreciated, and feel free to call me

Page 93

1  with any questions."  And did you --
2      A    Oh, yeah, because this is a -- if you scroll
3  down, this is -- he asked for one without our company
4  logo on it.  If you -- if you go to the attachment, he
5  wanted us to remove the title walk in the corner.
6      Q    And he wanted you to remove Notes paragraph
7  one, correct?
8      A    Yes.
9      Q    And he also wanted you to remove the warning,
10  correct?  The warning paragraph?
11      A    Yeah.  That's about having it sent out without
12  CDI's permission.  Yes.
13      Q    And did you allow him to remove those -- these
14  items?
15      A    Yeah, yeah.  I remember -- yeah, we talked
16  about it.
17      Q    Let me ask the question first before you
18  answer, just so we have a clear record.  You know where
19  I'm going, but -- you can go ahead and answer.
20      A    Yeah.  We didn't take any exception.  You
21  know, there -- there's -- if you're going to have a map
22  out within a community notice, there's no reason why
23  they need to know CDI's file number or anything like
24  that that was in the title block.  It just cleans up the
25  document.  We -- we felt that it wouldn't make any



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 26 of 49 PageID #:1840
The Deposition of RAYMOND ZUKOWSKI, taken on January 6, 2023
94..97

Page 94

1  difference if it was -- you know, people should know
2  what the exclusion zone is or where they can or can't
3  be.  But do they need to know, you know, who generated
4  it or who the client is and what the date was or
5  revision was?  No, those things are irrelevant.
6      Q    Are you aware of Hilco, of anyone at Hilco,
7  making any other edits to the exclusion zone document?
8      A    No.
9      Q    And you did not instruct Nick Pullara to make
10 these modifications to the exclusion zone document,
11 correct?
12     A    Correct.  He asked me if he could.
13     Q    So who normally sees the exclusion zone
14 document on an -- a demolition project?
15     A    Typically, obviously, my client does, and
16 their client and the -- any regulatory agencies involved
17 with the road closures or permitting.
18     Q    And why do you have to share with any
19 regulatory agencies that's involved in permitting?
20     A    They -- they're -- they have a right to know
21 what's going on, and the City of Chicago has specific
22 regulations as respects use of explosives in the city
23 limits, and if you have to close public right of ways,
24 you know, is that done by the DOT?  Is it done by the
25 police?  Is it done by the sheriff? That's all decided

Page 95

1  at the local level.  Those are outside of my scope of
2  work.  But, you know, we send out our suggested
3  exclusions zone, and so a lot of times, it gets modified
4  based on, you know, the -- whomever's in charge of the
5  road closure says, "No, no, no, no.  Let's move that
6  road closure back here.  That way, people can turn
7  around easier, and it's less -- less of an impact to the
8  community."  You know, we -- we give them the minimum,
9  and usually it gets expanded based on, you know, the
10 locality and who's actually in charge of the closures.
11     Q    Let's show -- can we look at 35, please?  So
12 this is Exhibit 9, Bates stamped CTRL 307 to 308, and
13 this is an e-mail from Eric Dovas to you and Jennifer,
14 correct?
15          (EXHIBIT 9 MARKED FOR IDENTIFICATION)
16     A    Yes.
17     Q    On April 2, 2020?
18     A    Yes.
19     Q    And it says, "Hello, Ray and Jennifer.
20 Attached is CDI's exclusion zone with a few
21 modifications I added per the phone meeting yesterday.
22 The west exclusion zone line is supposed to be moved
23 plus or minus 300 feet toward the west.  Can you use the
24 attached file and modify while keeping my modifications?
25 If so, please complete and return at your earliest

Page 96

1  convenience."  Did you modify the document after
2  receiving this e- mail from Eric?
3      A    I believe he -- he -- he put the mods on, and
4  it just went out as is because -- can you go to the
5  attachment, please?  Yeah, I'd have to -- whether we
6  took his -- yeah, we may have taken the -- the title,
7  where he put the boxes, where it's a command center at -
8  - and DustBosses and road closures within, I'm not sure
9  if they made it out to the final or not.
10         MS. HAMILTON:  Lindsay, is there a way to
11 switch the rotation of the document so that it's
12 landscape?
13         COURT REPORTER:  Let me see.  I don't know.
14 Let me try.  Oh, I had it.  There we go.
15         MS. HAMILTON:  Yep, that's great.  Thanks.
16     Q    So did you make the additions of the red boxes
17 that have text in them?
18     A    No, that was Eric.
19     Q    Okay.  And did you have any conversations with
20 Eric about him adding the red boxes and the text in
21 them?
22     A    Obviously, we had a conversation.  I don't
23 recall if it was specific to the text inside the boxes.
24 I know we talked about putting the command center on
25 there and making the commands, the -- the exclusion zone

Page 97

1  300 foot farther to the west, again, which is okay with
2  me.
3      Q    Did you instruct Eric where to put the
4  firetrucks in this document?
5      A    No.
6          MR. RICE:  Objection.  Asked and answered but
7  go ahead.
8      A    No.
9      Q    Did you instruct Eric to put -- where to put
10 the DustBoss and water truck at each side of the chimney
11 --
12         MR. RICE:  Objection.  Asked and --
13     Q    -- on this exclusion zone part of this
14 document?
15         MR. RICE:  Sorry.  I apologize.  Andrew Rice,
16 CDI.  Objection.  Asked and answered.  Go ahead, Ray.
17     A    No, we had -- we did not -- he did not ask me
18 where to put them, nor did I tell him.
19     Q    Are you familiar with Aaron Fitch of MCM?
20     A    Yes.
21     Q    Did you instruct him to make any modifications
22 of the exclusion zone document?
23     A    No, I don't recall.  Eric was -- or Aaron was
24 barely involved with this project.
25     Q    So I just want to make sure I understand your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 98

1  answer.  Do you not recall if you did or didn't have a
2  conversation with Aaron Fitch, or did you not have a
3  conversation with Aaron Fitch?
4      A    Did I have a conversation where I gave him
5  authority to change the exclusion zone drawing?  The
6  answer is no, if that was your question.
7      Q    Did you have any conversations with Aaron
8  Fitch about making any changes to the exclusion zone
9  document?
10     A    No.
11     Q    And you did not instruct Aaron Fitch to make
12 any changes to the exclusion zone document, correct?
13     A    No.
14     Q    No, that's not correct?
15     A    Aaron and I, to the best of my recollection,
16 never had any conversation regarding the exclusion zone
17 document.
18          MS. HAMILTON:  Okay.  Okay.  You can put the
19     exhibit down.  Thank you, Lindsay.
20          COURT REPORTER:  I'm sorry?
21          MS. HAMILTON:  You can put the exhibit down.
22 BY MS. HAMILTON:
23     Q    Did you have any conversations with anyone at
24 MCM about where the dust would migrate to you after the
25 implosion of the Crawford chimney?

Page 99

1      A    No.
2      Q    Did you tell anyone at MCM that the dust would
3  be contained within the exclusion zone?
4      A    No.
5      Q    Did you have any conversations with Hilco
6  about where the dust would migrate to after the
7  implosion of the Crawford chimney?
8      A    No.
9      Q    Did you or anyone at CDI explain to anyone at
10 Hilco that noise, dust, and debris were issues that
11 would be contained within the exclusion zone?
12          MR. SMITH:  Objection.  Form.
13          MR. RICE:  Andrew Rice.  Join.
14          You can answer.
15     A    No, the -- exclusion zone is for basically
16 how loud it's going to be.  Has nothing to do with, you
17 know, those distances with debris, or doesn't -- there's
18 no mention of dust.  Exclusion zones is not a dust zone.
19     Q    Do you think that dust would be dispersed
20 outside of the exclusion zone?
21     A    Again, which way is the wind going to blow?
22 No, I -- there's no way to answer that.
23     Q    Did you have any reason to think that dust
24 wouldn't be dispersed into the -- or dispersed outside
25 of the exclusion zone?

Page 100

1      A    I don't understand.
2      Q    Typically, dust is generated after an
3  implosion, correct?
4      A    Correct.
5      Q    And does dust usually migrate off-site after
6  an implosion?
7      A    It can, yes.
8      Q    Did you think that dust would migrate off-site
9  after this implosion of the Crawford chimney?
10     A    I didn't -- I did not give that any thought.
11     Q    Are there any measures that prevent dust from
12 dispersing off-site after an implosion?
13          MR. SMITH:  Michael Smith, Hilco.  Object to
14     form.
15          MR. DEVRIES:  MCM will join.
16          MR. RICE:  Andrew Rice, CDI.  I'll join.
17 BY MS. HAMILTON:
18     Q    You can answer.
19     A    What was the question again, please?
20          MS. HAMILTON:  Lindsay, can you play back the
21     question?
22          COURT REPORTER:  Yes.  Give me one moment.
23     Please stand by.  Sorry.  It's -- there we go.  My
24     speaker is not working.  Give me just a second.
25          (REPORTER PLAYS BACK REQUESTED QUESTION)

Page 101

1          MS. HAMILTON:  I believe it's the next
2     question.
3          COURT REPORTER:  Yeah.  It's -- for some
4     reason, it's not playing it.  I think there was a
5     little bit of delay.  Hold on a sec.
6          (REPORTER PLAYS BACK REQUESTED QUESTION)
7  BY MS. HAMILTON:
8      Q    Okay.  You can answer the question.
9      A    Define off-site.
10     Q    Outside of the exclusion zone.
11     A    The exclusion zone limits were -- most of the
12 exclusion zone limits were on the site.  So I'm not sure
13 where -- not sure where you're going with the question.
14 Sorry.
15     Q    Are there any measures that prevent dust from
16 migrating after an implosion?
17     A    No.  Sorry.
18     Q    Sorry.  You said your answer was --
19     A    No.  Again, it's -- dust is an unavoidable
20 byproduct of -- of what we do, and dust is going to go
21 which way the wind takes it regardless of -- of any --
22 an effort, 20 -- 22 firetrucks or 24 firetrucks and all.
23 You know, even if they were there, they can only spray
24 water so high, and if the dust is higher than where the
25 water is sprayed, it doesn't do any good, so --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 102

```
 1      Q    Would you agree that implementing any measures
 2  to control dust after an implosion is better than
 3  implementing no measures?
 4           MR. DEVRIES:  I'm going to object to the form
 5      of the question. It assumes that no measures were
 6      implemented, and it calls for speculation. It's
 7      incomplete and form. MCM.
 8           MR. RICE:  Andrew Rice, CDI.  I'll join.
 9           MR. SMITH:  Michael Smith, Hilco. I'll join.
10  BY MS. HAMILTON:
11      Q    You can answer.
12      A    As -- as was just stated, they did make an
13  effort.  They -- they had water trucks.  They had
14  DustBosses.  They -- the fire department had fire
15  trucks.  An attempt was made to palliate the dust.
16      Q    Right, but that was not my question.  My
17  question to you was would you agree that implementing
18  measures to control dust is better than implementing no
19  measures?
20           MR. DEVRIES:  Same objections for MCM and asked
21      and answered.
22           MR. SMITH:  Same objections for Hilco.
23           MR. RICE:  CDI.  Join.
24  BY MS. HAMILTON:
25      Q    You can answer.
```

Page 103

```
 1      A    Yes, of course, and again, an attempt was made
 2  to -- to mitigate the dust.
 3      Q    And who made the attempt to mitigate the dust
 4  after the Crawford implosion?
 5      A    I would have to assume it would be MCM because
 6  they're my client.
 7      Q    Why do you have to assume that it was MCM?
 8      A    Because dust is not our responsibility.
 9  Chimney falls down, we give the all clear. We're on the
10  next plane out of there.
11      Q    Do you know whether or not MCM made any
12  attempts to mitigate the dust after the implosion?
13           MR. RICE:  Objection.  Asked and answered,
14      considering he's talked about what he saw.  But go
15      ahead, Ray.
16           MR. DEVRIES:  MCM will join.
17           MR. SMITH:  Hilco will join.
18      A    Again, structure's on the ground.  All clear
19  is given. Everything went per plan.  Handshakes are
20  handed out.  See you later.  It's not our -- our
21  responsibility to monitor who or what cleans up the
22  dust.
23  BY MS. HAMILTON:
24      Q    Yes.  You said that you assumed that MCM, your
25  client, MCM, attempted to mitigate the dust, and I'm
```

Page 104

```
 1  asking you, did you actually observe them mitigating the
 2  dust?
 3      A    I -- I left site.
 4      Q    Okay.  So the answer is no, you did not
 5  actually see them taking any attempts to mitigate the
 6  dust after the implosion?
 7      A    Well, it's dust clean-up after the implosion.
 8  You can't mitigate something after it already happened.
 9  So I think we need to clear that up.  You have --
10  mitigation would happen prior to, and clean-up would
11  happen post. So there's post-dust clean-up.  Mitigation
12  would be before the event, and dust clean-up, post --
13  post-dust clean-up would obviously be after the event.
14      Q    Did you observe any pre-implosion dust
15  mitigation by MCM?
16      A    Yes.
17      Q    What did you observe?
18      A    They had the -- the -- the DustBosses set up,
19  and they had the water trucks going.  I believe they had
20  a street sweeper on standby or arranged to have a street
21  sweeper on standby.  I -- you know, someone arranged to
22  have the fire department there.  Whether that was MCM or
23  whomever, I -- I don't know.  But the -- those -- those
24  items were in place and operational before we shot.
25      Q    And did you observe any post-implosion dust
```

Page 105

```
 1  clean-up?
 2      A    No.  I'd left the site.
 3      Q    What would CDI have done if it had been
 4  responsible for dust mitigation under your contract with
 5  MCM?
 6           MR. RICE:  Objection, calls for speculation,
 7      incomplete hypothetical, and they don't do that.  So
 8      I think that's --
 9           MS. HAMILTON:  Please don't make speaking
10      objections.  I got your objection, but I -- you
11      know, you've had a few of those, and I've let them
12      go, but don't make speaking objections.
13           MR. DEVRIES:  MCM will join in the objections.
14           MR. SMITH:  Hilco will join as a form and
15      foundation objection.
16  BY MS. HAMILTON:
17      Q    You can answer.
18      A    We won't -- I -- I wouldn't do it.  I wouldn't
19  take on that responsibility.  Let me clarify that.
20  Those are -- those are items that do not fit our current
21  business model, and we do not have the resources to --
22  to -- to do that stuff.  We don't own DustBosses, and we
23  don't own trucks, or we don't own any equipment.  We're
24  just a super small little specialty blasting
25  subcontractor.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1    MS. HAMILTON:  Okay.  Can you show 138, please,
2  Lindsay?
3    COURT REPORTER:  Yes.  Give me --
4    MR. DEVRIES:  Hey, Danielle, whenever you have
5  a chance, I wouldn't mind just, like, a five-minute
6  break.  I'm not saying right away.  Just keep it in
7  mind.
8    MS. HAMILTON:  Yeah.  After this round of
9  questions, we can take a break.
10    MR. DRISCOLL:  And Danielle, just real quick,
11  how long do you think much more you have going, just
12  because if I'm going to have someone -- because I've
13  got to jump out somewhere.  Someone's going to come
14  on.  I want to give them an idea when they're going
15  to come on.
16    MS. HAMILTON:  I don't know.  I have, you know,
17  at least I would guess an hour's worth more, maybe
18  more than that.
19    MR. DRISCOLL:  Okay.  I mean, so if we take a -
20  - let's say we take a break in a couple minutes.  If
21  I tell someone they can pop on around 3:00, it's --
22  does that seem reasonable?
23    MS. HAMILTON:  Yeah.  3:00 Central?
24    MR. DRISCOLL:  Yeah.
25    MS. HAMILTON:  Yes.

Page 107

1    MR. DRISCOLL:  All right.  Thank you.
2    MS. HAMILTON:  No problem.  So this is Exhibit
3    10, I think.
4      (EXHIBIT 10 MARKED FOR IDENTIFICATION)
5    COURT REPORTER:  Yes.
6  BY MS. HAMILTON:
7    Q    This is a Crawford Generating Plant, CGP,
8  Fugitive Dust Control Plan for use of MCM Management,
9  and Lindsay, if you wouldn't mind just scrolling through
10  it.  I'm going to ask you, Mr. Zukowski, if you've ever
11  seen this document before.
12    A    Isn't this the same one we just looked at, or
13  is this different?
14    Q    This is different than what we --
15    A    No, I've never seen this.
16    Q    So -- sorry.  Your answer was you've never
17  seen the document?
18    A    No, it doesn't look familiar at all.
19    Q    I don't know if I marked the Bates stamp.  It
20  is CTRL 2057 through 2063.  So this document was not
21  provided to you prior to the demolition of the Crawford
22  chimney, correct?
23    A    Correct.
24    Q    Okay.  And then can we go to page 4, Section
25  2.0, Dust Control Approach, if that's the right page?

Page 108

1  Yes.  So this dust control approach says that a plan
2  will be implemented in conjunction with the standardized
3  requirements for demolition activities.  A site layout
4  map is provided and included as Figure 2, and can we go
5  to Figure 2, please?  Which is, I believe, on the next
6  page.  Oh, no, it's not.  Sorry.  It's on page 6.  Oh,
7  actually, sorry.  Let's go back to page 4, 2.0, Dust
8  Control Approach.  The second paragraph reads, "Control
9  of dust will be a top priority during the project.  The
10  primary equipment for dust control will be the use of
11  water trucks with a spray bar and hoses, along with
12  misting blowers.  Only potable water will be used for
13  dust control purposes."  Do you agree with this fugitive
14  dust control plan?
15    MR. SMITH:  This is Hilco.  Objection.  Form.
16    Foundation.
17    MR. DEVRIES:  MCM will join.
18    MR. RICE:  Andrew Rice, CDI.  I'll join as
19    well.
20  BY MS. HAMILTON:
21    Q    You can answer.
22    A    Again, you're asking me a comment on a
23  document I didn't have -- I didn't authorize to -- this
24  is a -- something between MCM and JEI, you know.  I -- I
25  was never given an opportunity to review it, you know.

Page 109

1  You know, "Controlled dust will be a top priority during
2  the demolition project."  I mean, I -- I don't like
3  throwing people under the bus, but this is a pretty
4  crappy document.  I mean, anybody could -- anybody with
5  common sense could have wrote that, so --
6    Q    Was the control of dust a top priority for CDI
7  during the Crawford demolition?
8    A    No.  Dust is not our responsibility per our
9  contract.
10    Q    Did CDI have a fugitive dust control plan for
11  the Crawford demolition?
12    A    No, we did not.
13    Q    Are you aware if MCM had a fugitive dust
14  control plan for the Crawford demolition?
15    MR. DEVRIES:  MCM will object to foundation.
16    Q    You can answer.
17    A    I have no knowledge of them having such a
18  plan.
19    Q    And did CDI follow any of this fugitive dust
20  control plan in paragraph -- the second paragraph of
21  2.0?
22    MR. DEVRIES:  MCM will object to form.
23    MR. RICE:  CDI will join.
24    MR. SMITH:  Hilco will join.
25  BY MS. HAMILTON:

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 30 of 49 PageID #:1844
THE DEPOSITION OF RAYMOND ZUKOWSKI, taken February 6, 2023

110..113

Page 110

1    Q    You can answer.

2    A    No.

3         MS. HAMILTON:  Okay.  You can put this exhibit

4    down.  Let's take a break.  Let's take a five-minute

5    break.

6         MR. DEVRIES:  That's fine for me.  Thank you.

7         MR. DRISCOLL:  You want to make it ten?

8         MS. HAMILTON:  Yeah, let's just come back at

9    1:00 Central.

10        MR. DRISCOLL:  Perfect.  Thank you.

11        (OFF THE RECORD)

12        COURT REPORTER:  All right.  We are back on the

13   record for the deposition of Raymond Zukowski on

14   February 6, 2023.  The current time is 2:01 p.m.

15   Eastern Standard Time.  You may continue.

16   BY MS. HAMILTON:

17   Q    Did you make any promises to Hilco that dust

18   wouldn't cause any issues off-site?

19   A    No, I did not.

20   Q    To your knowledge, did anybody else at CDI

21   make any promises like that to Hilco?

22   A    To my knowledge, no one made those promises.

23   Q    Did you make any promises to MCM that dust

24   wouldn't cause issues off-site?

25   A    No.

Page 111

1    Q    And to your knowledge, did anyone at CDI make

2    any promises like that to MCM?

3    A    No.

4    Q    Did you make any promises that dust wouldn't

5    cause issues off- site to anyone?

6    A    No.

7    Q    And to your knowledge, did anybody at CDI make

8    any promises that dust wouldn't cause issues off-site to

9    anyone?

10   A    No, to my knowledge.

11   Q    Okay.  Did you play any role in obtaining the

12   blasting permit from the City of Chicago for the

13   Crawford Demolition?

14   A    Other than attending one or two conference

15   calls with everybody involved, the -- permit was

16   handled by Hilco.

17   Q    And we'll go back to those conference calls,

18   but did you have any conversations with any City of

19   Chicago employees regarding the blasting permit for this

20   project?

21   A    Again, only in the conference calls.

22   Q    Okay.  Can you show 53, please?  Exhibit 11?

23   This is Exhibit 11, Bates stamped CTRL 27.  The top of

24   this is an e-mail from Eric Dovas to you on February 21,

25   2020, correct?

Page 112

1    (EXHIBIT 11 MARKED FOR IDENTIFICATION)

2    A    Yes.

3    Q    Okay.  And then at the bottom, there's an

4    e-mail from you to Eric Dovas on February 21, 2020 at

5    12:01 p.m.  Do you see that?

6    A    Yes.

7    Q    Okay.  The second paragraph reads, "Regarding

8    felling the Crawford Chimney on March 29th that date is

9    currently open on our schedule.  The only way we would

10   commit to that is that Hilco would have to obtain the

11   implosion permit with CDI's assistance from the City of

12   Chicago.  For when I was there to look at the boilers,

13   the Hilco representative I met with told me not to have

14   any contact with the city as respects to this project."

15   So when you said in this e-mail, "Obtain the implosion

16   permit with CDI's assistance," what did you mean by

17   that?

18   A    That they would obtain the permit from the

19   city, and we would support them with documents requested

20   like exclusion zones, documents, stuff like that.

21   Q    And do you recall what Hilco representative

22   you met with told you not to have any contact with the

23   city as respects this project?

24   A    Yes, it was Nicholas Pullara.

25   Q    And did he explain why he told you not to have

Page 113

1    any contact with the city as respect to this project?

2    A    No, he -- he just said he was spearheading the

3    -- the -- the permitting processes for this and -- and I

4    took it as a welcome change.

5    Q    In what way was it a welcome change?

6    A    Because it -- it tipped the -- if you were

7    able to click on that link, to get an implosion permit

8    through the City of Chicago, is a very lengthy and

9    arduous task that can take months of document production

10   and approvals.  And what the -- the -- the city decided

11   to do was to issue a -- the actual permit, helicopter

12   lift permit, which was a -- a clever way of cutting

13   through the masses of red tape that's normally involved

14   to -- to -- to meet the needs of the project, which was

15   simple -- a simple road closure of Pulaski for the 15

16   minutes at we -- we requested, excuse me.

17   Q    So had a developer ever spearheaded the

18   obtaining the permit projects for any implosion projects

19   that CDI was contracted to do?

20   A    I can't say specific which ones, I'm sure.  I

21   mean, there certainly has been projects for, excuse me,

22   our client or their client, you know, handled permitting

23   and all, you know, job specific.

24   Q    In the prior -- had CDI ever used explosives

25   in the demolition in Chicago prior to April of 2020?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1    A    Yes.
2    Q    And in those instances, did CDI obtain the
3  blasting permit or did someone else obtain the?
4    A    I -- again, I -- I wasn't -- I was on two of
5  those projects and I was just there to help load the
6  explosives.  I wasn't part of the management team, so I
7  can't say for sure.
8    Q    Did you think getting a blasting permit for
9  the Crawford project was far-fetched?
10   A    I'm not sure what you mean.  We needed a
11  permit.
12   Q    Did you think that it was likely that you were
13  going to get a permit for the blasting permit for the
14  Crawford project?
15   A    Yes.  Based on -- based on the conversations,
16  group conversations we had, there was no objections from
17  the city representatives on the phone or the alderman
18  that was helping out with the project that, you know,
19  everybody was helpful as respects getting the permit
20  issued.
21   Q    Okay.  And CDI's interrogatory responses in
22  this case, which you signed the CDI Interrogatories,
23  correct?
24   A    Yes.
25   Q    In those interrogatories, the -- one of the

Page 115

1  answers was that CDI was precluded from the permitting
2  process by Hilco.  How was CDI precluded from the
3  permitting process by Hilco?
4    A    We were told not to have any contact with the
5  city as respects to permit that all communications for
6  the permit was -- was to go through Hilco and my -- my -
7  - my contract's with MCM.  So I -- I wouldn't be -- be
8  dealing directly with Hilco, you know, anyhow.  If they
9  asked me something I would answer them, sure.  But, you
10  know, all -- all my submittals went through MCM.
11   Q    Okay.  Can we show 49 please?  Okay.  This is
12  an e-mail -- this is Exhibit 12, Bates stamped CTRL
13  4241.  This is an e-mail from you to
14  npullara@hilcoglobal.com on March 6, 2020, correct?
15       (EXHIBIT 12 MARKED FOR IDENTIFICATION)
16   A    Yes.
17   Q    It says, "Nick, per Eric's e-mail below, I'm
18  reaching out to you to see what you need from CDI as
19  respects the City of Chicago's implosion permit."  Did
20  Nick respond to this e-mail to you?
21   A    I may have.  If he did, I'm sure you have a
22  copy.  And again, the only reason I e-mailed Nick it was
23  at the request of my client.
24   Q    Okay.  Because prior to this, you had been
25  told not to reach out to the City of Chicago regarding

Page 116

1  the implosion permit, correct?
2    A    Correct.
3       MR. SMITH:  Michael Smith, Hilco, object to
4    form.
5    Q    And you only reached out to Nick about the
6  permit because Eric at MCM asked you to?
7    A    Yes.  Again, I'll be happy to help if they
8  want to spearhead the permit, great, but -- and I'll be
9  happy to help.  And I was just -- let me know if he
10  needed any help, yeah, I was there, and if I needed to
11  be at a meeting, let me know, I'll be there.
12   Q    Okay.  And then can you show 903, please?
13  This is Exhibit 13, Bates stamped CTRL 12782 to 12785.
14  Looking at the second e-mail chain on the first page
15  from you to Nick Pullara and Eric Dovas on
16  March 12, 2020, do you see that?
17       (EXHIBIT 13 MARKED FOR IDENTIFICATION)
18   A    Yes.
19   Q    Okay.  And then you say, "Nick, Eric, Tom's
20  going to be onsite to lay out CDI's drilling."  And then
21  the -- there's a question at the -- on the next page,
22  "Is there anyone Tom could or would need to meet with on
23  Monday as respects the permit?"  Do you see that?
24   A    Yes.
25   Q    So why were you asking if Tom could or would

Page 117

1  need to meet with anybody on Monday as respects to the
2  permit?
3    A    Again, you know, we're -- we're -- we're based
4  outside of Baltimore and the job's in Chicago, so we're
5  not on-site every day.  Tom's our licensed Chicago
6  blaster and he can certainly speak as the CDI's
7  operations on-site, you know, was just saying, "Hey,
8  he's there.  If you need him to help you out with
9  anything, ask him.  If he needs to meet with anybody,
10  he'll be happy to do it."  Just letting our client and
11  their client know that someone was going to be there.
12  Just a courtesy call, that's all.
13   Q    And did Tom meet with anybody regarding the
14  permit when he was on-site?
15   A    Not that I'm aware of, no.
16   Q    Okay.  Now let's look at 41, please.
17       MR. DEVRIES:  Do you know what exhibit number
18  we're on?
19       MS. HAMILTON:  This is going to be Exhibit 14.
20       (EXHIBIT 14 MARKED FOR IDENTIFICATION)
21       MR. DEVRIES:  Thank you.
22  BY MS. HAMILTON:
23   Q    This is Exhibit 14, Bates stamped CTRL 161 to
24  162.  This is at the top an e-mail from
25  J-M-L-O-I-Z-E-A-U-X@comcast.net to you, Thomas J. Doud

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 32 of 49 PageID #:1846
The Deposition of RAYMOND ZUKOWSKI, taken February 8, 2023
118..121

Page 118

1  with a CC to Carol E. Groft.  Who's J -- whose e-mail
2  address is J-M-L-O-I-Z-E-A-U-X@comcast.net?
3       A    That's Mark Loizeaux's personal e-mail.
4       Q    I don't remember how to pronounce that,
5  Loizeaux.  And so in this, Mark says, "Ray and Tom,
6  Carol previously spoke to me about her conversation with
7  you, Ray, about her concerns that Hilco is apparently
8  pushing to handle all the permitting on this project.  I
9  agree with Carol completely that CDI is the licensed
10  blaster in the city and state, and we have obligations
11  to ensure that all permits are handled properly.  From
12  the e-mail below Ray, it sounds like Nick Pullara of
13  Hilco wants to be the lead on these communications.  You
14  need to be sure moving forward that we license this
15  properly and advise regulatory agencies accordingly with
16  regard to CDI's role as the blasting subcontractor on
17  the project.  Mark."  Did you share Mark and Carol's
18  concerns that Hilco was pushing to handle all the
19  permitting on this project?
20           MR. BERIBAK:  Form.
21           MR. SMITH:  This is Mike Smith, Hilco,
22       objection to form.
23           MS. HAMILTON:  He can answer.
24       A    Obviously you don't know Mark.  It's his
25  company.  He owns it 100 percent and he makes sure

Page 119

1  everything is -- is per the company policy and plan.
2  And that was his e-mail to me and Tom to make sure it
3  was per -- again, not too often -- it's not very often
4  that permitting is handled by someone other than us for
5  our specific part.  And he was just saying, hey, just
6  make sure, you know, CDI's standard, you know, languages
7  or whatever, or -- or voice and meetings and you know.
8  Items like that.  Again, exclusion zones were submitted
9  and I'm sure those were passed along to the city and the
10  plans were probably passed along to the city.  Yeah.  So
11  other than Mark expressing concern for his company, you
12  know, concern for my concerns as well.  But again, you
13  know, as I said earlier, the city came up with a
14  streamlined version of the permit to meet the needs of
15  the project and it -- it happened and -- and we all
16  agreed that it was acceptable.
17  BY MS. HAMILTON:
18       Q    When you say we all agreed, who are you
19  referring to with "we"?
20       A    CDI, here at CDI -- here at CDI.
21       Q    And when Mark says in this e-mail, "You need
22  to be sure that we license this properly."  What did you
23  understand that to mean?
24       A    It means that we don't proceed unless we have
25  a permit to do so.

Page 120

1       Q    And when Mark said, "Advise regulatory
2  agencies accordingly with regard to CDI's role as the
3  blasting subcontractor on the project."  What did you
4  understand him to mean there?
5       A    You don't know Mark.
6       Q    I don't.
7       A    He's got a lot of words to come out, so I
8  didn't -- I didn't read anything into it, honestly.
9  It's just standard, make sure, you know, we cover our
10  own butts, take care of our stuff.
11       Q    And Mark references a conversation that you
12  and Carol Groft had about her concerns.  What did you
13  say -- what did Carol say to you and what did you say to
14  her?
15       A    Well, you asked earlier who normally handles
16  permitting and it's Carol, she's very protective of the
17  company and her work product.  And when she's told that
18  someone else is doing basically her job for her on this
19  project, she just wants to make sure it's done to her
20  satisfaction, that no one gets missed.
21       Q    Okay.  Did -- was the permitting process for
22  the Crawford project handled to Carol's satisfaction?
23           MR. SMITH:  Michael Smith, Hilco, object to
24       foundation.
25       Q    You can answer.

Page 121

1       A    As far as I know, yes.  And again, we had a
2  permit in hand from the City of Chicago to proceed with
3  the shot, you know, the morning of the 11th and we did.
4       Q    Okay.  Lindsay, can you, pull up 43 please?
5  This is Exhibit 15, Bates stamped CTRL 156.  This is an
6  e-mail from Mark to you with a copy to Carol Groft on
7  April 1, 2020 at 11:32 a.m.  Do you see that?
8           (EXHIBIT 15 MARKED FOR IDENTIFICATION)
9       A    Yes.
10       Q    And Mark here says, "If you decide" -- in the
11  second paragraph, "If you decide to join on the call at
12  2:00 p.m. per Nick Pullara's request in his e-mail this
13  morning, I want you to tell the attendees that while CDI
14  normally handles explosives, permitting, and implosion
15  related communications on our projects, Hilco has
16  mandated that they handle all implosion related
17  communications on this project.  Given that they're the
18  main contractor, we have no option but to comply with
19  their wishes in that regard."  You did attend the call
20  at 2:00 p.m. per Nick's request, correct?
21       A    I believe so, yes.
22           MR. SMITH:  Michael Smith, Hilco, object to
23       form.
24       Q    Sorry, can you repeat your answer?
25       A    I -- I believe so, yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

```
 1       Q    And did you tell the attendees what Mark is
 2   asking you to tell them in the second paragraph?
 3       A    No, because it didn't need to be said.  Every
 4   -- everybody involved with the permitting process knew
 5   that Hilco was taking the lead on it and -- and Nick was
 6   the guy spearheading the permit.  Yeah.  Again, Mark's
 7   concern is for the company, and you know, he's
 8   expressing his concerns to me, but sometimes those
 9   concerns, you know, have already been addressed or don't
10   need to be mentioned.
11       Q    Okay.  And another paragraph reads, "On the
12   call, I want you to cover our explosives delivery and
13   handling procedures, the exclusion zone/security and the
14   fact that dust from CDI's operation will likely follow
15   any prevailing wind or breeze the morning of the shot."
16   Did you cover the explosive delivery and handling
17   procedures on the call?
18       A    I'm sure we talked about it if it was asked.
19   And again, those -- I believe those dates were listed in
20   the plan and procedure.  And again, the closure of
21   Pulaski was for three reasons.  A, if -- if something
22   went wrong and the chimney went the other way, it
23   would've went across the road and that would present a
24   public hazard.  Two, you can't have people driving by a
25   power plant hear a loud bang and having them see
```

Page 123

```
 1   something fall over that -- because that will, you know,
 2   cause an issue.  And three, you know, dust was going to
 3   go on that road, and it needed to be cleaned up after
 4   the shot.  So again, the -- the fact that we were going
 5   to generate dust and it was going to need to be cleaned
 6   from the road was -- was -- was not hidden from anybody.
 7       Q    Okay.  Do you specifically recall on this
 8   April 1st conference call saying that dust from CDI's
 9   operation will likely follow any prevailing wind or
10   breeze in the morning of the shot or something to that
11   effect?
12       A    No, I don't recall.
13       Q    And then moving on the next paragraph states,
14   "Please state that an appropriate Community Outreach
15   Program, such as CDI, typically performs is performed by
16   Hilco to advise community of the schedule, the
17   unavoidable noise slash dust byproducts of CDI's
18   operations and the means by which adjacent property
19   owners can mitigate the impact of CDI's operations on
20   their properties."  Did you state what I just read in
21   this paragraph on the April 1st conference call?
22       A    I don't believe so, no.
23       Q    And why didn't you do that?
24       A    Again, the permit process was being handled
25   and it was being handled well and, you know, I -- I -- I
```

Page 124

```
 1   felt that all the bases were covered as far as CDI's
 2   operations were involved.
 3       Q    And did you have any role in the Community
 4   Outreach Program performed by Hilco?
 5       A    No, I did not.
 6       Q    Did you have any input in how the Community
 7   Outreach Program would occur for the Crawford
 8   Demolition?
 9       A    No, I did not.
10       Q    Were you advised by Hilco what the Community
11   Outreach Program would be for the Crawford Demolition?
12       A    No, I was not.
13       Q    Okay.  And then Mark says next, "It's
14   important that you put the City of Chicago agencies, our
15   client, MCM and Hilco, the property owner on notice that
16   they're assuming responsibility for these items given
17   that they are preventing CDI from carrying out our
18   standard procedures in that regard."  Did you put the
19   City of Chicago agencies, MCM and Hilco, on notice that
20   they were assuming responsibility for the above items?
21            MR. SMITH:  Michael Smith, Hilco, object to
22   form.
23            MR. DEVRIES:  MCM joined.
24       Q    You can answer.
25       A    No, I didn't.  Hang on.
```

Page 125

```
 1       Q    Why not?
 2       A    I'm just reading it again.
 3       Q    Sure.
 4       A    Again, I didn't -- didn't need it -- I didn't
 5   feel it needed to be said.  You know, like I'm -- I'm
 6   low man on the totem pole on this job. You know, it's
 7   not -- not my responsibility to -- to start making waves
 8   when I -- I -- again, I felt the permitting was being
 9   handled property -- permitting was being handled
10   properly, excuse me.  And the same -- same with
11   community outreach, we were told not to have, you know,
12   Community Outreach and permitting was all on Hilco and
13   that was passed down through MCM and -- and -- and we
14   decided that that was okay.
15       Q    Did you have any concerns about the Crawford
16   Power Plant being in a community with respect to, you
17   know, demolishing the chimney?
18       A    No, because when I got there, again, I've been
19   there a couple times, it came off the -- I can't
20   remember the road and I've never -- I didn't even really
21   notice the neighborhood, you know, until after all this
22   happened because normally, we don't have this much room,
23   so to speak, to take a structure down.  I mean, this was
24   a chimney in the middle of a field that I couldn't hurt
25   anything if I wanted to.  So -- and at the distances
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 126

1  outside, you know, the site, I -- I just honestly didn't
2  put any thought into it.
3      Q    Did you have any other conversations with Mark
4  about his concerns that he laid out in this e-mail?
5      MR. SMITH:  Michael Smith, Hilco, object to
6  form.
7      Q    You can answer.
8      A    Not that I recall, no.
9      Q    You can put that exhibit down.  Thank you,
10  Lindsay.  Did you have any conversations with MCM about
11  obtaining the blasting permit?
12      A    Yeah, Eric and I talked and then after --
13  after Nick told me that he was going to get it, that was
14  when I sent the e-mail to Eric, the day after.
15      Q    Okay.  Did you have any other conversations
16  with Eric other than the e-mail that you sent him the
17  day after talking with Nick?
18      A    Not that I recall.  We could have, I mean,
19  e-mailed question back and forth.
20      MR. DEVRIES:  I'm sorry, Danielle, the question
21  was about permitting, correct?  Conversation about
22  permit?
23      Q    Yes.  Yes, it was.  Do you recall reaching out
24  to Heneghan or Heneghan trying to obtain a permit for
25  the Crawford Demolition?

Page 127

1      A    No.  Heneghan -- Heneghan was brought in after
2  MCM's contract was terminated, if I remember right.
3      Q    Prior to the Crawford demolition, did you have
4  any conversations with Heneghan?
5      A    Yeah, they -- they asked us for a proposal to
6  -- to give -- to -- to shoot the boilers, if I remember,
7  possibly all of it.  Which is -- which was odd, you
8  know, because I remember talking internally.  That's
9  kind of puts us in a strange position that, you know,
10  I'm working for MCM.  Why is this third party asking for
11  a proposal when they're the contractor on the job?  No.
12      Q    Did you submit a proposal to Heneghan?
13      A    I'd have to -- I'd have to check the file.
14      Q    Let's look at 881.  Okay.  This is Exhibit 16,
15  Bates stamp CTRL 12827 through 12829.  This is --
16  looking at the second e-mail from Jeremy Thourd to you.
17  Jeremy works for Heneghan Wrecking Company, correct?
18      (EXHIBIT 16 MARKED FOR IDENTIFICATION)
19      A    Yes.  Heneghan.
20      Q    Heneghan, sorry.  And he wrote, "We have a
21  very good relationship with the City and believe we can
22  get the City's approval on this approach to finish the
23  project safely.  We are on board, and we are able to
24  present it as a cohesive plan together.  We would lay
25  down the groundwork ahead of time before presenting it

Page 128

1  as a team if required to ensure it was a smooth process
2  as possible."  Do you know what he is referring to when
3  he says finishing the project safely?
4      A    No, I don't recall.  There's more to the
5  e-mail below.  I'm not sure -- I e-mailed him.
6      Q    Yeah, why don't you read the whole exhibit and
7  then let know when you're finished.
8      A    All right.  Right there please.  Okay.  Yeah,
9  they were -- again, they were looking for price to shoot
10  the boilers in the chimney.  At the same time that we
11  were dealing directly with MCM, which felt odd.
12      Q    When you said -- did Jeremy ever get back to
13  you about -- with your question, what do you think the
14  chances are of the City approving explosives demolition
15  approach?
16      A    I thought he answered that.
17      Q    How did he answer that?
18      A    No, did -- didn't he e-mail back?  He --
19  didn't he say -- yeah, above that.  Yeah, he -- he
20  answered, he thought it -- the chances were good.  "We
21  believe we can get the city's approval on the approach
22  to finish this project safely."
23      Q    Were you concerned at all of the City
24  approving explosives demolition approach?
25      A    Again, the -- the concern was time and -- and

Page 129

1  the time frame that they wanted.  The typical implosion
2  permitting process is a very long and drawn-out affair
3  in the City of Chicago.  And to -- to meet the timelines
4  of the project, you know, that was the concern there.
5      Q    But you don't recall ever reaching out to
6  Jeremy at Heneghan or anybody else at Heneghan to help
7  you obtain -- or to help obtain a blasting permit for
8  the Crawford implosion, correct?
9      A    Correct.  I don't -- no conversations with
10  Heneghan regarding the permits.
11      Q    Okay.  So on the -- you can put that exhibit
12  down.  Thank you, Lindsay.  So on the April 1, 2020
13  conference call, did anybody else from CDI participate
14  other than you?
15      A    No, I believe it was just me.
16      Q    And what was discussed on that conference
17  call?
18      A    Sure just schedule, timing.
19      Q    Anything else?
20      A    Not that I remember.
21      Q    Did any of the agencies on the -- were there
22  City of Chicago agencies on that conference call?
23      A    Yeah, I -- I believe the fire department was
24  involved in permitting or whatever -- whoever handles
25  permitting.  There was many people on the call, and I



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 130

1  was not given a list of attendees.
2      Q    Did anybody on the call have any questions for
3  you?
4      A    Not -- I'm sure they did.  Nothing specific
5  that I can remember.
6      Q    Did you discuss a Community Outreach Program
7  on the April 1, 2020 call?
8      A    Not -- again, not that I -- that I remember.
9  If I was asked a question, I'd answer the question.
10     Q    Did you discuss dust being an unpreventable
11 byproduct of the implosion on the April 1, 2020
12 conference call?
13     A    I'm sure -- I'm sure dust was mentioned.
14 Again, that's why we had to close the road right out
15 front of the plant because it was going to get dusted
16 and people needed an opportunity to clean it up.
17     Q    Do you recall any other conversations about
18 dust on the April 1, 2020 conference call other than
19 what you testified to?
20     A    No, I do not.
21     Q    It's okay.  And so the Crawford chimney
22 demolition was on April 11, 2020, correct?
23     A    Yes.
24     Q    And were you on-site for the demolition?
25     A    Yes, I was.

Page 131

1      Q    Okay.  Was anybody else from CDI on-site?
2      A    Tom Doud and Jesse McClees.
3      Q    I'm sorry, what was Jesse's last name?
4      A    McClees Capital M-C, capital C-L-E-E-S.
5      Q    And what was Tom Doud's role on-site at the
6  demolition?
7      A    Tom -- Tom holds our City of Chicago blasters
8  license.  He had to be there.
9      Q    And what did -- what role did Jesse McClees
10 have on-site?
11     A    He was just help us -- hands help loading.
12     Q    Did you say pans uploading?
13     A    No, hands.  Hands to help explosive loading.
14     Q    Okay.  And take me through what you did when
15 you got on-site for the demolition.
16     A    Well, everything was prepared and completed
17 the day before, so the only thing we had to do was make
18 sure that our lines were run out and not run over by a
19 water truck as we talked about previous and make -- I
20 was in charge with the command post.  Jesse and -- Jesse
21 and Tom handled the seismographs.  And Jesse and Tom
22 were at the firing point, if I remember correctly.  So -
23 - and again, command post is established probably around
24 7:00, and that's just checking with -- with everybody
25 involved that the -- the closures are in fact in place

Page 132

1  and no one's in the wrong spot.  And we go through
2  security checks, you know, internally and with MCM.
3  They check with their people, make sure everybody's
4  where they're supposed to be.  You know, Hilco, I
5  believe had a representative there.  And the fire
6  department, I believe, had one or two gentlemen there.
7  So -- and that's -- it's a very informal process, just
8  making sure that there's a -- there's a timeline of
9  events in our plan of procedure, but it's -- it's --
10 it's a -- it's a guideline.  If it doesn't happen at
11 7:58, then happens at 7:57, whatever.  Yeah.  It's just
12 as long as everything is in place, everybody is where
13 they're supposed to be.  And if everything is in place
14 and where they're supposed to be, and it's safe to
15 proceed, we proceed.  And we did.
16     Q    To your knowledge, did MCM soak the ground for
17 an hour and 15 minutes before the implosion?
18         MR. DEVRIES:  I'll object to foundation for
19 MCM.
20         MR. RICE:  Hey, Andrew Rice, CDI.  I'll join.
21 Calls for speculation.
22         MR. SMITH:  Michael Smith, Hilco.  Join.
23 BY MS. HAMILTON:
24     Q    You can answer.
25     A    I have no way of knowing how long they soaked

Page 133

1  the ground for.
2      Q    But to your knowledge, they did soak the
3  ground?
4      A    Yes, they had the water trucks running and the
5  DustBosses running.
6      Q    Okay.  So after the implosion, was the amount
7  of dust that was generated more than you expected?
8      A    No, not at all.
9      Q    Was it less than you inspect -- expected?
10     A    It was exactly what I expected it to be.
11     Q    And the dust generated from the implosion
12 migrated off-site, correct?
13     A    Yes.
14     Q    And are you aware of how far off-site the dust
15 migrated?
16     A    No, I'm not.
17     Q    Did you expect that dust would migrate
18 off-site after the chimney was demolished?
19         MR. DEVRIES:  Objection.  Asked and answered.
20     A    Correct.  Just it's all a function of which
21 way the wind's going to blow.  Had the wind been out of
22 a different direction, it would've never went that way.
23 I didn't give it -- I honestly didn't give it any
24 thought.  The perimeter was secure, and we proceeded with
25 the shot.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 36 of 49 PageID #:1850
The Deposition of RAYMOND ZURKOWSKI, taken on February 7, 2023
134..137

Page 134

1    Q    So you had no expectations prior to the shot
2  about how far the dust would migrate off-site?
3    A    I honestly didn't give it any thought.
4    Q    So what did you do after the shot?
5    A    Handed out some handshakes and said thank you
6  and left.
7    Q    And CDI was responsible for doing some
8  vibration and air overpressure monitoring, correct?
9    A    Correct.  And we did.
10    Q    And did you perform that monitoring?
11    A    Tom actually set the machines up.
12    Q    And so how is -- how did -- how does CDI do
13  vibration and air overpressure monitoring?
14    A    With a seismograph.
15    Q    So do you put a seismograph on the site after
16  the -- after coming to the site?
17    A    Yeah.  We -- we actually place six
18  seismographs to cover all the way around.  And honestly,
19  they're there to protect us from -- from frivolous
20  lawsuits because they can't exceed the 140 DBL inside an
21  exclusion zone or outside the exclusion zone.  And --
22  and the US Bureau of Mines has set of standard as how
23  much vibration you can generate and those seismographs
24  prove without any question that those vibration limits
25  were not exceeded and those noise limits were not

Page 135

1  exceeded.  They're there to -- they're there to protect
2  not only CDI, but CDI's client as well.
3    Q    And in this case, the seismograph readings,
4  the results were that -- what were the results of the
5  seismograph readings?
6    A    They were all within industry standards, below
7  the recommended limits.  Through the report, you can
8  find it.  I can help you through it if need be.
9        MS. HAMILTON:  Yeah, let's pull it up.  It's
10    65, please.  So this is Exhibit -- what are we on?
11    17 or 18?
12        COURT REPORTER:  I believe this one is 17.
13  BY MS. HAMILTON:
14    Q    Okay.  Make this 17.  This is Bates stamped
15  CTRL 176 through 181. And the first page of this exhibit
16  is an e-mail from Mark to edovas@cmcdemo.com copying
17  you, Tom, Thomas J. Doud, and Carol E. Groft.  And it
18  says, "Eric, attached you will find the vibration and
19  air overpressure monitoring report for CDI's felling of
20  a Crawford chimney this past Saturday."  And then the
21  report is attached.  So let's go to the third page.
22        (EXHIBIT 17 MARKED FOR IDENTIFICATION)
23        COURT REPORTER:  Of the overall exhibit or of
24    the report?
25        MS. HAMILTON:  Oh, sorry.  Of the overall

Page 136

1  exhibit.
2  BY MS. HAMILTON:
3    Q    So this is an explanation of vibration
4  monitoring?
5    A    Yes.
6    Q    And the vibration standards is also on that
7  page, correct?
8    A    Correct, correct.
9    Q    And then the next page shares the peak
10  overpressure, an explanation of that?
11    A    Uh-huh.
12    Q    And then can you explain to me the
13  conclusions?
14    A    Can you go to the table that shows the
15  results?  Yeah, page 5.
16    Q    Yeah, let's go to the next page.
17    A    Yeah.  So again, depending upon where the --
18  the seismograph placement was, I believe there was a map
19  involved.  So obviously the closer you are to it, the
20  louder it's going to be.  That would be the DBL numbers
21  and the maximum PPV is the peak particle velocity.  And
22  just so you know, the -- the -- the standard is I can't
23  exceed 2.0.  And yeah, our highest -- our highest
24  reading was 0.0.3.  So we're nearly ten times -- most of
25  them were -- were ten times below the standard that

Page 137

1  could possibly cause damage regarding vibration.  And if
2  you look at the -- the -- the farther distance is out,
3  you know, you some air -- air overpressure like 140,
4  138.  Again, that -- the -- the distance is evolved to
5  anything that could possibly hurt from, you know - - if
6  it's too loud, you can break windows, too.  There's --
7  there's an aspect there, but the distances we're talking
8  about, you know, obviously we didn't cause any damage.
9    Q    Got it.  And so what's the highest DBL that's
10  within industry standards?
11    A    Well, again, the -- the DBL goes back to the
12  OSHA standard at 140 where I have to start providing
13  hearing protection to people inside that exclusion zone.
14  So -- and there was nobody inside the exclusion zone at
15  the time of the shot.  Other than CDI employees.
16    Q    Right.  And so when Mark said, "You'll note in
17  this e-mail, you'll note that we were one sixth" -- or
18  sorry.  In the conclusions, if you go to the paragraph -
19  - or the page before, it says, "Ground vibrations and
20  air overpressure is transmitted to adjacent, above and
21  below grade structures were less than one-sixth of
22  generally accepted safe limits for the respective types
23  of adjacent structures exposures."  And what does that
24  mean?
25    A    Again, the -- the -- the limits are -- the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 37 of 49 PageID #:1851
The Deposition of RAYMOND ZUROWSKI, taken February 01, 2023
138..141

Page 138

1  limit he's most likely referring to, or is -- is the
2  vibration limits. And -- and the air overpressure at
3  the distances of adjacent improvements to remain, which
4  would mean businesses around or people's houses around
5  the site. At -- those you can extrapolate what the
6  measurements would be by using the data collected close
7  to the job than -- and going out. But the farther you
8  go out, the lower it goes. So basically said there's no
9  way we would've caused damage. Nor did we.
10      Q   Right. Okay. Let's look at 156. This is
11  Exhibit 18. This is Bates stamped Hilco Crawford 2236
12  to 2237. This is an April 13, 2020 statement to Samir
13  Mayekar, M-A-Y-E-K-A-R, Deputy Mayor of City of Chicago
14  from Roberto Perez, Chief Executive Officer of the Hilco
15  Redevelopment Partners. Did you have any involvement in
16  the creation of this document?
17          (EXHIBIT 18 MARKED FOR IDENTIFICATION)
18      A   No, this -- the first time I saw this was when
19  I was transmitted to me today.
20      Q   Okay. So you've never seen this document
21  before today's deposition.
22      A   Correct.
23      Q   Okay. So under response to the mayor about
24  halfway through, it says, "It is the responsibility of
25  the contractor to secure all appropriate permits and

Page 139

1  approvals, which was done." Was it the responsibility
2  of CDI to secure all appropriate permits and approvals?
3      A   No.
4      Q   Was it MCM's responsibility?
5          MR. DEVRIES:  I'll object to -- MCM, I'll
6      object to foundation. The witness can answer.
7          MR. SMITH:  Hilco joins.
8      A   So it is the responsibility of the contractor
9  to secure all appropriate permits and approval, which
10  was done. So -- they're saying they had all the proper
11  permits and approvals to proceed.
12  BY MS. HAMILTON:
13      Q   Right. Do you agree with this statement that
14  it is the responsibility of the contractor to secure all
15  appropriate permits and approvals?
16      A   Who's the contractor?
17          MR. SMITH:  Michael Smith -- Michael Smith,
18      Hilco. Object to foundation.
19      Q   Well?
20      A   Who -- who defined the contractor that this --
21  you'd have to talk to the author of this letter to -- to
22  ask them who they're saying the contractor is.
23      Q   So the first sentence reads, "HPR is working
24  cooperative with the City of Chicago to review
25  Saturday's demolition event undertaken by HRP'S

Page 140

1  demolition contractor."
2      A   That would be -- that would be MCM.
3      Q   Okay. So is it the responsibility of MCM to
4  secure all appropriate permits and approvals?
5          MR. DEVRIES:  Object to foundation.
6      Q   You can answer.
7          MR. RICE:  Andrew Rice, and I join.
8          MR. SMITH:  Michael Smith, Hilco, join.
9      Q   You can answer.
10      A   Again, I -- I don't know what permits exactly
11  MCM was required to -- to -- to have to do the
12  demolition job. It's not my -- not my job to check on
13  them.
14      Q   Typically when you -- when you do demolition
15  jobs, it's CDI's responsibility to get the appropriate
16  permits and approvals, correct?
17      A   Explosives related permits, yes.
18      Q   Okay.
19      A   Everything else is not our responsibility.
20      Q   Okay. All right. Then another sentence
21  reads, "While our review is ongoing, it is our initial
22  conclusion that although all regulatory steps were taken
23  and all procedures were followed by our contractor to
24  conduct a proper implosion, dust suppression efforts
25  utilized by our demolition contractor were

Page 141

1  insufficient." Were all procedures followed by CDI to
2  conduct a proper implosion?
3      A   Yes, as far as filling the chimney, we did
4  exactly what we said we were going to do and it was
5  perfect shot.
6      Q   And do you agree that the dust suppression
7  efforts utilized by the demolition contractor -- Hilco's
8  demolition contractor were insufficient?
9          MR. DEVRIES:  MCM. This is MCM. I'll object
10      to the form of question.
11          MR. SMITH:  Hilco, object to form as well. And
12      foundation.
13          MR. RICE:  CDI joins.
14  BY MS. HAMILTON:
15      Q   You can answer.
16      A   Again, it's not -- not my scope of work to
17  determine if -- if my client is doing their job
18  correctly. They -- they had a dust prevention plan or
19  mitigation plan, which was implemented the morning of
20  and the structure was brought safely to the ground. At
21  -- at that point in time, my contract responsibilities
22  are over, and I left.
23      Q   Do you have an opinion as to whether the dust
24  suppression efforts utilized by MCM were insufficient?
25          MR. DEVRIES:  MCM will object to form of the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

1  question.
2       MR. RICE:  CDI joins.
3       MR. SMITH:  Hilco joins.
4  BY MS. HAMILTON:
5       Q   You can answer.
6       A   In my opinion, they did industry standard
7  effort to mitigate the dust.
8       Q   So you believe that the -- in this -- the --
9  you believe that the dust mitigation efforts by MCM were
10 sufficient, correct?
11      A   They -- they --
12      MR. DEVRIES:  This is MCM.  I'll object to the
13 form of the question.
14      A   Yes.  Again, they did what any other
15 contractor that I'm used to dealing with would've done
16 to mitigate the dust the morning of the shot.
17      Q   So you disagree with this statement by Hilco
18 here that says, "The dust efforts utilized by our
19 demolition contractor were insufficient"?
20      MR. SMITH:  Object to form.  Michael Smith for
21 Hilco.
22      MR. RICE:  CDI join.
23      MR. DEVRIES:  MCM will join.
24      A   I -- I don't agree or disagree with the
25 statement.  It's not for me to say.

Page 143

1  BY MS. HAMILTON:
2       Q   Okay.  Let's look at 154.  This is Exhibit 19.
3  Bates stamp CTR -- oh, sorry.  Hilco Crawford 17928
4  through 17929.  This is April 14, 2020.  A statement
5  from Hilco redevelopment partner, CEO Roberto Perez.
6  Have you seen this document before?
7       (EXHIBIT 19 MARKED FOR IDENTIFICATION)
8       A   Not until this morning.
9       Q   Okay.  So this morning was the first time you
10 saw this document, correct?
11      A   Yes.
12      Q   And you had no involvement in the creation of
13 this document, correct?
14      A   Correct.
15      Q   And the second paragraph reads, "The implosion
16 process was conducted by one of the most recognized
17 implosion experts in the country who was hired by our
18 primary demolition contractor on site.  Hilco
19 Redevelopment Partners expected the implosion expert
20 that was engaged to follow the plan submitted to, and
21 the permit issued by, the City of Chicago, including but
22 not limited to, the dust mitigation plan and protocol,
23 which included on-site water to be used before, during
24 and after the implosion."  Was CDI engaged to follow the
25 plan submitted to, and the permit issued by, the City of

Page 144

1  Chicago, including but not limited to, the dust
2  mitigation plan and protocol?
3       A   The permit issued by the city has no mention
4  of dust.
5       Q   So --
6       A   There's no -- there's -- the City did not
7  require a dust permit.
8       Q   So is this statement inaccurate?
9       MR. SMITH:  Michael Smith, Hilco, object to
10 form.
11      Q   You can answer.
12      A   I -- I have no idea what Hilco could expect
13 from us.  It's impossible for me to answer.  And let's
14 jump down to the third paragraph that "despite the
15 assurances we received from our implosion expert, the
16 measures that were implemented were not."  Those -- that
17 never came from controlled demolition.  I don't know who
18 this Roberto Perez guy is but sounds like someone's
19 throwing someone else under the bus here because we
20 never made those assurances, I promise you.
21      Q   So CDI never made assurances to Hilco that the
22 measures that were to be implemented were -- oh, sorry.
23 CDI did not make any assurances to Hilco regarding dust
24 mitigation, correct?
25      A   Never -- never said that -- not sufficient to

Page 145

1  contain the dust that migrated off-site.  No, we did
2  not.
3       Q   So this statement, this sentence by Roberto
4  Perez, is inaccurate, correct?
5       A   As -- as far as my role on the project, yes.
6       Q   Okay.
7       A   Again, dust is not our responsibility for our
8  contract with MCM.  And I -- you know, why would I start
9  making promises to people that I'm not even contracted?
10 Nor would I.
11      Q   Did you make any assurances to contain the
12 dust that migrated off-site or just to contain the dust
13 to MCM?
14      A   No.  Again, I hate to reiterate it for the
15 fifteenth time.  Dust is not our responsibility.  The
16 control of it, the clean-up of it.  Again, it's not part
17 of my contract.  And we were hired to do a very specific
18 task, which we did.
19      Q   Do you have any idea why Roberto Perez stated
20 that he received assurances from CDI about containing
21 the dust?
22      MR. SMITH:  Michael Smith for Hilco, object to
23 foundation.
24      MR. RICE:  Andrew Rice, CDI, join, and
25 speculation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 39 of 49 PageID #:1853
The Deposition of RAYMOND ZUKOWSKY, taken on January 12, 2023
146..149

Page 146

1    Q    You can answer.
2    A    I -- I -- I have no idea where he came to
3 this.
4    Q    And I take it, you've never had any
5 conversations with Roberto Perez about the Crawford
6 demolition?
7    A    I think I may have seen the man once and said
8 hello, but we certainly never had a conversation.
9    Q    Okay.  And just to be crystal clear, you the
10 implosion expert, you were never engaged to do a dust
11 mitigation plan and protocol, correct?
12   A    Correct.
13   Q    Do you have any idea why Roberto Perez said
14 that you were in this statement?
15        MR. SMITH:  Michael Smith, Hilco.  Object to
16   form and foundation.
17        MR. RICE:  CDI join.
18 BY MS. HAMILTON:
19   Q    You can answer.
20   A    I have no idea why he said it.
21   Q    Okay.  Let's look at 153.  This is Exhibit 20,
22 Bates stamped PL 1 through 95, I think.  96.  This is a
23 April 16, 2020 electronic mail to Mayor Lightfoot from -
24 - you'd look on the second page, you see that it's from
25 Roberto Perez, CEO of Healthcare Redevelopment Partners.

Page 147

1 Do you see that?
2        (EXHIBIT 20 MARKED FOR IDENTIFICATION)
3    A    Yes.
4    Q    And on page 3, it says Exhibit A, Description
5 of Events on April 11, 2020.  Do you see that?
6    A    Yes.
7    Q    And it reads, "As part of the planning for the
8 implosion, the projects demolition contractor, MCM
9 Management Corporation, MCM reported to HRP, that MCM
10 and its relevant subcontractors developed and
11 implemented a dust control plan, which included numerous
12 efforts to control and mitigate dust emissions from the
13 Site."  Did you, along with MCM, develop and implement a
14 dust control plan, which included numerous efforts to
15 control and mitigate dust emissions from the site?
16   A    No, CDI had no involvement whatsoever with the
17 dust control plan.
18   Q    Do you have any idea who the relevance
19 subcontractors are in this document?
20   A    No idea.
21   Q    But it's not CDI, correct?
22   A    Again, contractually dust mitigation clean-up
23 is not our scope of work, so I have no idea who he's
24 referring to.
25   Q    Are you aware of any subcontractors that

Page 148

1 developed and implemented a dust control plan along with
2 CD -- along with MCM?
3    A    No, I'm not.
4    Q    Okay.  And let's look at 152.  This is Exhibit
5 21.  It's Bates stamped Hilco Crawford 22789.  This is
6 an e-mail from Eve to Roberto Perez. Actually, let's
7 look at the second e-mail chain.  It's from Gary Epstein
8 to Roberto Perez with a CC to Jeremy Grey.  Do you know
9 Gary Epstein?
10        (EXHIBIT 21 MARKED FOR IDENTIFICATION)
11   A    Do I know Gary Epstein, no.
12   Q    Yes.
13   A    I do not know him, no.
14   Q    Do you know Jeremy Grey?
15   A    No.  The only person I dealt with at Hilco was
16 -- was Nick.
17   Q    Okay.  And did you know anybody else at MCM
18 besides Eric Dovas and Aaron Fitch?
19   A    Yeah, I know a lot of people there.  We worked
20 together for years.
21   Q    As concerns the Crawford project, did you have
22 any other contacts at MCM other than Eric Dovas and
23 Aaron Fitch?
24   A    Yes, there was Leroy was there and -- and
25 Dennis was there. Leroy Stults, I believe his last name,

Page 149

1 and Dennis Johnson.
2    Q    Okay.  And in this e-mail chain, Gary writes,
3 "We deeply regret the unintended consequences caused by
4 our contractor, resulting in the dust that crossed into
5 the neighborhood." Do you believe that the unintended
6 consequences resulting in dust that cross into the
7 neighborhood was caused by
8 CDI?
9        MR. SMITH:  Michael Smith, Hilco, object to
10   form and foundation.
11        MR. RICE:  Andrew Rice, CDI joins.
12 BY MS. HAMILTON:
13   Q    You can answer.
14   A    Can you ask it again, please?
15   Q    Sure.  Do you believe the unintended
16 consequences caused, or -- excuse me.  Do you believe
17 that the unintended consequences that resulted in the
18 dust that crossed into the neighborhood after the
19 Crawford chimney demolition, do you believe that those
20 unintended consequences were caused by
21 CDI?
22        MR. SMITH:  Michael Smith, Hilco, object to
23   form and foundation.
24        MR. DEVRIES:  MCM will join.
25        MR. RICE:  CDI joins.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1  BY MS. HAMILTON:
2      Q    You can answer.
3      A    Ma'am, no, I do not.
4      Q    Do you believe that the unintended
5  consequences resulting in dust crossing the neighborhood
6  was caused by MCM?
7          MR. DEVRIES:  MCM objects to the form of the
8  question.
9      Q    You can answer.
10     A    No.  The -- the wind was responsible for the
11 dust leaving the job.
12     Q    Were there any other causes of the dust
13 leaving the job other than wind?
14     A    No.
15     Q    Do you believe that the unintended
16 consequences of the dust crossing into the neighborhood
17 was caused by Hilco?
18         MR. SMITH:  Again, Hilco, objection to form and
19 foundation.
20     A    Again, no.  No -- no company or -- or
21 individual has any control which way the wind's going to
22 blow.  Had the wind been blowing in the opposite
23 direction, we wouldn't be having this conversation
24 today.
25     Q    Could CDI, MCM, or Hilco have picked a day to

Page 151

1  do the Crawford chimney demolition to prevent dust from
2  crossing into the neighborhood?
3          MR. SMITH:  Michael Smith, Hilco, object to
4  foundation.
5          MR. RICE:  CDI joins.  It assumes that CDI had
6  some involvement.
7          MR. DEVRIES:  And MCM will join as well as
8  calls for speculation.
9  BY MS. HAMILTON:
10     Q    You can answer.
11     A    No.  I mean, are we just supposed to stand
12 around and -- and not work and -- and -- and wait for
13 days, weeks, months, when the vast majority of city
14 officials and agencies are involved and make sure this
15 is done, you know, per the permit and per the time
16 stated, it's not a reasonable expectation.
17     Q    Okay.  Let's look at 155.  This is Exhibit 22.
18 Bates stamped Hilco Crawford 12502 to 12504.  Let's go
19 to the second page.  This is a Termination Notice to
20 Robert Mardigian, M-A-R-D-I-G-I-A-N, dated April 28,
21 2020.  Let's go to the second page, third paragraph.
22 I'm sorry, second paragraph, it says, "Contractor's
23 breaches of the agreement resulting from the stack
24 implosion are innumerable and by their nature
25 incurable."  Sorry.  Let me back up and just -- why don't

Page 152

1  you actually read this whole document.  It's not very
2  long.  And let me know what you've done reading it.
3          (EXHIBIT 22 MARKED FOR IDENTIFICATION)
4      A    Okay.  Next page, please.  Okay.
5      Q    Okay.  So going back to the second page,
6  second paragraph, "Contractor's breaches of the
7  agreement resulting from the stack implosion or
8  innumerable and by their nature incurable.  Do you agree
9  with that statement?
10         MR. DEVRIES:  I'm going to object.  MCM objects
11 to form.  Foundation, and any testimony frankly,
12 about a letter from Hilco to MCM about its contract.
13 BY MS. HAMILTON:
14     Q    You can answer.  Oh, I'm sorry.  Go ahead.
15     A    CDI has no privity of contract between MCM and
16 Hilco.  I mean, I have no idea what their contract says.
17 Never saw it.  Don't want to see it.  It's not -- not my
18 business to know.
19     Q    Okay.  Well, having just looked at the
20 contract, do you think that --
21     A    That's not the -- this is just a letter.
22     Q    I'm sorry.
23     A    Their contract could be 50 pages long for all
24 I know.  And again, our contract with MCM is very clear
25 and -- and -- and, you know, we take exceptions to a lot

Page 153

1  of things and maybe MCM didn't do that with theirs.  I
2  don't know.  I -- I can't say.  This is -- this is
3  business between Hilco and MCM, and CDI has no part of
4  it.
5      Q    So do you believe, going back up to the first
6  page, as to the part of the agreement between Hilco and
7  MCM that's in quotes, "In the performance of the work,
8  contractor shall take all required measures to prevent
9  impacts to the property and any neighboring properties
10 resulting from dust, noise, truck traffic, vibration and
11 other nuisances resulting from the work.  Contractors
12 shall be liable for any loss of or damage to any such
13 property that is caused by the action or neglect of
14 contract for any of its subcontractors."  Do you believe
15 that MCM breached that agreement?
16         MR. DEVRIES:  MCM, again, objects to form.
17 Foundation and asking this witness to opine on
18 whether MCM breached its contract with Hilco.
19         MR. RICE:  CDI will join.
20         MR. SMITH:  Hilco joins.
21 BY MS. HAMILTON:
22     Q    You can answer.
23     A    I have no idea if that's even part of the
24 contract.  Without having -- without having the contract
25 in hand in front of me, I'm -- I'm not going to answer



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 154

1  the question.  It's not -- it's not my position to
2  answer that question.  It's MCM's agreement with -- with
3  their client.
4      Q    Okay.  If the contract has this paragraph that
5  I've just read, do you think that MCM breached its --
6  this part of the contract with Hilco?
7          MR. DEVRIES:  This is MCM, same objections.
8          MR. RICE:  CDI will join, and an incomplete
9  hypothetical.
10         MR. SMITH:  Hilco joins.
11 BY MS. HAMILTON:
12     Q    You can answer.
13     A    It's not for me to say what Hilco thinks or
14 who -- whomever decided to terminate the contract
15 thinks.  No idea what they thought.
16     Q    Well, I'm not asking you what Hilco thinks.
17 I'm asking what you think.
18     A    It doesn't matter what I think.  It's -- it's
19 -- it's -- you're asking me something that I've no
20 knowledge of.  You're asking me questions about a
21 contract that I've never seen before, and it's not -- my
22 opinion on their contract doesn't matter.  It's between
23 Hilco and MCM.
24     Q    Well, I'm asking for your opinion of whether
25 or not you believe this section of the agreement that

Page 155

1  I've just read that is in quotes was breached?
2      A    I would --
3          MR. DEVRIES:  MCM.  I'm going to make the same
4  objections and asked and answered now a few times.
5          MR. RICE:  CDI will join and I think he's
6  already answered this, that he doesn't have an
7  opinion, so --
8          MR. SMITH:  Hilco joins.
9          MS. HAMILTON:  Well, he said his opinion
10 doesn't matter, and I want to know what the opinion
11 is.
12         MR. DEVRIES:  I think he specifically said he
13 had no opinion.  We could review the transcript, but
14 that is what he said previously.  And I don't mind
15 if Ray says it again, but he said more than once, he
16 doesn't have an opinion on this.  Ray, you can
17 answer the question if you'd like.
18     A    Again, I have no opinion on this.  Not my
19 business.
20 BY MS. HAMILTON:
21     Q    Under this agreement that is in quotes here
22 that I've read, was it permissible to let a dust bomb
23 circulate through the neighborhood after the Crawford
24 demolition?
25         MR. DEVRIES:  Object to form.

Page 156

1      A    What?
2          MR. DEVRIES:  Did you say a dust bomb?
3          MS. HAMILTON:  I did.
4          MR. DEVRIES:  I'll object to the form of the
5  question.  And can I just have like a standing
6  objection on you asking the witness about MCM's
7  contract with Hilco?
8          MS. HAMILTON:  Yes.
9          MR. DEVRIES:  Thank you.
10         MR. RICE:  Yeah, I will join.
11         MR. SMITH:  Hilco joins.
12 BY MS. HAMILTON:
13     Q    You can answer.
14     A    Ask the question again, please.
15     Q    Was it permissible under this agreement,
16 particularly sections that I've read here that's in
17 quotes, to let a dust bomb circulate through the
18 neighborhood after the Crawford demolition?
19     A    Dust bomb, really?  Define dust bomb.  Whose
20 words are those?  Dust left the -- dust -- dust left the
21 site.  That's it.  I mean, it wasn't a dust bomb.  That
22 implies something nefarious was planned.  So I can't
23 answer that question.  Again, I'm -- I'm -- I'm not
24 going to answer questions about the contract between
25 Hilco and MCM.  That's not my business.  I've never seen

Page 157

1  their contract, nor do I want to.
2      Q    I'm showing you a part of their contract.
3  It's in quotes.
4          MR. DRISCOLL:  Wait.  Just real quick.  Are you
5  refusing to answer the question, Mr. Zukowski?  Are
6  you refusing to answer the question?
7          THE WITNESS:  My answer is not going to change.
8          MR. DRISCOLL:  Well, that's not my -- I'm
9  asking, are you definitively refusing to answer the
10 question, yes or no?  It's a yes or no question.
11 Are you definitively refusing to ask -- the answer
12 the question?
13         THE WITNESS:  The one about the dust bomb or
14 the one about the contract?
15         MR. DRISCOLL:  Yes.  This -- the last question
16 that was asked, sir, are you --
17         THE WITNESS:  Yes.  Yes.
18         MR. DRISCOLL:  -- definitively refusing?
19     A    Okay.  I object to the word dust bomb.  Dust
20 words, dust bomb.  And I'm not going to answer that, no.
21 BY MS. HAMILTON:
22     Q    Okay.  Was it permissible under the provision
23 of the contract that is in quotes that I've read to you
24 and showed you to let dust circulate through the
25 neighborhood after the Crawford demolition?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      MR. DEVRIES:  In addition to MCM's standing
2  objection, I object to the form of the question.
3      A    The day of the event or every day that dust
4  left the site?  Dust left that site every day of the
5  week.  Trust me.
6      Q    After the implosion, the day of the implosion,
7  was it permissible under this provision of the contract
8  to let dust circulate through the neighborhood?
9      MR. DEVRIES:  Same standing objections and form
10  and vague.
11      A    Yeah.  Yeah, it's vague.  And -- and it's not
12  for me to interpret their contract.  You talk to me
13  about my contract with MCM, I'll be extremely specific
14  on how it's interpreted and -- and stuff of that nature,
15  but this is not my responsibility.
16      Q    So are you also refusing to answer this
17  question?
18      A    I just did.  I -- I -- you're asking for --
19  for me to interpret someone else's writings.
20      MR. DEVRIES:  Yeah, I --
21      A    I -- I can't do that.  You're asking me to --
22  to -- to, you know, opine on something that -- that I
23  have no -- A, I have never read before, nor did I write
24  or B, did I have a chance to read it before today.
25      MR. DEVRIES:  This is MCM.  I just want to put

1  on the record the witness is answering these
2  questions.  I mean, and to treat him --
3      MR. DRISCOLL:  No he's not.
4      MR. DEVRIES:  -- as he's not.  He is.
5      MR. DRISCOLL:  No he is not.
6      MR. DEVRIES:  He answered them, Sean.  You
7  don't like his answer.
8      MR. DRISCOLL:  This is Plaintiff Sean Driscoll
9  representing in the state matter.  He is not
10  answering the questions.
11      MR. RICE:  I would completely object, Sean.
12  He's answered this question more than once and has
13  provided the fact that he doesn't have an opinion on
14  this.  I don't know how else you want him to answer
15  the question, but --
16      MR. DRISCOLL:  He is not answering the
17  questions.  And if we want to go in and we can sit
18  here and we can argue a little bit more, but we'll
19  go in on a motion, but he is not answering the
20  questions.  And for him to also pontificate of
21  saying how a question is vague is also
22  inappropriate.  Counsel was correct before to
23  indicate that there were inappropriate speaking
24  objections.  So either he is going to answer it, or
25  he is not going to answer it.

1  BY MS. HAMILTON:
2      Q    Mr. Zukowski, can you answer yes or no, was it
3  permissible under the provision of the contract that
4  I've read that's quoted here whether to let dust
5  circulate through the neighborhood on the day of the
6  implosion?
7      MR. DEVRIES:  MCM raises its standing
8  objections and also form.
9      MR. RICE:  CDI joins.
10      MR. SMITH:  Hilco joins.
11      A    I'm just reading it again.  Contracts will
12  take all required measures to prevent the impacts to the
13  property in any from da, da, da, da.  The -- in my
14  opinion, MCM took those measures to prevent the impacts.
15  They made the attempt to control the dust.
16  BY MS. HAMILTON:
17      Q    Okay.  So in your opinion, did MCM breach this
18  provision of the contract?
19      MR. DEVRIES:  Asked and answered.  Standing
20  objections, not listening to his last answer.
21      MS. HAMILTON:  That's not an objection.
22      MR. DEVRIES:  Yeah.  Well, it's frustrating to
23  hear the same question over and over again when he
24  has answered it.
25      MS. HAMILTON:  Well, I appreciate that you feel

1  that way, but you can make objections, state what
2  your basis of your objection is, and please don't
3  make speaking objections.  Can you answer the
4  question, Mr. Zukowski?
5      MR. DEVRIES:  I'll withdraw my last part of my
6  objection.
7      MR. RICE:  CDI joins, asked and answered.
8      MR. SMITH:  Hilco joins, form.  Foundation.
9  BY MS. HAMILTON:
10      Q    You can answer.
11      A    I answered my last answer.  I believe the
12  contractor took required measures the day of to mitigate
13  the dust.
14      Q    So in -- is your answer that you believe that
15  MCM did not breach its agreement with Hilco, the
16  provision that I've read?
17      MR. DEVRIES:  MCM makes the same objections to
18  the last several questions.
19      MR. RICE:  CDI joins.
20      MR. SMITH:  Hilco joins.
21  BY MS. HAMILTON:
22      Q    You can answer.
23      A    It's not a yes or no answer.  It -- it can't
24  be yes or no.  It -- you're asking me specific questions
25  about things that are not my responsibility, nor do I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 162

1 have any knowledge of prior to seeing this put in front
2 of my face ten minutes ago.
3     Q    So you cannot answer the question yes or no as
4 to whether or not MCM breached its agreement, breached
5 this provision of the agreement with Hilco, you cannot
6 answer that question yes or no?
7     A    I cannot answer that question yes or no.
8     Q    Okay.  In your opinion, did CDI breach its
9 agreement with MCM?
10     A    No.
11     Q    Okay.  You can put this exhibit down.  Thank
12 you, Lindsay.  Did you have any involvement in Community
13 Outreach after the demolition?
14     A    No, the structure was on the ground, and we
15 left.
16     Q    Do you know what Hilco or MCM did with regard
17 to Community Outreach following the demolition?
18     A    No.
19     Q    Did you have any conversations with Hilco or
20 MCM about Community Outreach after the demolition?
21     A    No.
22     Q    Did you have any involvement in testing the
23 off-site dust after the demolition?
24     A    No.
25     Q    Do you know whether Hilco or MCM tested the

Page 163

1 off-site dust after the demolition?
2     A    I know somebody did.  There's reports out
3 there.  I haven't seen them, but I was made aware of
4 them.
5     Q    Do you know who tested the off-site dust?
6     A    No.
7     Q    Did you have any conversations with Hilco or
8 MCM about testing the off-site dust after the
9 demolition?
10     A    No.
11     Q    Did you have any involvement in any
12 remediation efforts in the Little Village neighborhood
13 after the demolition?
14     A    No.
15     Q    Did you talk to any Little Village residents
16 after the demolition?
17     A    No.
18     Q    Did you provide any supplies to any Little
19 Village residents such as air furnaces -- air furnace
20 filters or masks?
21     A    No.
22     Q    Did you undertake any street sweeping measures
23 of the areas impacted by the demolition?
24     A    No.
25     Q    Do you know what Hilco did with regard to

Page 164

1 remediation efforts after the demolition?
2     A    No.
3     MR. SMITH:  Michael Smith, Hilco, objection.
4 Form and foundation.
5     Q    Do you know what MCM did with regard to
6 remediation efforts after the demolition?
7     MR. DEVRIES:  MCM objects.  Form and
8 foundation.
9     Q    I didn't hear your answer if you gave one.
10     A    No, the answer is no.
11     Q    Did you have any conversations with Hilco or
12 MCM about remediation efforts after the demolition?
13     A    No.
14     MS. HAMILTON:  Okay.  Can we take a ten-minute
15 break?
16     COURT REPORTER:  Yeah.  We are going off the
17 record.  The current time is 3:26 p.m. Eastern
18 Standard time.
19     (OFF THE RECORD)
20     COURT REPORTER:  All righty.  We are back on
21 the record for the deposition of Ray Zukowski on
22 February 6, 2023.  The current time is 3:41 p.m.
23 Eastern Standard Time.  You may continue.
24     MS. HAMILTON:  Mr. Zukowski, I don't have any
25 further questions for you.  Some of the other

Page 165

1 plaintiff's counsel will ask you questions next.
2 Thanks you for -- thank you for your time.
3     THE WITNESS:  You're welcome.  Thank you.
4     MR. DRISCOLL:  I'm assuming Carrie and
5 Stephanie, do you mind if I go next?
6     MS. COTTER:  Go ahead.
7     CROSS EXAMINATION
8 BY MR. DRISCOLL:
9     Q    Mr. Zukowski, my name is Sean Driscoll.  How
10 are you today?
11     A    I'm doing well, thank you.
12     Q    Good.  Explain to me what CDI does for its
13 business.
14     A    We travel the world, and we blow things up.
15     Q    So do you consider yourself an implosion
16 expert?
17     A    Yes.
18     Q    And how long have you been an implosion expert
19 for?
20     A    Well, that's a -- that would be -- that would
21 be my boss' call, not mine.
22     Q    All right.
23     A    Obviously when I -- when -- when I first
24 started 27 years ago, I didn't know any of it.
25     Q    Got you.  Well, let me ask you this.  At the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 44 of 49 PageID #:1858
The Deposition of RAYMOND ZUKOWSKI, taken on January 6, 2023
166..169

Page 166

1  time of this implosion, did you consider yourself an
2  implosion expert?
3      A    Yes.
4      Q    And it's my understanding that as part of
5  CDI's business, they've imploded hundreds if not
6  thousands of chimneys, correct?  Or smokestacks?
7      A    Definitely -- definitely hundreds.
8      Q    Definitely hundreds.  And when doing the
9  implosion, you guys essentially incorporate and utilize
10  methodologies for speed and efficiency, correct?
11      A    To -- to bring it to grade or --
12      Q    Yeah.
13      A    Yes.  It's -- it's a -- it's a faster method.
14      Q    All right.  And the reason why you do that is
15  you want to limit the exposure to personnel and
16  facilities to any potential risks, correct?
17      A    Not us, but our -- our clients.  Again, we get
18  asked to do this.  We're not, you know, knocking on doors
19  saying, "Hey, I think you -- you should let us do this,"
20  so we're assisting our --
21      Q    Well, I --
22      A    We're assisting our clients in a -- a quicker,
23  time saving, and cheaper method.
24      Q    And your client in this case was MCM?
25      A    Yes.

Page 167

1      Q    All right.  And prior to this, how many
2  different occasions do you think you actually imploded a
3  smokestack similar to the one that was subject to this
4  litigation for MCM?
5      A    No, it's -- can we not use the word
6  smokestack?  It's -- it's not -- technically incorrect.
7  So --
8      Q    All right.  Would you rather use chimney?
9      A    Chimney, please, yes.
10      Q    All right.
11      A    Yes.
12      Q    And I appreciate it.  If there's any part in
13  this deposition where you prefer different nomenclature
14  that is more specific to your industry, let me know so
15  at least we're speaking on the same terms, okay?
16      A    Will do.
17      Q    So we're talking about chimneys.  Prior to
18  this implosion, on how many occasions do you think you
19  did an implosion of a chimney for MCM?
20      A    Me personally, I don't believe I've -- I've
21  done -- I'd have to check the -- the -- the files, but
22  I'm -- I'm -- I'm assuming we've done other chimneys for
23  MCM.  I know we've done numerous other projects.
24      Q    In any given year, how many contracts have you
25  executed with MCM to do some type of demolition or

Page 168

1  implosion?
2      A    No year's typical, but this year we had, you
3  know, two projects running concurrently as we talked
4  about earlier, with the Beckjord project and the
5  Crawford project.
6      Q    Got it.  And have you taken the OSHA 30?
7      A    Have I?
8      Q    Yes.
9      A    I know I've done HAZWOPER.  I don't think I've
10  taken specifically
11  30.
12      Q    Okay.
13      A    Did HAZWOPER before.
14      Q    Do you have a CV or anything like that, that
15  specifically delineates which OSHA courses you've taken?
16      A    It's -- yes, I have a CV, and it would be on
17  there in training.
18      Q    Okay.  Are you aware that OSHA has a dust
19  mitigation course for construction training?
20      A    I'm not aware, no.
21      Q    All right.  Have you or anyone working for CDI
22  taken the OSHA course regarding dust mitigation for
23  construction training?
24      A    Not to my knowledge, unless it's part of the
25  OSHA 30 overall course.

Page 169

1      Q    Well, let me ask you this.  You in your, you
2  know, experience of being an expert in implosion, have
3  you ever taken a course by any entity or seminar
4  regarding dust mitigation?
5      A    I have not, no.
6      Q    Have you ever been contracted to handle dust
7  mitigation services or measures on a construction
8  project?
9      A    No.
10      Q    Okay.  If you had to describe for someone what
11  MCM does for a business, how would you do that?
12      MR. DEVRIES:  Just MCM will object to
13  foundation.
14      Q    All right.  Here, let me rephrase, and I'll
15  set the foundation.  You have worked with MCM on multiple
16  occasions, true?
17      A    True.
18      Q    You have negotiated multiple contracts with
19  MCM, true?
20      A    Two, specifically.  Yes.
21      Q    What is your general understanding of what MCM
22  is in the business of doing?
23      MR. DEVRIES:  Same.  MCM will still object to
24  foundation.  You can answer.
25      A    They're a demolition contractor.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 170

1    Q    All right.  And if you had to explain to 12
2  people who aren't in the construction industry, and
3  don't do what you do, what a demolition contractor is,
4  how would you describe that to them?
5    A    They take down buildings and bridges and
6  chimneys.  I mean, they -- they demolish things, and I
7  don't know any other way to say it.
8    Q    All right.  And when they're -- would you
9  agree with me when taking down certain structures such
10 as chimneys, they have an obligation to do dust
11 mitigation measures, true?
12       MR. DEVRIES:  Object to the form.  Foundation.
13       MR. RICE:  CDI joins.
14       MR. DEVRIES:  That's MCM, I'm sorry.
15 BY MR. DRISCOLL:
16    Q    Is -- you would agree with me that, as a
17 demolition contractor with your 27 years' experience in
18 the industry, that they need to take measures for dust
19 mitigation, true?
20       MR. DEVRIES:  MCM objects to form.  Foundation.
21    Q    You can answer.  I can't hear you because he's
22 objecting and you're answering at the same time, and
23 we're on Zoom, and so can you answer the question, sir?
24    A    Yes, they should be, you know -- dust is part
25 of any demotion project, and obviously they're a

Page 171

1  demolition contractor.
2    Q    Okay.  And I understand that it's part of
3  every project.  My question is very specific.  Would you
4  agree with me that MCM must take dust mitigation
5  measures when they are the contractor handing --
6  handling the demolition of a chimney?  Yes or no?
7       MR. DEVRIES:  MCM objects to the form.
8  Foundation, calls for speculation.
9       MR. RICE:  CDI joins.
10       MR. DRISCOLL:  Did we get an answer, Lindsay?
11    A    No, I didn't -- no, I didn't answer.  Yes,
12 I'll answer the question yes.
13 BY MR. DRISCOLL:
14    Q    All right.  So with your 27 years of
15 experience in the industry, and your review of your
16 contract -- I'll strike that.  With your 27 years in the
17 industry, in your review of CDI's contract with MCM, is
18 it your understanding that MCM had responsibility for
19 dust mitigation?  Yes or no?
20    A    Yes.
21    Q    All right.  And was it your understanding that
22 Hilco was the primary entity responsible for obtaining
23 the permits for the demolition of the chimney?
24       MR. SMITH:  Objection.  Form.  Foundation.
25    Michael Smith for Hilco.

Page 172

1    Q    Sir, you can answer.
2    A    Yes.
3    Q    All right.  And with your 27 years of
4  experience in the industry and getting demolition
5  permits, it's your understanding that the person who
6  procures the permit is also responsible for dust
7  mitigation, true?
8       MR. SMITH:  Michael Smith, Hilco, objection.
9  Form.  Foundation.
10       MR. DEVRIES:  MCM will join.
11 BY MR. DRISCOLL:
12    Q    My statement is true, correct?
13    A    No.
14    Q    Are you saying that the City of Chicago does
15 not put in -- does not have regulations or rules in
16 which someone who obtains a permit for demolition must
17 have a dust mitigation plan?
18    A    CDI's responsibility on this project was to
19 assist in explosives demolition permit, period.
20    Q    Sir, that is not my question.  My question is
21 --
22    A    That's, again, I -- I -- I don't know.  I do
23 not -- I do not know.
24    Q    Let me finish my question, sir.  My question
25 is a yes-or-no question, and I will ask my question, and

Page 173

1  you can answer.  And if you can't answer it, then you
2  can state for the record why you can't, all right?  I'm
3  the one asking the questions in this, just like counsel
4  before me.  Is it your testimony here under oath, as an
5  implosion expert who has done work in the City of
6  Chicago, that the person who obtains the permit does not
7  need to have a dust mitigation plan in place?  Is that
8  your short testimony under oath for a implosion expert
9  that does work in Cook County, yes or no?
10       MR. SMITH:  Michael Smith, Hilco, objection.
11  Form.  Foundation.
12       MR. DEVRIES:  MCM will join.
13       MR. RICE:  CDI joins.
14    A    I'll ask one more question.  Which permit are
15 you referring to?
16 BY MR. DRISCOLL:
17    Q    Well, which permit had to do with the
18 implosion of the chimney?  The one you were working on?
19    A    The blasting permit.
20    Q    All right.  So if there is a blasting permit
21 that may create dust that may escape the construction
22 site, is it your testimony under oath, for someone who
23 does work in Chicago, that the person who obtains the
24 permit does not need to have a dust mitigation program?
25 Yes or no?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 174

1    MR. SMITH: Michael Smith, Hilco, objection.
2  Form. Foundation.
3    MR. DEVRIES: MCM will join.
4    MR. RICE: CDI joins.
5  BY MR. DRISCOLL:
6    Q   You can answer.
7    A   No, it is not applicable to CDI's permit.
8    Q   I didn't ask about CDI's permit.
9    A   Then ask me --
10   Q   In your 27 years in the experience, who do you
11 believe was responsible for the dust mitigation services
12 for this project?
13   A   MCM.
14   Q   Who is responsible for Community Outreach?
15   A   Community Outreach is -- it's no one's
16 responsibility.  It's a joint effort.  There's no --
17   Q   All right.
18   A   There's no regulations regarding Community
19 Outreach.
20   Q   Well, that wasn't my question.  I asked for
21 this construction project, who did you understand was
22 responsible for Community Outreach?
23   A   Hilco.
24   Q   Would you agree with me that the most common
25 methods for controlling demolition dust are surface

Page 175

1  wetting and airborne capture?
2    A   Yes.
3    Q   Would you agree with me that with surface
4  suppression, the goal is to prevent dust problems by
5  wetting the source before particles can become airborne?
6    A   Partially, yes.  It -- as respects the -- the
7  -- the soil, dust generated from soil on the ground,
8  yes.
9    Q   Did you actually see the saturation of the
10 construction site prior to the implosion?
11   A   I was on-site -- go ahead.
12       MR. RICE: Objection to asked and answer, but
13   go ahead, Ray.
14   Q   And I appreciate that Andrew.  I'm not trying
15 to be difficult.  I don't think -- I'm going to ask you
16 where you were, and how long you're on the job site, but
17 I don't know if it was actually answered.  So did you
18 actually see any of the wetting of the actual
19 construction site prior to the implosion?
20   A   Yes, I did.
21   Q   Okay.  And what was the method that you
22 observed being utilized?
23   A   MCM had the water trucks running and they had
24 the DustBosses set up.
25   Q   Okay.  Do you know how long those trucks had

Page 176

1  been running, at least in time proximity to the point of
2  implosion?
3    A   No.
4        MR. RICE: Sorry to object, but asked and
5    answered, but go ahead, Ray.
6    Q   Okay.  And can you give me a -- I don't know,
7  where were you actually located on the job site at the
8  time of implosion?
9    A   I was at the command post.
10   Q   Okay.  Just bear with me a second.  I -- I've
11 got a lot of notes here, and since we were kind of
12 jumping around, I'm trying to avoid the objections that
13 your counsel is making.  So just give me a second.  Who
14 specifically directed you not to be involved in the
15 permitting process?
16   A   Hilco.  Nick from --
17   Q   Who at Hilco?
18   A   Nick.
19   Q   And how -- on how many occasions -- well, was
20 it in-person or was it solely via e-mail?
21   A   In-person.
22   Q   Okay.  And what did he specifically say to
23 you?
24   A   I can't remember word for word, but basically
25 it was that he was going to handle all the permitting.

Page 177

1    Q   Did that surprise you?
2    A   No, honestly it did not.
3    Q   On how many projects in Chicago had CDI been
4  involved in where they were not actively participating
5  in the permit process?
6    A   I can't answer that.  I wasn't involved in
7  every project in Chicago.  In the two previous jobs in
8  Chicago I was there for -- for help.  I wasn't part of
9  management.
10   Q   If I wanted to direct a specific request to
11 CDI to determine how many projects that they were
12 involved in Chicago, in let's say the last ten years
13 prior to this incident, is those records that are
14 usually kept by CDI to the best of your knowledge and
15 understanding?
16   A   Yes, we would have those records.
17   Q   In the two prior incidents, I know that it was
18 handled by someone else, and you were there for
19 assisting, but were -- was CDI involved in the permit
20 process during that time, on those two projects?
21   A   I -- I can't answer that.  I'm -- I'm -- I
22 will assume yes.
23   Q   Okay.  Based on your understanding and
24 experience working at CDI, you believe on the two other
25 projects that CDI was involved in the permitting

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 178

1  process, fair?
2      A    Fair.
3      Q    Now, the exclusion zone that was discussed
4  before, you were the original person who created that
5  document, correct?
6      A    Correct.
7      Q    And you had then tendered that document to the
8  other contractors on the site, including MCM as well as
9  Hilco, true?
10     A    Yeah.  Transmitted to MCM.
11     Q    And you then became aware that MCM had
12  transmitted that document to Hilco, correct?
13     A    Yes.
14     Q    And you became aware that that document was
15  being disseminated into the community, true?
16     A    Yes.  After they requested we take our name
17  off of it.
18     Q    Okay.  So after they made the request, you
19  understood that a document that you had been -- that you
20  had created was being utilized and disseminated out into
21  the community, true?
22     A    Yes, it's my understanding.
23     Q    Did you take any objection to Hilco
24  disseminating your work product into the community?
25     A    No.

Page 179

1      Q    Did you ask why they were disseminating the
2  work product into the community?
3          MR. SMITH:  Objection.  Foundation.  Michael
4      Smith for Hilco.
5      Q    Well, here, I want to know, did you yourself
6  ever object to say, "Hilco, no, my document, which
7  identifies the exclusion zone, I don't want you
8  disseminating that into the community"?  Did you do
9  that?  Yes or no?
10     A    No.
11     Q    Why not?
12     A    Because it was -- it showed the exclusion zone
13  and the road closures.
14     Q    Okay.  Well, what was your understanding of
15  why they were disseminating it into the Little Village
16  neighborhood?
17         MR. RICE:  Objection.  Calls for speculation.
18         MR. DRISCOLL:  I'm asking what his
19     understanding is.
20         MR. SMITH:  Hilco joins the objection.
21  BY MR. DRISCOLL:
22     Q    I'm very particular about my question.  I want
23  to know what your understanding was --
24     A    I know, I'll answer you.
25     Q    -- why -- let me get the question out again.

Page 180

1  I want to know what your understanding was of why the
2  document you created for the exclusion zone was being
3  disseminated into a community in the Chicagoland area
4  that was immediately adjacent to a property where you
5  were imploding a chimney.
6      A    So Hilco could make the community aware of
7  what road closures might be enforced, and timeline of
8  events.
9      Q    Was it your understanding that there was a
10  probability that there may be dust migration from the
11  construction site after your implosion into the
12  neighborhood?  Yes or no?
13     A    It could happen, yes.
14     Q    All right.  So when you allowed Hilco to use
15  your exclusion zone plan, you knew at that time that due
16  to the implosion that you were conducting, that there
17  may be dust migration into the neighborhood, true?
18     A    Partly, yes.
19     Q    All right.  And is it your testimony here
20  today that there was no obligation on your behalf to do
21  any dust mitigation?
22     A    Yes.  Contractually, it was outside of our
23  scope of work.
24     Q    Would you agree with me that the chimney was
25  being taken down as part of a larger project to improve

Page 181

1  the property for a development?
2      A    Yes.
3      Q    You would agree with me that this was an
4  active construction site?
5      A    Yes.
6      Q    All right.  Give me one last second here.  I
7  think I'm almost done.  Have you had any specific
8  conversations with Mark where he felt that MCM did not
9  do the proper job in dust mitigation?
10     A    Mark Loizeaux?
11     Q    Yeah.
12     A    Not that I recall, no.
13     Q    Did you have any concerns about Hilco handling
14  the permit process with the City of Chicago regarding
15  this project?
16         MR. SMITH:  Michael Smith, Hilco.  Object to
17     form.
18     A    No, I -- no, I did not.
19     Q    Why did you not have any concern with Hilco
20  handling the permit process?
21     A    Because of the way Nick involved everyone in
22  the permitting process.  He was very thorough.  I
23  thought he did a very good job, and I didn't feel CDI's
24  interests were not being served.
25     Q    So you felt that CDI's interests were being

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-02348 Document #: 262-2 Filed: 04/15/24 Page 48 of 49 PageID #:1862
The Deposition of RAYMOND ZUKOWSKI, taken on January 9, 2023

182..185

Page 182

1  served by Hilco during the permit process, true?
2      A    Yeah.
3      Q    Did you think that the community's interests
4  were being served during the permit process?
5      A    The community and the permit don't have any
6  correlation.
7      Q    Okay.  So it's your testimony, after 27 -- 27
8  years of experience, that when they're blasting a
9  chimney that may cause dust migration, that the
10  community has no interest during the permit process and
11  their interest should not be considered?  That's your
12  testimony here today, true?
13      A    True.
14      Q    Why did Mark want the City of Chicago and its
15  agency to know that your client, MCM, and Hilco, the
16  property on notice, that Hilco as assuming the
17  responsibility for getting the permit?
18      A    Just --
19          MR. SMITH:  Michael Smith, Hilco.  Object to
20  foundation.
21      A    Just --
22      Q    You can answer.
23      A    Just to make sure that nothing was missed that
24  would put CDI in harm's way.
25      Q    Okay.  Well, describe for me in detail what

Page 183

1  you did to make sure that CDI was not put in harm's way
2  during the implosion of the smokestack.
3      A    That's kind of vague question.  I'm not really
4  sure what you're asking.
5      Q    Well, you just said you wanted all the --
6  CDI's interests.  How were CDI's interests protected by
7  Hilco and the MCM during the permit process until the
8  date of the implosion?
9      A    Just to make sure that nothing was said out of
10  turn, you know, specifically as it relates to explosives
11  handling and operations.
12      Q    Do you think that the dust cloud that went
13  over the Little Village neighborhood was an appropriate
14  amount of dust after the implosion to leave the
15  exclusion zone and go into neighborhood?
16          MR. RICE:  Object to the term "appropriate,"
17  but go ahead, Ray, if you understand.
18      A    Well --
19      Q    Ray, do you know what the word "appropriate"
20  means?
21      A    Yeah.  I'll answer your question.  It was --
22  again, I -- it -- this question was asked before.  It
23  wasn't more than expected and it wasn't less than
24  expected.
25      Q    So you --

Page 184

1      A    So I'm -- the same amount of dust that you
2  would expect from something nearly 400 feet tall.
3      Q    So it's your testimony here that the Little
4  Village neighborhood was covered in the appropriate
5  amount of dust after an implosion performed by CDI,
6  true?
7      A    That's --
8          MR. DEVRIES:  Same objection to the form of the
9  question and that it misstates his testimony.
10          MR. RICE:  CDI joins.
11  BY MR. DRISCOLL:
12      Q    You can answer.
13          MR. SMITH:  Hilco joins.
14      A    My answer is no.
15          MR. DRISCOLL:  All right.  I have no further
16  questions.  Ray, you have a good one.  It was nice
17  meeting you, okay?
18          THE WITNESS:  Take care.  Thank you.
19          MR. RICE:  Anybody else have some questions for
20  Mr. Zukowski? Hearing none, I guess we're done for
21  today; is that accurate?  Anybody have any questions
22  for him?
23          MS. COTTER:  I don't.
24          MR. RICE:  Okay.
25          MR. DEVRIES:  MCM does not.

Page 185

1          MR. SMITH:  None for Hilco.
2          MR. LYMAN:  None for Marine Technology
3  Solutions.
4          MR. OLSEN:  This is Ed Olsen.  No questions.
5          MR. RICE:  I'm sure the Strellis firm
6  responded, but I guess I didn't catch that.
7          MS. COTTER:  Yeah.  No further questions from
8  the Strellis firm.
9          MR. RICE:  All right.  Then I think we're done,
10  Ray.
11          COURT REPORTER:  Before we get going, I do have
12  -- Mr. Zukowski, did you want to read or waive
13  today?  So you have the ability to read the
14  transcript, to review the transcript for any
15  inaccuracies.  So did you want to read, or did you
16  want to go ahead and waive on that today?
17          THE WITNESS:  Read it, like, right now?
18          COURT REPORTER:  Oh, no.
19          THE WITNESS:  I'll defer to Andrew on this.
20          MR. RICE:  Reserve signature.  We'll have
21  Mr. Zukowski review it.
22          COURT REPORTER:  Okay.  And then let's go ahead
23  and get orders while we're still on record.  That
24  read and sign, are we sending that to you, Mr. Rice?
25          MR. RICE:  That's fine.  Yes, you can send it



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 186

1  to me.
2      COURT REPORTER:  Okay.  And then, Ms. Hamilton,
3  how would you like a copy of the transcript today?
4      MS. HAMILTON:  I don't think we're going to
5  order at this time, actually.
6      COURT REPORTER:  Okay.  What about the video?
7  Same for the video?
8      MS. HAMILTON:  Yep.  Same for the video.
9      COURT REPORTER:  Okay.  Mr. DeVries, transcript
10  and/or video today?
11      MR. DEVRIES:  No video certainly.  I'll take a
12  copy if it's going to be written up.
13      COURT REPORTER:  Uh-huh.  All right.  And then
14  let's see.  Mr. Smith, would you like a copy of the
15  transcript and/or video today?
16      MR. SMITH:  If we have a standing order, if my
17  firm as a standing order, let's do that.
18      COURT REPORTER:  Okay.
19      MR. SMITH:  So yeah, let's do that.  And if
20  not, you can get in touch with me, and we'll figure
21  it out.
22      COURT REPORTER:  Yeah.  All right.  Mr. Rice,
23  would you like a copy of the transcript and/or video
24  today?
25      MR. RICE:  Just the transcript.  E-tran is

Page 187

1  fine.  No video.
2      COURT REPORTER:  Okay.  All right.  Is
3  Mr. Lyman still on the call?
4      MR. LYMAN:  Yes, I am, Lindsay.  Neither for
5  me.  Thank you.
6      COURT REPORTER:  Okay.  Mr. -- so it looks like
7  Mr. Beribak hopped off.  Mr. Olsen, do you know if
8  your firm -- if you-all would like to order a
9  transcript and/or video today?
10      MR. OLSEN:  Definitely not the video.  I'll ask
11  John to do any ordering because I just kind of
12  jumped on here on this.
13      COURT REPORTER:  Okay.
14      MR. OLSEN:  I appreciate it.  Thank you.
15      COURT REPORTER:  And then anybody from Strellis
16  firm --
17      MS. COTTER:  Yes.
18      COURT REPORTER:  -- are we ordering a copy of
19  the transcript and/or video?
20      MS. COTTER:  We'll take a copy of -- a PDF copy
21  of the transcript, please, not the video.
22      COURT REPORTER:  Okay.  And then I -- is
23  Mr. Driscoll still on?  Mr. Driscoll, are you still
24  there?  Okay.  I'll just reach out to him via
25  e-mail.  That is all I have for on-record stuff.  I

Page 188

1  do just have one spelling, but let me go ahead and
2  hop us off the record real quick.  All right.  This
3  concludes the deposition of Ray Zukowski on February
4  6, 2023.  The current time is 4:08 p.m. Central
5  Standard Time [sic].
6      (DEPOSITION CONCLUDED AT 4:08 P.M. (ET))

Page 189

1              CERTIFICATE OF REPORTER
2              STATE OF ILLINOIS
3
4      I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page here of by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded digitally by me and then reduced to
10  type written form under my direction, and constitutes a
11  true record of the transcript as taken, all to the best
12  of my skill and ability. I certify that I am not a
13  relative or employee of either counsel, and that I am in
14  no way interested financially, directly or indirectly,
15  in this action.
16
17
18
19
20
21
22  LINDSAY LARSON-TODD,
23  COURT REPORTER / NOTARY
24  MY COMMISSION EXPIRES ON: 11/01/2023
25  SUBMITTED ON: 02/14/2023

LINDSAY LARSON TODD
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 1, 2023

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS